**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**(Norfolk Division)**

|  |  |  |
|---|---|---|
| | ) | |
| THE RADIANCE FOUNDATION, INC. | ) | |
| and RYAN BOMBERGER, individually, | ) | |
| | ) | |
| Plaintiffs/Counterdefendants, | ) | |
| | ) | |
| v. | ) | Case No. 2:13-cv-53 (RAJ/LRL) |
| | ) | |
| NATIONAL ASSOCIATION FOR THE | ) | |
| ADVANCEMENT OF COLORED PEOPLE, | ) | |
| | ) | |
| Defendant/Counterclaimant. | ) | |
| | ) | |

**OPPOSITION OF DEFENDANT/COUNTERCLAIMANT NATIONAL ASSOCIATION**
**FOR THE ADVANCEMENT OF COLORED PEOPLE TO**
**PLAINTIFFS/COUNTERDEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

COMES NOW Defendant/Counterclaimant National Association for the Advancement of

Colored People ("NAACP"), by counsel, and submits its Opposition to the Motion for Summary

Judgment (the "Motion") filed by Plaintiffs/Counterdefendants The Radiance Foundation, Inc.

and Ryan Bomberger ("Plaintiffs") in the captioned matter.  For the reasons set forth herein,

Plaintiffs' Motion -- filed prior to the commencement of discovery in this case -- is premature,

relies on conclusory and self-serving assertions on matters that are inherently fact-based and

issues for trial, and takes positions that are at odds with governing law.

**INTRODUCTION**

It is important to emphasize at the outset what this case is and is not about.  This is not a

case where the NAACP seeks to suppress free speech, as Plaintiffs would have the Court believe.

This case concerns the unlawful and adulterated use of the NAACP's protected and famous

trademarks, in conjunction with the name "The National Association for the Abortion of Colored

People," in support of a commercial "ad campaign" that infringes upon the NAACP's rights in those marks, and dilutes and tarnishes the NAACP's reputation and goodwill.  Plaintiffs' activities here are precisely of the type that the courts have found to constitute "use in commerce . . . in connection with the sale, offering for sale, distribution, or advertising of any goods or services" and are thus subject to the restrictions and prohibitions of the Lanham Act.

Plaintiffs cannot hide behind their meritless First Amendment argument to avoid liability for engaging in conduct that creates a likelihood of confusion on the part of the "ordinary consumer" as to: (1) whether the NAACP has approved or sponsored the Plaintiffs' ad campaign; (2) whether the "National Association for the Abortion of Colored People" is an actual organization affiliated with the NAACP; (3) whether the NAACP has changed its name to "The National Association for the Abortion of Colored People;" or (4) whether "The National Association for the Abortion of Colored People" is an actual organization *not* affiliated with the NAACP.

Further, Plaintiffs are not immune under the First Amendment from using a name that tarnishes the NAACP's reputation by misrepresenting not only its positions regarding abortion but also the central mission of the organization itself.

At the very least, the NAACP's trademark infringement and dilution claims raise issues of fact for trial, which cannot be adjudicated at this early stage of the proceedings before discovery has even begun.  Accordingly, Plaintiffs' Motion should be denied.

### COUNTERSTATEMENT OF THE CASE

In January 2013, the NAACP learned through an alert generated by the Google Internet search engine for the "NAACP" name that Plaintiffs had posted material on their websites located at www.theradiancefoundation.com (the "Radiance Site") and

2

www.toomanyaborted.com (the "TooManyAborted Site") (together referred to herein as the "Plaintiffs' Sites") in which they used the registered NAACP mark and the NAACP Seal together with the name "The National Association for the Abortion of Colored People."  Each of these websites displayed on its homepage the name "The National Association for the Abortion of Colored People."  By clicking the live hyperlink at that name, a visitor to each site was taken to a page that prominently displayed the name "The National Association for the Abortion of Colored People" (or, on the Radiance Site, "NAACP:  National Association for the Abortion of Colored People").  On the TooManyAborted Site, the following graphic was prominently displayed immediately below the heading:



In the text appearing immediately beneath the heading and the graphic, Plaintiffs used the registered NAACP mark interchangeably with "The National Association for the Abortion of Colored People."  Plaintiffs even stated in a separate posting that the NAACP "has become the National Association for the Abortion of Colored People."  The Plaintiffs also posted material on the website at the URL www.lifenews.com (the "LifeNews Site") which prominently displayed

3

the NAACP Seal next to an article containing the heading "The National Association for the Abortion of Colored People."

The "National Association for the Abortion of Colored People" page of the TooManyAborted Site links to another page on that site entitled "Expose the Lies. Sponsor a Billboard," where the Plaintiffs solicit money in exchange for the sponsorship of billboards, licensing artwork, design of customized websites, website hosting, content creation, and extensive research on abortion issues by state. The page contains a contract form which a visitor can complete on-line and thereby enter into a commercial transaction with the Plaintiffs.

By engaging in the activities described above, Plaintiffs have used "in commerce" the registered NAACP mark, the NAACP Seal, and the name "The National Association for the Abortion of Colored People" "in connection with the sale or offering for sale of goods and services," thus falling within the scope of the Lanham Act, 15 U.S.C. § 1051 *et seq.* The Plaintiffs' uses of the registered NAACP mark and the NAACP Seal in tandem with the name "The National Association for the Abortion of Colored People" create the likelihood that members of the general public will be confused into believing (1) that "NAACP" is the acronym for "National Association for the Abortion of Colored People" or that the NAACP has changed its name to "The National Association for the Abortion of Colored People," and (2) that the NAACP has approved of or sponsored, or otherwise endorsed the postings on the Plaintiffs' Sites such that people would attribute the views expressed on those sites with the NAACP.

