UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
(Norfolk Division)

|  |  |
|---|---|
| THE RADIANCE FOUNDATION, INC. and RYAN BOMBERGER, individually, <br><br> Plaintiffs/Counterdefendants, <br><br> v. <br><br> NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, <br><br> Defendant/Counterplaintiff. | Case No. 2:13-cv-53 (RAJ/LRL) |

**DEFENDANT/COUNTERPLAINTIFF NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION *IN LIMINE* TO EXCLUDE EXPERT REPORT AND TESTIMONY OF TRACY TUTEN, PH.D.**

COMES NOW Defendant/Counterplaintiff National Association for the Advancement of Colored People ("Defendant" or "NAACP"), and pursuant to Rule 702 of the Federal Rules of Evidence and the principles set forth in *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), hereby submits its Memorandum of Law in support of its Motion *in Limine* To Exclude Expert Report and Testimony of Tracy Tuten, Ph.D.

### I. INTRODUCTION

Plaintiffs/Counterdefendants The Radiance Foundation, Inc. ("Radiance") and Ryan Bomberger ("Bomberger") (together, "Plaintiffs") have retained Tracy Tuten, Ph.D. to critique the consumer survey conducted by the NAACP's expert, Henry D. Ostberg, Ph.D., through which Dr. Ostberg determined consumer reactions to the term "National Association for the Abortion of Colored People." Specifically, Dr. Ostberg's survey determined the extent to which

Plaintiffs' use of that term created (1) a likelihood of confusion among the relevant consumer group (*i.e.*, potential Radiance supporters) by suggesting that Plaintiffs are affiliated with or sponsored by the NAACP or that Plaintiffs required permission or approval from the NAACP to use that term, and (2) a likelihood of dilution among the relevant consumer group (*i.e.*, potential NAACP supporters) by tarnishing the name and reputation of the NAACP. Dr. Ostberg, a recognized consumer survey expert who has performed over 2,000 surveys on likelihood of confusion and dilution and has testified at trial in over 40 trademark cases in federal courts throughout the United States, concluded from the results of the survey that Plaintiffs' use of the term "National Association for the Abortion of Colored People" created significant levels of confusion and dilution among the relevant consumer groups.

Rather than conduct their own survey, Plaintiffs submitted a report from Dr. Tuten, dated October 14, 2013 (the "Tuten Report") (attached hereto as Exhibit A), which purports to critique Dr. Ostberg's consumer survey and report. From the outset, it is apparent that Dr. Tuten is wholly unqualified to offer expert opinion or testimony regarding Dr. Ostberg's consumer survey or report. She has virtually no experience in designing or conducting consumer surveys for trademark litigation. No court has ever found her to be qualified to offer expert testimony on any subject, nor has any court ever accepted any consumer survey she conducted for any purpose. Similarly, no court has ever found her to be qualified to offer expert testimony and opinion to critique an opposing party's consumer survey. She has published no books or articles and given no speeches or presentations on the methodology for designing and executing consumer surveys for trademark litigation, nor has she ever been asked to do so. She is not a member of any professional associations consisting of trademark law practitioners or trademark litigation survey experts. She has never taken courses or attended seminars or symposiums on the methodology

for designing and executing consumer surveys for trademark litigation, nor has any of her prior educational or work experience involved such issues.

In addition to her utter lack of qualifications, Dr. Tuten, both in her report and at her deposition in this case, demonstrates a complete lack of knowledge of and familiarity with basic trademark concepts and litigation survey methodology. She cannot name or describe the two most commonly used survey designs to determine likelihood of confusion in trademark cases, yet claims Dr. Ostberg's survey design is "flawed."[1] She has virtually no knowledge of the concepts of trademark dilution and likelihood of confusion, yet pontificates on those topics. She does not know how to define the proper "universe" of respondents for consumer surveys to measure likelihood of confusion or dilution, yet criticizes Dr. Ostberg's survey on this very point. She is unfamiliar with and cannot interpret the basic types of statistical tables that typically accompany a survey report (such as those appended to Dr. Ostberg's report), yet faults Dr. Ostberg's tables for being "disorganized."[2] She has no knowledge regarding standard techniques employed in litigation surveys, such as the use of non-probability samples and the providing of incentives to encourage survey participation, but again criticizes Dr. Ostberg's report on these very issues.