In addition, the Plaintiffs' uses of the registered NAACP mark together with the name "The National Association for the Abortion of Colored People" dilute and tarnish the NAACP marks and the goodwill and reputation associated with this 103-year-old organization. This use

4

falsely suggests that the NAACP supports abortion and, indeed, that its principal mission is the abortion of African-Americans and other people of color.

Faced with this unlawful use of its valuable marks and adulteration of its name, the NAACP, through counsel, sent a letter to Plaintiffs dated January 28, 2013 in which the NAACP demanded that Plaintiffs cease and desist from any further infringement or dilution of its marks. In that letter, the NAACP's counsel stated that "[w]hile you are certainly entitled to express your viewpoint, you cannot do so in connection with a name that infringes on the NAACP's rights." (Declaration of Benjamin Todd Jealous, dated May 13, 2013 ("Jealous Dec."), at ¶ 16. Instead of responding to the NAACP's letter, Plaintiffs filed suit in this Court on February 5, 2013 seeking a declaratory judgment that their conduct is not in violation of the Lanham Act. The NAACP thereafter filed, on April 8, 2013, its Answer and Counterclaim, in which it asserted claims against the Plaintiffs for trademark infringement, false designation of origin, and trademark dilution under the Lanham Act, and for trademark infringement and unfair under Virginia common law.

**STATEMENT OF MATERIAL FACTS IN DISPUTE**

Pursuant to Local Rule 56(B) of the United States District Court for the Eastern District of Virginia, the NAACP sets forth the following statement of material facts in dispute:[1]

1. Undisputed.

2. Undisputed.

3. Undisputed.

4. Undisputed.

5. Undisputed.

---

[1] The numbered paragraphs herein correspond to the numbered paragraphs in Plaintiffs' Statement of Undisputed Facts.

6. Undisputed.

7. Undisputed.

8. Undisputed.

9. Undisputed that Plaintiffs used "NAACP" to refer to the NAACP. Disputed as to the use of the name "The National Association for the Abortion of Colored People," which is a fictitious alteration of the NAACP's mark and creates a likelihood of confusion among consumers and tarnishes the reputation of the NAACP. Jealous Dec. at ¶ 17-18.

10. Undisputed.

11. Undisputed.

12. Undisputed.

13. Undisputed.

14. Undisputed.

15. Undisputed.

16. Undisputed.

17. Disputed. The NAACP provides informational, educational, and community outreach services to members of the black community in the United States. *See* Jealous Dec. at ¶ 20.

18. Undisputed.

19. Undisputed.

20. Disputed. Plaintiffs have used the NAACP marks and the name "The National Association for the Abortion of Colored People" in commerce in connection with the

sale and offering for sale of Plaintiffs' goods and services.  Bomberger Dec., Exs. 1-6, 8-9.

21. Disputed.  Plaintiffs have used the NAACP marks and the name "The National Association for the Abortion of Colored People" in commerce in connection with the sale and offering for sale of Plaintiffs' goods and services.  Bomberger Dec., Exs. 1-6, 8-9.

22. Disputed.  Plaintiffs have used the NAACP marks and the name "The National Association for the Abortion of Colored People" in commerce in connection with the sale and offering for sale of Plaintiffs' goods and services.  Bomberger Dec, Exs. 1-6, 8-9.

23. Undisputed at this time, subject to what may be uncovered during discovery, which has yet to begin.

24. Undisputed.

25. Disputed.  Mr. Bomberger's Declaration states only that he has no personal knowledge of any such confusion.  Discovery in this matter has yet to begin, and the NAACP has yet to determine the scope and extent of any confusion caused by Plaintiffs' conduct.

26. Disputed.  The proffered fact is based entirely on Mr. Bomberger's self-serving, unsupported assertion.

27. Disputed.  Plaintiffs have used the NAACP mark and the name "The National Association for the Abortion of Colored People" interchangeably on their websites, and have stated that the NAACP "has become the National Association for the

Abortion of Colored People," all in connection with the Plaintiffs' offering of goods and services from their TooManyAborted Site.  Bomberger Dec., Exs. 1-6, 8-9.

28. Disputed.  Plaintiffs have used the referenced marks and the name "The National Association for the Abortion of Colored People" in commerce in connection with the sale, offering for sale, distribution and advertising of goods and services.  Bomberger Dec., Exs. 1-6, 8-9.

29. Disputed.  The referenced exhibits to Mr. Bomberger's Declaration do not support the proffered facts.

## ARGUMENT

### A.  The Summary Judgment Standard

When reviewing a motion for summary judgment, a court must view the evidence in the light most favorable to the party opposing the summary judgment motion, and draw all reasonable inferences in that party's favor.  *George & Co. LLC v. Imagination Entertainment Ltd.* 575 F.3d 383, 392 (4th Cir. 2009).  Where, as here, the parties have yet to engage in discovery, a district court should decline to grant summary judgment where the non-moving party has not had the opportunity to discover information necessary to oppose summary judgment.  *Sutton v. Roth*, *L.L.C.*, 361 Fed.Appx. 543, 549, (4th Cir. 2010).