Beyond these glaring shortcomings, there is a complete lack of foundation for the opinions expressed by Dr. Tuten in her report. The sum and substance of the "foundation" for her opinions consists of her cursory review of an article by Shari Seidman Diamond that appears in the *Reference Manual on Scientific Evidence*, yet she offers opinions that are directly contradicted by that article. For the most part, Dr. Tuten relies on little more than her "personal opinion."

---

[1] Tuten Report, ¶ 11.

[2] Tuten Report, ¶ 51.

And one need look no further than Dr. Tuten's own deposition testimony to see that not even she possesses any appreciable level of confidence in her own opinions and conclusions. She there recounted how, three days before her deposition (and one week after submission of her report), she randomly searched the Internet for articles on trademark surveys and methodology because she "wanted to think through more carefully what sort of guidelines should [she] be considering in trying to identify what would be the right population [of interest]" for Dr. Ostberg's survey. The obvious implication of her after-the-fact research is that she did not believe she had thought through this issue carefully enough in preparing her report.

In short, Dr. Tuten's report and testimony fall woefully short of the standards established under Rule 702 of the Federal Rules of Evidence, and by the U.S. Supreme Court in *Daubert*, for the admission of expert testimony. Her report and testimony should therefore be excluded from evidence in this case.

## II. BACKGROUND

### A. Dr. Tuten Lacks Any Qualifications or Experience to Provide Expert Testimony or Opinion Regarding Trademark Litigation Surveys

In her report, Dr. Tuten states that she is a Professor of Marketing at East Carolina University. Tuten Report, ¶ 4. She claims to have "substantial work experience in the role of survey methodologist" and, during the course of her academic career, has "designed and conducted dozens of research projects, several of which focused on survey methodology." *Id*. at ¶¶ 5-6.

Despite these claims, it became readily apparent during Dr. Tuten's deposition that she lacks any qualifications or experience that would enable her to offer expert opinion or testimony regarding trademark litigation surveys.

Consider the following testimony by Dr. Tuten:[3]

- She has not taken any courses, attended any conferences, or participated in any symposiums or seminars on trademark law or the methodology for designing and executing consumer surveys in trademark litigation. (20:13-21:19)

- None of her prior educational or work experience has involved the design or execution of consumer surveys for trademark litigation to determine likelihood of confusion or dilution. (94:6-95:14; 96:17-97:11)

- She has never written or published any articles on the methodology for designing and conducting consumer surveys in trademark litigation to determine likelihood of confusion or dilution. She has never partnered with or served as a consultant to anyone who was writing such an article, nor has she ever been asked to do so. (22:21-24:5)

- She has never contributed to any book or treatise on trademark law or on the methodology for designing and executing consumer surveys in trademark litigation to determine likelihood of confusion or dilution, nor has she ever been asked to do so. (24:6-25:1)

- She has never given a presentation on the methodology for designing and executing consumer surveys for trademark litigation to determine likelihood of confusion or dilution, has never served as a panelist on any type of program on those topics, and has never been asked to do so. (25:2-26:4)

- She has never testified at trial as an expert in a trademark litigation. She has never been found by a court to be qualified to offer expert testimony on likelihood of confusion or dilution. (72:19-73:15)

- She has never designed or conducted a consumer survey for the purpose of determining trademark dilution. (74:2-5)

- No court has ever accepted any survey she designed and conducted for any purpose. (74:6-8)

- No court has ever upheld any critique by her of the opposing party's survey results, nor has any court ever found her to be qualified to offer expert testimony or opinion to critique a consumer survey conducted by the opposing party's expert. (74:15-22)

- The only consumer survey on likelihood of confusion that she has ever designed and conducted was a "preliminary research study" for a matter that was never litigated. (50:10-51:16; 73:16-74:1)

---

[3] All citations are to the transcript of the Deposition of Tracy Tuten, Ph.D., dated October 21, 2013, the relevant excerpts of which attached hereto as Exhibit B.