In addition, " '[c]redibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment.' "  *Rosetta Stone Ltd. v. Google, Inc.*, 676 F.3d 144, 160 (4th Cir. 2012) (reversing district court's grant of summary judgment for defendant on plaintiff's trademark infringement and dilution claims) (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

**B.  Plaintiffs Are Not Entitled To Summary Judgment On The NAACP's Trademark Infringement, False Designation of Origin, and Unfair Competition Claims**

To establish a trademark infringement claim under the Lanham Act, a plaintiff must prove: (1) that it owns a valid mark; (2) that the defendant used the mark "in commerce" and without the plaintiff's authorization; (3) that the defendant used the mark (or an imitation of it) "in connection with the sale, offering for sale, distribution, or advertising" of goods or services; and (4) that the defendant's use of the mark is likely to confuse consumers.  *Rosetta Stone Ltd. v. Google, Inc.*, 676 F.3d at 152.

Here, Plaintiffs admit that the NAACP and NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE marks are owned and used by the NAACP, and that the NAACP mark is registered with the United States Patent and Trademark Office.  Pls. Brief at 6.  The federal trademark registration for the NAACP is incontestable, and thus is *prima facie* evidence of the NAACP's ownership of the mark, the validity of the mark and of the registration of the mark, and the NAACP's exclusive right to use the mark in connection with the goods and services set forth in the Certificate of Registration.  *See* 15 U.S.C. § 1115(b).

There also is no dispute that Plaintiffs have used the registered NAACP mark, the NAACP Seal, and the confusingly similar moniker "The National Association for the Abortion of Colored People" without the authorization of the NAACP.  Jealous Dec. at ¶ 16.  Moreover, as shown herein, Plaintiffs have used those marks and name in commerce in connection with the sale, offering for sale, distribution, or advertising of goods and services.  And at this early stage of the proceedings where discovery has yet to commence, there are at the very least material issues of fact as to whether Plaintiffs' use of the marks "is likely to confuse an ordinary consumer as to the source *or sponsorship* of the goods [or services]."  *Rosetta Stone* at 157 (emphasis in original).

9

1. **Plaintiffs' Use of the Registered NAACP Mark, the NAACP Seal, and the Name "The National Association for the Abortion of Colored People" is a Use "In Commerce" in Connection with the "Sale, Offering For Sale, Distribution, or Advertising Of Any Goods Or Services" and is Subject to the Lanham Act**

Plaintiffs blatantly gloss over or ignore entirely their own conduct that subjects them to the provisions of the Lanham Act. A review of the webpages accompanying Plaintiffs' Motion, together with the governing law, leads to the inescapable conclusion that Plaintiff's activities are precisely the type that the Lanham Act prohibits.

Section 32(1)(a) of the Lanham Act bars the unauthorized use "in commerce" of "any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or *services* [if] such use is likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114(1)(a) (emphasis added).[2] The term "services" has been interpreted broadly. As the court held in *N.A.A.C.P. v. N.A.A.C.P. Legal Defense and Educ. Fund*, the right to enjoin infringement of a trade or service mark "is as available to public service organizations as to merchants and manufactures." 559 F.Supp. 1337, 1342 (D.D.C. 1983), *rev'd on other grounds*, 753 F.2d 131 (D.C. Cir.), *cert. denied*, 472 U.S. 1021, 105 S.Ct. 3489, 87 L.Ed.2d 623 (1985).

As a result, the Lanham Act has been applied to parties furnishing a wide variety of non-commercial public and civic benefits, including informational services relating to the anti-abortion and anti-birth control movement, as Plaintiffs here provide. *See, e.g., Planned Parenthood Federation of America, Inc. v. Bucci*, 42 U.S.P.Q.2d 1430, 1436 (S.D.N.Y., Mar. 24,

---

[2]  Section 43(a) of the Lanham Act similarly prohibits the unauthorized use in commerce of "any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person." 15 U.S.C. § 1125(a)(1)(A).

10

1997), *aff'd*, 152 F.3d 920 (2d Cir. 1998) (defendant's solicitation of funds in relation to his anti-abortion activities was commercial in nature, and defendant's labeling of his web site with plaintiff's mark related to the origin, sponsorship, or approval by plaintiff of defendant's web site; Lanham Act held applicable);   *United We Stand America, Inc. v. United We Stand, America New York, Inc.*, 128 F.3d 86, 90 (2d Cir. 1997), *cert. denied*, 523 U.S. 1076, 118 S.Ct. 1521, 140 L.Ed.2d 673 (1998) (defendant political organization that was incorporated "to solicit, collect and otherwise raise money," and engaged in political organizing, issuing press releases, endorsing candidates, and distributing partisan political literature, though not undertaken for profit, "unquestionably render[ed] a service . . . .  We have no doubt that they satisfy § 1114(1)(a)'s requirement that the mark be used in connection with goods and services."); *Brach Van Houten Holding, Inc. v. Save Brach's Coalition for Chicago*, 856 F.Supp. 472, 475-76 (N.D. Ill. 1994) (group engaged in soliciting donations, preparing press releases, holding public meetings and press conferences, and organizing on behalf of its members' interests was performing "services" within the meaning of the Lanham Act); *Birthright v. Birthright, Inc.*, 827 F.Supp. 1114, 1138 (D.N.J. 1993) ("Although, strictly speaking, [the defendant's] fundraising letters were not commercial advertisements, Section 43(a)(1)(B) [of the Lanham Act] is broad enough to support, in the context of non-profit fundraising, a claim of false and misleading statements about the services presented by a protected mark.").