- She is not a member of the International Trademark Association (INTA) or the American Intellectual Property Law Association (AIPLA) nor has she ever heard of either organization, and has never been a member of any other such organization that consists of trademark law practitioners and trademark litigation survey experts. (20:21-22:11)

- She has never received or subscribed to any publications or newsletters put out by INTA or AIPLA. She has never subscribed to or received any periodicals, e-mails, newsletters or updates on developments in the area of trademark law. (22:12-20; 26:5-15)

**B. Dr. Tuten Lacks Familiarity with Basic Concepts of Trademark Law and the Methodology for Designing and Conducting Consumer Surveys for Trademark Litigation**

It is also apparent that Dr. Tuten is completely unfamiliar with and has limited or no knowledge of the topics on which she purports to be an expert, namely, the trademark concepts of likelihood of confusion and dilution, and the methodology for designing and conducting consumer surveys for trademark litigation. Her deposition testimony amply demonstrates that these topics are far beyond any type of expertise she may otherwise possess.

For example, when asked questions regarding likelihood of confusion and dilution, which should be readily answerable by any credentialed trademark litigation survey expert, Dr. Tuten gave the following testimony:

- She has no understanding as to whether the Lanham Act sets forth a legal standard for determining likelihood of confusion. (30:14-31:2)

- Other than source confusion, she is unaware of any other type of confusion that has been recognized by the courts. She is unfamiliar with the concept of forward confusion. (33:19-34:3)

- She does not know whether the Lanham Act contains a provision regarding dilution. (36:12-14)

- She cannot name the U.S. Supreme Court decision that dealt with the issue of trademark dilution. (37:19-21)

- She is not familiar with the types of trademark dilution and does not know how many types of trademark dilution there are. (108:3-8)

- She does not know whether the Trademark Dilution Revision Act ("TDRA") addresses the types of dilution, and admits that she has never read the TDRA. (108:9-21)

- She erroneously believes that if the junior mark is targeting a different audience or competing among a different class of consumers than the senior (or famous) mark, it cannot dilute the senior mark. (142:7-143:1)

- She says that the proper respondents for a consumer survey to determine dilution are "all potential consumers" of "whatever the product category is" and that this consists of both the plaintiff and defendant's products. After confusing the concept of dilution with likelihood of confusion, she then changes her answer to say that the proper respondents for a dilution survey are all potential consumers of the famous mark owner's goods or services. (37:22-39:16)

- She reads court decisions involving trademark law about once every 2 years. She cannot name the two most recent court decisions she has read. She cannot name two U.S. Supreme Court decisions involving trademark law, nor can she name any other court decisions involving trademark law. (26:16-28:6)

- She owns no books on trademark law or on the methodology for designing and executing consumer surveys for trademark litigation. Other than the Shari Diamond article, she has consulted no such books in preparing her report. (28:7-21)

Similarly, when asked basic questions about trademark litigation survey methodology and design, Dr. Tuten displayed either no familiarity with such concepts or erroneous beliefs regarding the subject matter:

- She cannot name the two types of surveys that are generally conducted to determine likelihood of confusion in trademark litigation. When asked specifically about *Eveready* and *Squirt* survey designs, she was unable to describe what they are.[4] (31:4-32:19)

- She erroneously states that the relevant universe for a dilution survey should consist of potential Radiance Foundation supporters *and* potential NAACP supporters. (139:11-140:4)

- She does not believe that a dilution survey should measure the impact of the allegedly diluting term among potential consumers of the famous mark owner's goods or services, stating erroneously that if such consumers "won't be exposed to the potentially infringing term, then there can be no dilution." (143:12-18)

---

[4] The *Eveready* and *Squirt* designs are the two survey formats that are commonly used to test for confusion of source, sponsorship, affiliation or connection. *See* McCarthy on Trademarks and Unfair Competition § 32:173.50 (4th ed. 2013).