The case of *Christian Science Board of Directors of the First Church of Christ, Scientist v. Robinson*, 123 F.Supp.2d 965 (W.D.N.C. 2000) is instructive here.  In *Christian Science*, the defendant, Nolan, operated a website, which displayed the plaintiff's marks, to provide informational services to convince people that his version of Christian Science was the "true" version and posted material that was critical of the plaintiff.  Rejecting Nolan's contention that

11

he that did not engage in use of the plaintiff's mark under the Lanham Act because he was not offering anything for sale, the court held that "there is no profit requirement in the Lanham Act."[3]  *Christian Science*, 123 F.Supp.2d at 970.  The court further held as follows:

> ***The fact that Nolan criticizes the Plaintiffs does not provide immunity.*** [citation omitted] Moreover, as did Nolan, the defendant in *Planned Parenthood* solicited funds through the Internet and encouraged followers to enlist in his cause.  The "defendant offer[ed] informational services for use in convincing people that certain activities, including the use of the plaintiff[s'] services, are morally wrong.  ***In this way, defendant offers his own set of services, and [defendants'] use of plaintiff[s'] mark is in connection with the distribution of those services over the Internet***. . . . Thus, contrary to Defendants' position, the Lanham Act does apply to "the free distribution of information services" concerning the Defendants' religious beliefs on the Internet.

123 F.Supp.2d at 970-71 (emphasis added).

Plaintiffs' attempt to dodge the Lanham Act's prohibitions against the misleading and deceptive use in commerce of another's mark (or a confusingly similar mark) in connection with the offering of goods and services is equally unavailing.  Just as the defendant did in *Christian Science*, Plaintiffs here "solicit funds through the Internet and encourage[ ] followers to enlist in [their] cause," and "offer informational services for use in convincing people that certain activities, including the use of [the NAACP's services], are morally wrong."  As Plaintiffs confirm:

- "Radiance . . . presents speakers, seminars and conferences on social issues and it researches, prepares, and distributes news articles and high quality media regarding social issues." Bomberger Dec. at ¶ 6;

- "Radiance . . . solicits charitable contributions for its efforts at [the Radiance Site] and the [TooManyAborted Site]" and "encourages donors to give donations

---

[3]  As the *Christian Science* court observed, "the [Lanham] Act's requirement that an infringing use be 'in commerce' encompasses non-profit services."  123 F.Supp.2d at 970 (*citing United We Stand America*, 128 F.3d at 92-93).  *See also MGM Pathe Communications v. Pink Panther Patrol*, 774 F.Supp. 869 (S.D.N.Y. 1991) (group formed to offer the free service of protecting gay individuals from assault was subject to the Lanham Act).

designated for the purposes of creating and erecting billboards consistent with the TooManyAborted.com initiative." *Id*. at ¶ 33;

- "Radiance established [the TooManyAborted Site] and at that site presented information, news articles and videos educating the public about abortion and its disproportionate impact on African Americans." *Id*. at ¶ 8;

- "On its web sites, Radiance presents news articles relevant to its mission." *Id*. at ¶ 36;

- "Plaintiffs . . . used the [NAACP's] marks to comment and criticize Defendant's policies and support of abortion." Pls. Brief at 11, *citing* Bomberger Dec. at ¶¶ 30, 32. [4]

Thus, Plaintiffs are offering their own set of services in commerce, and their use of the registered NAACP mark, the NAACP Seal, and the confusingly similar moniker "The National Association for the Abortion of Colored People" is in connection with the sale, offering for sale, distribution, or advertising of Plaintiffs' services over the Internet. *See Christian Science* at 970-71. This commercial activity falls squarely within the scope of the Lanham Act.

## 2. <u>There Are Material Issues of Fact as to Whether Plaintiffs' Use of the Registered NAACP Mark, The NAACP Seal, and the Name "The National Association for the Abortion of Colored People" Is Likely To Confuse an Ordinary Consumer as to the Source, Affiliation, or Sponsorship of Plaintiffs' Goods and Services</u>

As this Circuit has recognized, "[l]ikelihood of confusion is 'frequently a fairly disputed issue of fact on which reasonable minds may differ,' . . . and has long been recognized to be 'a matter of varying human reactions to situations incapable of exact appraisement.'" *Anheuser-Busch, Inc. v. L&L Wings, Inc.*, 962 F.2d 316, 318 (4th Cir. 1992) (internal citations omitted).

---

[4] Plaintiffs gloss over the full extent of the goods and services offered on the TooManyAborted Site, referring generally to their "seeking contributions for the creation and erection of billboards furthering its mission, as well as the preparation of other media materials, including state specific web pages." Pls. Brief at 7. What Plaintiffs actually do on their TooManyAborted Site is solicit donations in exchange for the sponsorship of billboards, licensing artwork, design of customized websites, website hosting, content creation, and extensive research on abortion issues by state. The site even contains a contract form which a visitor can complete on-line and thereby enter into a commercial transaction with the Plaintiffs for these goods and services. *See* Exhibit 8 to Bomberger Dec.

13

Thus, this Circuit "has concluded that determining the likelihood of confusion is an 'inherently factual' issue that depends on the facts and circumstances in each case." *Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc.*, 43 F.3d 922, 933 (4th Cir. 1995). *See also Rosetta Stone*, 676 F.3d at 153 (reversing grant of summary judgment on plaintiff's trademark infringement and dilution claims, where district court "did not properly apply the summary judgment standard of review but instead viewed the evidence much as it would during a bench trial.").[5]

The Fourth Circuit has identified seven factors for determining whether a likelihood of confusion exists, but "not all these factors are always relevant or equally emphasized in each case." *Pizzeria Uno Corp. v. Temple,* 747 F.2d 1522, 1527 (4th Cir.1984) (internal quotation marks, citations, and brackets omitted). The factors are: "(1) the strength or distinctiveness of the mark; (2) the similarity of the two marks; (3) the similarity of the goods/services the marks identify; (4) the similarity of the facilities the two parties use in their businesses; (5) the similarity of the advertising used by the two parties; (6) the defendant's intent; (7) actual confusion." *Id.* (citation omitted).