- When asked whether it is true that most dilution surveys seek to measure dilution where the marks at issue are in two distinctly different markets and not in competition with each other, she states that she "can't speak to most dilution surveys" because she has not done any. (144:2-8)

- She does not know if non-probability samples are commonly used in trademark litigation to determine likelihood of confusion or dilution. (150:16-151:13)

- When shown an excerpt from the Shari Diamond article which states that "[a] majority of the consumer surveys conducted for Lanham Act litigation present results from non-probability convenience samples," she states that she has no reason to question that statement. (152:20-153:18)

### C. Dr. Tuten's Report is Inherently Unreliable as it Contains Numerous Inaccuracies and Inconsistencies Regarding the Topics on Which She Purports to Opine

In addition to Dr. Tuten's lack of qualifications and lack of familiarity with basic trademark and litigation survey concepts and methodology, her report is rife with numerous inconsistencies and inaccuracies concerning the subject matter on which purports to opine and, consequently, is wholly unreliable. While her report makes much of alleged "fatal flaws" in Dr. Ostberg's report and contains sweeping categorical statements regarding what she believes to be acceptable survey methodology, she was repeatedly unable during her deposition to back up such criticisms and statements and, in some instances, repudiated them entirely.

Dr. Tuten states in her report that her "first concern with the Ostberg report is whether the [survey] design is appropriate to address the core issues" (Tuten Report, ¶ 14), but admitted in her deposition that she inaccurately defined those "core issues." Her definition omits any reference to confusion as to sponsorship or approval, even though she agreed that survey questions directed to those issues are standard types of likelihood of confusion questions. (66:11-67:5; 99:16-101:13) She also admitted she inaccurately defined the "core issues" as whether Plaintiffs' use of the term "National Association for the Abortion of Colored People"

"dilutes" and "tarnishes" the NAACP's name and reputation when the applicable legal requirement is *likelihood* of dilution and *likelihood* of tarnishment. (109:1-110:15)

Dr. Tuten also asserts in her report that Dr. Ostberg's survey design "was not appropriate for measuring dilution and potential tarnishment" (Tuten Report, ¶ 11) but, vacillates when pressed on this point. For example:

- She criticizes the Ostberg survey for not having a control group, but then admits that control questions (which were utilized in the Ostberg survey) are one of "the most reliable means for assessing response levels against a baseline level of error associated with a particular question." (113:14-22; 114:18-22)

- She criticizes the Ostberg survey for not asking questions to measure the reputation of the senior mark before exposure to the junior mark, basing this criticism solely on "common sense." She admits that she has never designed a dilution survey in this manner and, in fact, has never designed any type of dilution survey. (116:17-117:18)

- She criticizes the Ostberg survey for having a target population that is "ill-defined," but admits the potential purchasers of the alleged infringer's goods (*i.e.*, potential Radiance supporters) is the appropriate universe for a likelihood of confusion survey. (135:4-7; 135:13-136:4)

Dr. Tuten similarly does an "about-face" regarding the issue of providing incentives to self-recruited survey respondents to encourage participation. In her report, she states categorically that "the use of a sample drawn from members of self-recruited and incentivized online panel does not meet the basic requirements for assessing likelihood of confusion, dilution, and/or tarnishment." (Tuten Report, ¶ 29) Her deposition testimony vividly demonstrates the complete lack of support for that statement. Consider the following:

- She admits that most consumer surveys, whether online or in person, offer some type of incentive. She does not know whether this is the case for consumer surveys conducted for litigation purposes. (154:12-155:2)

- She later says that she "didn't believe they commonly offered incentives to respondents in trademark surveys, but you would be the better source on that than I." (157:2-11)

- She is unaware of any case law or other authority that would hold that it is improper to offer incentives to respondents in a consumer survey in a trademark case. (159:1-5)

- By "self-recruited," she is referring to non-probability samples, which she acknowledges are used in the majority of trademark litigation surveys. (156:7-157:1)

Dr. Tuten was in equally unfamiliar territory on the issue of how to define the appropriate "universe" of survey respondents:

- She states in her report that the proper universe of survey respondents should have been "actual and prospective purchasers of the goods in question" but then admits that she "would have to look to see how specific the literature addresses prospective versus actual." She does not know what the case law says on this issue. (132:20-133:11; 134:16-22)

- She criticizes the Ostberg report by stating that "[m]ost of the analysis focuses on the two populations separately," but cannot answer whether that is because the relevant population for likelihood of confusion is potential Radiance supporters and the relevant population for dilution is potential NAACP supporters. (162:4-163:10)

- She ultimately concedes that she expresses no opinion regarding Dr. Ostberg's reliance upon a universe that was defined as potential Radiance supporters for purposes of the likelihood of confusion analysis. (168:1-6)

And for all her criticism of Dr. Ostberg's findings of likelihood of confusion and dilution (*see* Tuten Report, ¶¶ 39-48), Dr. Tuten's deposition testimony makes plain that it stems from her inability to read basic statistical tables that commonly accompany trademark litigation survey reports.