Here, even if the Court were to deem it appropriate to undertake the "inherently factual" inquiry into likelihood of confusion based on a wholly undeveloped factual record and prior to any discovery, there are, at the very least, material issues of fact that preclude a grant of summary judgment.

---

[5]   It is important to note that the district court in *Rosetta Stone* had before it a fully-developed factual record, consisting of extensive discovery, depositions, and consumer surveys.

14

There can be no dispute that the NAACP's marks, used continuously for over 100 years, are strong, nor do Plaintiffs maintain otherwise.[6] *See Planned Parenthood*, 42 U.S.P.Q.2d at 1430 (defendant conceded the strength of plaintiff's mark, "which is reasonable in light of plaintiff's trademark registration of the mark and plaintiff's continued use of the mark for over 50 years."). Indeed, the strength of the mark is the "paramount" consideration under this Circuit's likelihood of confusion analysis. *See Pizzeria Uno*, 747 F.2d at 1527. The "similarity of the marks" factor also weighs strongly in favor of the NAACP. It is undisputed that Plaintiffs use the *identical* NAACP registered mark, the NAACP Seal, and the confusingly similar name "The National Association for Abortion of Colored People," on their websites. Pls. Brief at 20.

Furthermore, the goods and services offered by the NAACP and Plaintiffs are similar. Both organizations provide informational, educational, and community outreach services to members of the black community in the United States, and both actively solicit donations to support those efforts. Jealous Dec. at ¶¶ 20-21; Bomberger Dec. at ¶¶ 6, 8, 33. They both engage in similar types of advertising by purchasing billboard space to promote and publicize their campaigns and outreach activities. Jealous Dec. at ¶ 23; Bomberger Dec. at ¶¶ 9-10, 33. And both the NAACP and Plaintiffs maintain websites through which they provide informational and educational services, so that the "similarities of the facilities that the two parties use in their businesses" also weighs in the NAACP's favor. Jealous Dec. at ¶ 22; Bomberger Dec. at ¶¶ 7-8.

Plaintiffs seek to belittle the significance of the "strength of the mark" and the "similarity of the marks" factors, claiming that their use of the marks is "nominative" because they did not use the NAACP marks or "The National Association for the Abortion of Colored People" to refer to their own organization and services but rather to the NAACP. Pls. Brief at 20-21. This

---

[6] In fact, Plaintiffs concede that the NAACP's marks are famous. Pls. Brief at 20.

argument is without merit.  As the Fourth Circuit held in *Rosetta Stone*, "by definition, nominative use involves the use of *another's* trademark in order to describe the trademark owner's *own* product."  676 F.3d at 154 (emphasis in original).  Here, of course, Plaintiffs are *not* using the NAACP's mark but a fictitious altered version of the NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE mark.  As a result, their use is not "nominative," and Plaintiffs' reliance upon *Rosetta Stone* for the proposition that the "strength of the mark is often not informative in [the nominative use] context" (Pls. Brief at 21) is wholly misplaced.

Plaintiffs claim that their only intent in using the NAACP's marks and the name "The National Association for the Abortion of Colored People" was to "criticize the Defendant, its policies and programs and, particularly, its position on abortion."  Pls. Brief at 22.  At this early stage of the proceedings, with discovery yet to begin, the NAACP has not had the opportunity to depose Mr. Bomberger and others at the Plaintiffs' organization as to their subjective intent in using the NAACP's marks and the "National Association for the Abortion of Colored People" moniker.

Nonetheless, even based on the very limited factual record before the Court, there is evidence that Plaintiffs intended to create confusion in the mind of the ordinary consumer. The prominent use of the NAACP mark along with "The National Association for the Abortion of Colored People" name as headings on Plaintiffs' websites, together with the appearance of the Plaintiffs' Sites as "hits" in a Google alert for "NAACP," would lead an "ordinary consumer" to believe, at least initially, that the NAACP sponsored or approved the postings on the Plaintiffs' Sites.  Jealous Dec., Ex. A; Bomberger Dec., Exs. 1-6.

The Fourth Circuit has acknowledged the existence of "initial interest confusion" among websites that create a "distraction or diversion of a potential customer from the Web site he was initially seeking to another site, based on the user's belief that the second site is associated with the one he originally sought." *Government Employees Ins. Co. v. Google, Inc.*, 2005 WL 1903128, 4 -5 (E.D.Va. 2005). To prove either the likelihood or absence of initial interest confusion, courts rely on the results of customer or potential customer surveys. *Id.* Such initial interest confusion here is actionable under the Lanham Act, even though an actual reading of the content on the Plaintiffs' Sites, which would only occur after a delay in accessing and loading the site on the user's computer, may subsequently dispel any potential confusion *See Planned Parenthood*, 42 U.S.P.Q.2d at 1438 ("Only in the course of reading [the anti-abortion content on defendant's site] can the user determine that she has not reached plaintiff's homepage. . . . This lengthy delay between attempting to access plaintiff's homepage and learning that one has failed to do so increases the likelihood of consumer confusion.").[7]

Even assuming the "initial interest confusion" is dispelled by reading the content on the Plaintiffs' Sites, there remains the likelihood that an ordinary consumer would still be confused by the name "The National Association for the Abortion of Colored People," and question whether it is an actual organization affiliated with the NAACP, whether the NAACP has changed its name, or whether it is an organization unaffiliated with the NAACP. An actionable case of confusion exists under any of these scenarios, each of which presents issues of fact for trial, as "'[t]he confusion that is remedied by trademark and unfair competition law is confusion

---

[7]   It therefore appears that the Fourth Circuit in *Lamparello v. Falwell*, 420 F.3d 309, 318 (4th Cir. 2005) was mistaken when it criticized the court in *Planned Parenthood* for "not consider[ing] whether the websites' content would dispel any confusion," since the court clearly did so.

not only as to source, but also as to affiliation, connection or sponsorship.'" *Rosetta Stone*, 676

F.3d at 157 (*quoting* 4 *McCarthy on Trademarks and Unfair Competition* § 23:8).