For example, she criticizes the Ostberg report's finding that 13% of potential Radiance supporters believed that the people who use the term "National Association for the Abortion of Colored People" were either affiliated with the NAACP or required permission or approval from the NAACP to use that term, stating that "[t]here is no analysis to ensure that these questions are not simply double-counting the same respondents." (Tuten Report, ¶ 40) However, she admits in her deposition that she is unfamiliar with the concept known as a "balancing line" technique (shown at the end of Table 5 of Dr. Ostberg's report) whereby Dr. Ostberg excluded the percentage of respondents who believed there was an affiliation from the percentage who

believed that permission or approval was required. She further admits that if this "balancing line" concept was explained to her, she "wouldn't have reason to question that percentage." (168:10-169:1; 171:7-17; 173:2-15; 175:22-176:16)

Dr. Tuten also criticizes the Ostberg report's finding that 5% of respondents volunteered that the term "National Association for the Abortion of Colored People" was intended as parody or criticism, stating that "it is unclear where this result can be found in the analysis." (Tuten Report, ¶ 42) Only after being shown the percentages from Tables 11 and 23 of Dr. Ostberg's report which display these results does she finally understand that the percentages add up to 4.7%, or approximately 5%. (176:18-179:21)

### D. Dr. Tuten Lacks Confidence in the Opinions Expressed in Her Report

There is perhaps no clearer indicator of the unreliability of Dr. Tuten's report than her own lack of confidence in her opinions. Three days before her deposition (and one week *after* submission of her report), Dr. Tuten reviewed four articles to see if there were some references that "would help [her] form [her] opinion," despite the fact that the only opinions she formed in this case are the ones she set forth in her report a week earlier. She found the articles by doing a Google search for terms like "trademark surveys and population" and "survey design and tarnishment." She did this because she "wanted to think through more carefully what sort of guidelines should [she] be considering in trying to identify what would be the right population [of interest]." She did not do any of this prior to preparing her report. (8:15-16:15)

That same day, Dr. Tuten went to the NAACP website to look up its mission statement. She did this because she wanted to "think about what should have been the population [of interest] for the survey." She did not look up the NAACP's mission statement prior to preparing her report. (17:22-18:19)

## III.     LEGAL STANDARD

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

This entails a two-part determination. The purported expert must be qualified "by knowledge, skill, experience, training, or education to render an opinion," and "if the expert is sufficiently qualified, the court must determine whether the expert's opinion is reliable. . . ." *U.S. v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009).

Expert testimony is reliable (and therefore admissible) only if it is "ground[ed] in the methods and procedures of science" based on facts, not mere "subjective belief or unsupported speculation." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 590 (1993). Moreover, "an inference or assertion must be derived by the scientific method . . . [and] must be supported by appropriate valuation—i.e., 'good grounds,' based on what is known." *Id*. "[T]he [proffering party] must show that the method employed by the expert in reaching the conclusion is scientifically sound and that the opinion is based on facts that satisfy Rule 702's reliability requirements." *Mitchell v. Gencorp Inc.*, 165 F.3d 778, 781 (10th Cir. 1999).

The objective of *Daubert*'s "gatekeeping" requirement "is to ensure the reliability and relevancy of expert testimony." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999). The court must "make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id*.

## IV.     ARGUMENT

### A. The Court Should Exclude Dr. Tuten's Report and Testimony Due to Her Lack of Qualifications to Offer Expert Opinions Regarding Trademark Litigation Surveys

Dr. Tuten was engaged by the Plaintiffs as an expert in this case to critique Dr. Ostberg's expert report and for no other purpose. (75:4-9) As a threshold matter, she must be qualified "by knowledge, skill, experience, training, or education" to render an opinion regarding the subject matter, namely, the consumer survey conducted by Dr. Ostberg to determine likelihood of confusion and dilution. *See U.S. v. Nacchio*, 555 F.3d at 1241. As shown at pages 4 through 6, *supra*, Dr. Tuten is completely lacking any qualifications that would permit her to offer expert testimony and opinion regarding trademark litigation surveys, such as the one conducted by Dr. Ostberg.