Plaintiffs assert that "there is no evidence of any confusion here."[8] In this Circuit, actual

confusion "can be demonstrated by both anecdotal and survey evidence." *Rosetta Stone*, 676

F.3d at 156. Here too, discovery will be necessary to determine the nature and extent of actual

consumer confusion caused by Plaintiffs' conduct. Simply because Mr. Bomberger avers that he

has no personal knowledge of any such confusion by no means ends the issue, nor should the

NAACP be required to accept his assertion at face value or be denied the opportunity to cross-

examine him on this point.[9]

### C. Plaintiffs Are Not Entitled to Summary Judgment On The NAACP's Trademark Dilution Claim

Unlike traditional trademark law, "the prohibitions against trademark dilution . . . are not

motivated by an interest in protecting consumers." *Rosetta Stone*, 676 F.3d at 166 (*quoting*

*Moseley v. V Secret Catalogue, Inc.*, 537 U.S. 418, 429, 123 S.Ct. 1115, 155 L.Ed.2d 1 (2003)).

Thus, "[d]ilution is not concerned with confusion in the marketplace." *Rosetta Stone* at 166.

Dilution by tarnishment, which forms the basis of the NAACP's trademark dilution claim against

Plaintiffs, "creates consumer aversion to the famous brand – *e.g.*, when the plaintiff's famous

---

[8] Given the place in Plaintiffs' argument where this statement appears, Plaintiffs presumably are intending to refer to the "actual confusion" factor in the *Pizzeria Uno* analysis. The NAACP therefore assumes that the omission of the word "actual" before the word "confusion" was inadvertent.

[9] Contrary to Plaintiffs' assertions (Pls. Brief at 23), the issue of what NAACP is an acronym for bears directly on the issue of confusion in this case, particularly in view of Plaintiffs' interchangeable use of "NAACP" with "The National Association for the Abortion of Colored People" and their statement that the NAACP "has become The National Association for the Abortion of Colored People," all of which could lead an ordinary consumer to believe that the NAACP has changed its name to embrace the *abortion* – rather than the *advancement*-- of African Americans. These all raise issues of fact that are not amenable to disposition on summary judgment.

trademark is linked to products of shoddy quality, or is portrayed in an unwholesome or unsavory context" such that "the public will associate the lack of quality or lack of prestige in the defendant's goods with the plaintiff's unrelated goods." *Id*. 167 (internal quotations omitted).

A plaintiff establishes a *prima facie* dilution claim under the Trademark Dilution Revision Act ("TDRA") by showing (1) that the plaintiff owns a famous mark that is distinctive; (2) that the defendant commenced using a mark in commerce that allegedly is diluting the famous mark at any time after the owner's mark became famous; (3) that a similarity between the defendant's mark and the famous mark gives rise to an association between the marks, and (4) that the association is likely to impair the distinctiveness of the famous mark or likely to harm the reputation of the famous mark. *Id*. at 168. Importantly, a plaintiff can establish dilution by tarnishment "***regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury.***" 15 U.S.C. § 1125(c)(1) (emphasis added).

Even based on the limited and undeveloped factual record before the Court, the NAACP readily satisfies the requirements for establishing a *prima facie* case of dilution by tarnishment. Plaintiffs concede that the NAACP's marks are famous (Pls. Brief at 16, n.4), and the NAACP's incontestable federal trademark registration for the NAACP mark is proof of its distinctiveness. *See Lone Star Steakhouse*, 43 F.3d at 935-36. It is also likely that Plaintiffs' first use in commerce of the name "The National Association of the Abortion of Colored People," which appears to have been in June 2011, was long after the NAACP's marks had become famous. There also is no dispute – indeed, Plaintiffs admit – that the name "The National Association for the Abortion of Colored People" closely resembles "National Association for the Advancement of Colored People" and that consumers would associate the former with the latter. Pls. Brief at 18.

19

Most importantly, this fictitious alteration of the NAACP's name harms the reputation of the NAACP by creating an unsavory association with a position that the NAACP does not even take and does not endorse. The NAACP has dedicated itself for over 100 hundred years to fighting for social justice, equality, and opportunity for African Americans and other people of color. It is hard to imagine a greater harm to the NAACP's reputation than to have its famous and revered name altered in a manner that falsely proclaims the abortion of African Americans as the organization's central mission.