Ironically, the article upon which Dr. Tuten relies for her opinions – *Reference Guide on Survey Research* by Shari Seidman Diamond – also highlights the reasons why she should not be permitted to provide those "expert" opinions in this case. As the Diamond article points out, "[p]ublication in peer-reviewed journals, authored books, membership in professional organizations . . . are indications of a professional's area and level of expertise." *See* Shari Seidman Diamond, *Reference Guide on Survey Research*, in REFERENCE MANUAL ON SCIENTIFIC EVIDENCE at 238 (Federal Judicial Center 2000). Dr. Tuten has no such credentials in the area into which she has thrust herself in this case – trademark litigation surveys. She has published no articles and authored no books on trademark litigation surveys nor has she ever been asked to do so. (22:21-24:5; 24:6-25:1) She has never been a member of any professional organizations, such as the INTA or AIPLA, that consist of trademark law practitioners and trademark litigation survey experts and, indeed, has never heard of either

organization. (20:21-22:11) She has never spoken on the topic of trademark litigation surveys and has never been asked to do so. (25:2-26:4) And she has never taken courses or participated in any conferences or symposiums on the topic. (20:13-21:19)

Not surprisingly, Dr. Tuten's experience as an expert witness in trademark litigation is virtually non-existent. She has never testified at trial as an expert in trademark litigation, never been found by a court to be qualified to give expert testimony in a trademark case, and never had a court accept any survey she conducted for any purpose. (72:19-73:15; 74:6-8) No court has ever upheld any critique by her of the opposing party's survey results, nor has any court found her to be qualified to offer such a critique. (74:15-22) She has personally designed and conducted a grand total of *one* survey on likelihood of confusion, and that was only a "preliminary research study" for a matter that was never litigated. (50:10-51:16; 73:16-74:1) She has *never* conducted a survey for the purpose of determining trademark dilution. (74:2-5)

Dr. Tuten thus lacks any "knowledge, skill, experience, training or education" that would qualify her to present expert testimony and opinion regarding Dr. Ostberg's consumer survey on likelihood of confusion and dilution. The Court should on this basis alone exclude her report and testimony from evidence in this case.

### B. The Court Should Exclude Dr. Tuten's Report and Testimony on the Grounds that Her Opinions are Completely Unreliable

It is not enough for an expert witness to be qualified to offer opinion testimony. Rule 702 of the Federal Rules of Evidence also requires that the putative expert's opinion be reliable. *Daubert*, 509 U.S. at 597. As this Circuit has observed, "[b]ecause expert witnesses have the potential to be both powerful and quite misleading, the court must ensure that any and all scientific testimony . . . is not only relevant, *but reliable*." *PBM Products, LLC v. Mead Johnson & Co.*, 639 F.3d 111, 123 (4th Cir. 2011) (emphasis added) (internal quotations and citations

omitted). Thus, even if the Court were to conclude that Dr. Tuten is qualified to offer expert testimony and opinion to critique Dr. Ostberg's survey, she is so lacking in knowledge of basic concepts of trademark law and litigation survey design and methodology that any opinions or testimony she could offer are wholly unreliable.

Despite the fact that Dr. Ostberg's survey and, indeed, the NAACP's claims for trademark infringement and dilution, are grounded in the principles set forth in the Lanham Act and applicable case law, Dr. Tuten has virtually no knowledge of either. She does not know whether the Lanham Act sets forth a legal standard for determining likelihood of confusion, is unaware of any type of confusion other than source confusion, does not know whether the Lanham Act contains a provision regarding dilution, is not familiar with the types of dilution or whether the Lanham Act address that point, and has never read the federal anti-dilution statute (the TDRA). (30:14-31:2; 33:19-34:3; 36:12-14; 108:3-8; 108:9-21)