This is precisely the type of reputational harm that the federal anti-dilution law was designed to remedy and for which the courts have granted relief.[10] Indeed, for decades, the courts have upheld dilution by tarnishment claims when faced with the same type of false and defamatory alteration of a famous mark as involved here. *See, e.g., Anheuser-Busch, Inc. v. Balducci Pubs.*, 28 F.3d 769, 772, 777-78 (8th Cir. 1994) (defendants' use of MICHELOB OILY held tarnishing due to its suggestion that plaintiff's beer contained oil); *Chemical Corp. of America v. Anheuser-Busch, Inc.*, 306 F.2d 433, 436-38 (5th Cir. 1962), *cert. denied*, 372 U.S. 965, 83 S.Ct. 1089, 10 L.Ed.2d 129 (1963) (enjoining use of "WHERE THERE'S LIFE . . . THERE'S BUGS!" slogan as tarnishing of WHERE THERE'S LIFE, THERE'S BUD); *Pillsbury Co. v. Milky Way Productions, Inc.*, 215 U.S.P.Q. 124, 135 (N.D. Ga. 1981) (finding defendant liable for dilution by tarnishment for publishing cartoon of "Poppin' Fresh" and "Poppie Fresh" doughpersons engaging in sexual intercourse and fellatio); *Coca-Cola Co. v.*

---

[10]   Plaintiffs try to brush off the issue of whether or not the NAACP supports abortion as immaterial (Pls. Brief at 11, n.2) when it is the crux of this case and goes directly to the harm sustained by the NAACP as a result of Plaintiffs' acts of dilution by tarnishment. Plaintiffs maintain that the NAACP is pro-abortion. The NAACP says it is not. It is hard to imagine a more material issue of fact in dispute, which certainly cannot be resolved on the present Motion.

*Gemini Rising, Inc.*, 346 F.Supp. 1183, 1190-91 (E.D.N.Y. 1972) (enjoining ENJOY COCAINE posters based on tarnishment because customers might be "turned off" by so-called "spoof").

Plaintiffs desperately attempt to find solace under one of the exceptions in the TDRA, none of which apply here. First, Plaintiffs' claim that their use of the name "The National Association for the Abortion of Colored People" constitutes "fair use" because "no use of the Defendant's marks would suggest in any way that the mark is referring to a good or service of the Plaintiffs." Pls. Brief at 16-17. This precise argument was rejected by the Fourth Circuit in *Rosetta Stone*. There, the court held that "the district court erred when it ruled that Google was not liable for dilution simply because there was no evidence that Google uses the Rosetta Stone marks to identify Google's own goods and services." *Rosetta Stone*, 676 F.3d at 169. As the *Rosetta Stone* court observed, "[r]egardless of the type of fair use claimed by a defendant, a common component of fair use is good faith, *Id.*, and the inquiry into a defendant's good faith "concerns the question whether the user of a mark intended to create consumer confusion as to source *or sponsorship*." *Id.* (emphasis in original)[11] The Fourth Circuit reversed the district court's grant of summary judgment on Rosetta Stone's dilution claim, holding that the district court "impermissibly omitt[ed] the question of good faith and collaps[ed] the fair use doctrine into one question – whether or not Google uses the ROSETTA STONE mark as a source identifier for its own products." *Id.* at 170.[12]

_____

[11]   Here again, the issue of whether Plaintiffs intended to create such confusion is an issue of fact for trial.

[12]   Plaintiffs misguidedly argue that the NAACP's dilution claim fails because of the "implausibility of asserting that consumers would be confused into believing that 'The National Association for the Abortion of Colored People' refers to the Plaintiffs." Pls. Brief at 17-18. This is at odds with the express language of the TDRA, which states that an owner of a famous mark can obtain relief for dilution (including by tarnishment) "***regardless of the presence or absence of actual or likely confusion*** . . . ." 15 U.S.C. § 1125(c)(1) (emphasis added).

Further, Plaintiffs cannot avail themselves of the parody exception under the TDRA. Plaintiffs' parody argument rests entirely on their self-serving, unsupported assertion that "[n]o one would reasonably believe that an organization devoted to advancing the interests and civil rights of African Americans would name itself the "National Association for the Abortion of Colored People."  This, of course, is a yet another factual issue that the Court cannot resolve on summary judgment.  However, the courts have rejected parody defenses in similar circumstances.  *See, e.g., Anheuser-Busch v. Balducci*, 28 F.3d at 776 (rejecting parody defense to trademark infringement and dilution claims where the parody was "likely to confuse consumers as to its origin, sponsorship, or approval" and the defendant "could have conveyed his message with substantially less risk of consumer confusion.").[13]

The "news reporting and news commentary" exception is likewise unavailable to Plaintiffs, as commercial speech is not protected under the First Amendment if it is misleading. *See Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of New York*, 447 U.S. 557 (1980); *Burke v. City of Charleston*, 893 F. Supp. 589, 608 (D.S.C. 1995).  *See also MGM-Pathe Communications Co. v. Pink Panther Patrol*, 774 F.Supp. at 877 ("The seriousness and virtue of a cause do not confer any right to the use of the trademark of another.").

## D. Plaintiffs Cannot Shield Themselves From Liability Under The Lanham Act By Invoking The First Amendment

Plaintiffs' First Amendment argument rests upon their misguided – and demonstrably wrong – belief that their activities are "non-commercial."  In other words, Plaintiffs wrongfully argue that they do not use the NAACP's marks (and the fictitious alteration thereof) "in

---

[13]   It is worth noting that the court in *Balducci* had before it a consumer survey showing that the defendant's parody suggested that Anheuser-Busch products were contaminated by oil. *Balducci*, 28 F.3d at 772-73.  Here, given the early stage of this proceeding, the NAACP has not had the opportunity to develop such evidence.

commerce . . . in connection with the sale, offering for sale, distribution or advertising of any goods or services," and thus are outside the scope of the Lanham Act. *See* Pls. Brief at 10-15. As shown, however, Plaintiffs ignore the substantial line of authority holding exactly to the contrary. *See* pp. 9 -13, *supra*. As a result, Plaintiffs' First Amendment argument is a red herring.