Her lack of knowledge of basic trademark law concepts is manifested in her report, where she makes numerous misstatements regarding likelihood of confusion and dilution. For example, her definition of what she believes to be the "core issues" (Tuten Report, ¶ 14) is riddled with errors: (1) she states that Dr. Ostberg's survey design should address likelihood of confusion *as to source* but ignores the other types of confusion specified in the Lanham Act, namely, confusion *as to sponsorship or approval* (*see* 15 U.S.C. § 1125(a)(1)(A)); (2) she defines "dilution" and "tarnishment" as separate issues, reflecting her erroneous belief that they are two independent concepts when in fact, as the Lanham Act provides, tarnishment is a subset of dilution (*see* 15 U.S.C. § 1125 (c)(1)); and (3) she misstates the standard for dilution, stating that the issue is whether Plaintiffs' use of the name "National Association for the Abortion for Colored People" "dilutes" or "tarnishes" the NAACP's mark when the correct legal standard

(again set forth in the Lanham Act) is whether such use creates a *likelihood* of dilution by tarnishment. 15 U.S.C. § 1125(c)(1).

Dr. Tuten commits additional glaring errors in her report when she attempts to opine on the appropriate "universe" of survey respondents for likelihood of confusion and dilution. First, she states, without citation or support, that "if a senior mark is to be potentially infringed by a junior mark, presumably those marks would be competing among the same universe of consumers." Tuten Report, ¶ 23. She apparently is unaware of decades of trademark infringement court opinions involving companies that market to different consumers.[5] Second, regarding the universe for dilution, she states that "[t]he junior mark, if targeting a different audience, could not dilute the senior mark." Tuten Report, ¶ 23. Had Dr. Tuten actually read the federal anti-dilution statute (which she admits she has never done), she would have immediately recognized the fallacy of her statement, as the statute expressly provides that a plaintiff may recover for dilution by tarnishment "***regardless of the presence or absence*** of actual or likely confusion, ***of competition***, or of actual economic injury." 15 U.S.C. § 1125(c)(1) (emphasis added).

Further, Dr. Tuten's erroneous beliefs and lack of knowledge regarding basic likelihood of confusion and dilution concepts give rise to yet additional misstatements and inaccuracies in her report regarding the design for trademark litigation surveys. For example, after much "waffling" during deposition as to what she believes is the proper universe of a likelihood of confusion survey (after unequivocally stating in her report that the Ostberg survey's universe was "ill-defined" (Tuten Report, ¶ 23)), she finally "punts" by stating that she ***expresses no***

---

[5] *See, e.g., Union Carbide Corp. v. Ever-Ready, Inc.*, 531 F.2d 366 (7th Cir. 1976), *cert. denied*, 429 U.S. 830, 97 S.Ct. 91, 50 L.Ed.2d 94 (1976) (plaintiff was manufacturer of batteries and defendant manufactured light bulbs).

*opinion* regarding the universe defined by Dr. Ostberg for the likelihood of confusion analysis. (168:1-6) Regarding dilution, she admits that the relevant universe is the potential consumers of the famous mark owner's goods or services (37:22-39:16) but later claims that a dilution survey should not measure the impact of the allegedly diluting term among those potential consumers. (143:12-18) She is similarly confused when it comes to defining the survey universe as a whole, believing it to be "actual and prospective purchasers of the goods in question" (Tuten Report at ¶ 21) when in reality the case law defines it as *prospective*, not actual, purchasers.[6]

Dr. Tuten is similarly in unchartered waters on the topic of trademark litigation survey methodology. Time and again during her deposition, she retreated from the criticisms leveled against the Ostberg survey in her report. She faults the Ostberg survey for having a non-probability sample (Tuten Report, ¶¶ 28-29), but then acknowledges that the Diamond article (upon which she relies) states that the majority of consumer surveys in trademark litigation are conducted in this manner. (152:20-153:18) She criticizes the Ostberg survey for not having a control group (Tuten Report, ¶ 18), but admits that control questions (utilized in the Ostberg survey) are one of the most reliable means for filtering out "noise" in survey responses. (113:14-22; 114:18-22) She claims that a self-recruited incentivized online panel, such as that used in the Ostberg survey, "does not meet the basic requirements for assessing likelihood of confusion, dilution, and/or tarnishment" (Tuten Report, ¶ 29), but admits that she does not know whether offering incentives is commonly done in trademark litigation surveys and concedes that self-recruited respondents constitute the non-probability samples that are used in the majority of