It is well established that "the Constitution accords less protection to commercial speech than to other constitutionally safeguarded forms of expression." *Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 64-65, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983); *Edge Broadcasting Co. v. United States*, 5 F.3d 59, 61 (4th Cir. 1992) ("A lesser degree of First Amendment protection is accorded commercial speech than other constitutionally guaranteed expression"). "[R]egulation of commercial speech based on content is less problematic [than non-commercial speech]. In light of the greater potential for deception or confusion in the context of certain advertising messages, . . . content-based restrictions on commercial speech may be permissible." 463 U.S. at 65. *See also Friedman v. Rogers*, 440 U.S. 1, 99 S.Ct. 887, 59 L.Ed.2d 100 (1979) (upholding prohibition on use of trade names by optometrists). As the Supreme Court aptly stated in *Bolger* (a case cited by Plaintiffs), a "company has the full panoply of protections available to direct its comments on public issues, so there is no reason for providing similar constitutional protection [accorded to non-commercial speech] when such statements are made in the context of commercial transactions." 463 U.S. at 68. [14]

---

[14]    Plaintiffs grossly distort the holding of *CPC International, Inc. v. Skippy Inc.*, 214 F.3d 456 (4th Cir. 2000), upon which they heavily rely. According to Plaintiffs, the Fourth Circuit in *Skippy* "refused to enjoin the alleged infringer's use, *even though goods and services were offered for sale at the web site*." Pls. Brief at 13 (emphasis added). In reality, "the only place [on defendant's website] where a commercial transaction was even conceivably proposed was in Skippy's "legal notice," which states 'for information about licensing these images and trademarks, please contact Joan Crosby Tibbetts.'" 214 F.3d at 462. The court observed that

23

To be sure, "speech that misleads or creates confusion is not protected by the First Amendment." *Westchester Media v. PRL USA Holdings, Inc.*, 214 F.3d 658, 672 (5th Cir. 2000). The NAACP does not dispute that Plaintiffs have the right under the First Amendment to criticize the NAACP, its mission, and programs. Indeed, Plaintiffs in the past have voiced such criticisms, to which the NAACP has responded with its own criticism of Plaintiffs. As was the case in *Christian Science*, the NAACP "[has] not in any manner attempt[ed] to restrain [Plaintiffs'] speech on any subject, including [the NAACP]; however, [it] does insist that [Plaintiffs] not use [the NAACP's] marks." 123 F.Supp.2d at 971 (rejecting First Amendment defense). Even assuming that Plaintiffs "might communicate their [anti-abortion] message more effectively by appropriating [the NAACP's marks], such appropriation would cause significant consumer confusion. It is not protected by the First Amendment." *Id*.

---

"[b]eyond the warning, the [defendant's] web site *did not offer any products for sale . . . .*" *Id*. (emphasis added) The court denied relief because the defendant's website was a pure speech site, *i.e.*, it "simply tells one woman's story about her family and recounts her view of CPC's actions and the legal events surrounding the SKIPPY trademark." *Id*. at 462-63. The "commercial activity" on that site (if it can even be called that) is a far cry from the commercial transactions proposed by Plaintiffs at their TooManyAborted Site, where Plaintiffs solicit money in exchange for the sponsorship of billboards, licensing artwork, design of customized websites, website hosting, content creation, and extensive research on abortion issues by state, *and even provide a contract form which a visitor can complete on-line and thereby enter into a commercial transaction with the Plaintiffs.*

## CONCLUSION

For all of the foregoing reasons, Plaintiffs' Motion for Summary Judgment should be denied.

Dated: May 13, 2013                          Respectfully submitted,

           /s/ *David G. Barger*

David G. Barger
VSB No. 21652
GREENBERG TRAURIG, LLP
1750 Tysons Blvd., Suite 1200
McLean, Virginia  22102
Telephone: (703) 749-1300
Facsimile: (703) 749-1301
bargerd@gtlaw.com

Johnine P. Barnes (admitted *pro hac vice*)
Steven J. Wadyka, Jr. (admitted *pro hac vice*)
GREENBERG TRAURIG, LLP
2101 L Street, N.W., Suite 1000
Washington, D.C.  20037
Telephone:  (202) 331-3100
Facsimile:  (202) 261-0135
wadykas@gtlaw.com

Ernest L. Greer (subject to *pro hac vice* admission)
GREENBERG TRAURIG, LLP
Terminus 200
3333 Piedmont Road, N.E., Suite 2500
Atlanta, Georgia  30305
Telephone:  (678) 553-2402
Facsimile:  (678) 553-2212
greere@gtlaw.com

*Counsel for Defendant/Counterplaintiff*
*National Association for the Advancement of*
*Colored People*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 13, 2013, the foregoing Opposition of Defendant/Counterplaintiff National Association for the Advancement of Colored People to Plaintiffs/Counterdefendants' Motion for Summary Judgment was filed with the Clerk of the Court using the CM/ECF filing system and that service will thereby be accomplished on:

Charles M. Allen, Esq.
GOODMAN, ALLEN & FILETTI, PLLC
4501 Highwoods Parkway
Suite 201
Glen Allen, VA 23060
Telephone: (804) 346-0600
Facsimile: (804) 346-5954
callen@goodmanallen.com

*Attorney for Plaintiffs The Radiance Foundation, Inc.*
*and Ryan Bomberger*

_/s/ David G. Barger_____

David G. Barger
VSB No. 21652
Greenberg Traurig, LLP
1750 Tysons Boulevard, Suite 1200
McLean, Virginia 22102
Telephone: (703) 749-1300
Facsimile: (703) 749-1301
bargerd@gtlaw.com

*WDC 372802084v1*

26