---

[6] *See, e.g., Universal City Studios, Inc. v. Nintendo Co., Ltd.*, 746 F.2d 112, 118 (2d Cir. 1984) ("[T]he survey utilized an improper universe in that it was conducted among individuals who had already purchased or leased Donkey Kong machines rather than those who were contemplating a purchase or lease."). *See also* McCarthy on Trademarks and Unfair Competition § 32:159 at 32-364 ("In a traditional case involving "forward" confusion, . . . the proper universe to survey is the potential buyers of the *junior user's* goods or services.") (emphasis in original).

trademark surveys. (152:20-153:18; 156:7-157:1) And she displayed total unfamiliarity with the basic types of statistical tables that commonly accompany trademark litigation survey reports, claiming in her report that the survey results were "inflated" and "double-counted" (Tuten Report, ¶¶ 40, 46) only to be shown during her deposition how to properly read the results displayed in the statistical tables accompanying Dr. Ostberg's report. (168:10-169:1; 171:7-17; 173:2-15; 175:22-176:16; 176:18-179:21)

Finally, Dr. Tuten herself appears to have seriously questioned the reliability of her own opinions and conclusions, having conducted an Internet search for articles that "would help her form her opinions" one week *after* she submitted her report in this case. (8:15-16:15)

## V. CONCLUSION

In conclusion, Dr. Tuten is wholly unqualified to offer an expert testimony or opinion regarding the Ostberg survey, and the opinions set forth in her report are completely unreliable. Her report and opinions thus do not meet the requirements for the admission of expert testimony under *Daubert* and its progeny. Accordingly, the NAACP respectfully requests that the Court grant this Motion *in Limine* and exclude Dr. Tuten's report and testimony from evidence in this case.

Dated: November 6, 2013          Respectfully submitted,

/s/ *David G. Barger*
David G. Barger
VSB No. 21652
GREENBERG TRAURIG, LLP
1750 Tysons Blvd., Suite 1200
McLean, Virginia 22102
Telephone: (703) 749-1300
Facsimile: (703) 749-1301
bargerd@gtlaw.com

Johnine P. Barnes (admitted *pro hac vice*)
Steven J. Wadyka, Jr. (admitted *pro hac vice*)
GREENBERG TRAURIG, LLP
2101 L Street, NW
Suite 1000
Washington, DC 20037
Tel: (202) 331-3100
Fax: (202) 331-3101
barnesj@gtlaw.com
wadykas@gtlaw.com

Ernest L. Greer (subject to *pro hac vice* admission)
GREENBERG TRAURIG, LLP Terminus 200
3333 Piedmont Road, N.E., Suite 2500
Atlanta, Georgia 30305
Tel: (678) 553-2420
Fax: (678) 553-2421
greere@gtlaw.com

*Attorneys for Defendant/Counterplaintiff*
*National Association for the Advancement of*
*Colored People*

## **CERTIFICATE OF SERVICE**

I hereby certify that on November 6, 2013, the foregoing document was filed with the Clerk of the Court using the CM/ECF filing system and that service will thereby be accomplished on:

>Charles M. Allen, Esq.
>GOODMAN, ALLEN & FILETTI, PLLC
>4501 Highwoods Parkway
>Suite 210
>Glen Allen, VA 23060
>Telephone: (804) 346-0600
>Facsimile: (804) 346-5954
>callen@goodmanallen.com
>
>*Attorney for Plaintiffs The Radiance Foundation, Inc.
>and Ryan Bomberger*

>　　　　　　　/s/ *David G. Barger*
>David G. Barger
>VSB No. 21652
>Greenberg Traurig, LLP
>1750 Tysons Boulevard, Suite 1200
>McLean, Virginia 22102
>Telephone: (703) 749-1300
>Facsimile: (703) 749-1301
>bargerd@gtlaw.com
>*Counsel for Defendant/Counterplaintiff
>National Association for the Advancement of
>Colored People*