**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**(Norfolk Division)**

| | | |
|---|---|---|
| THE RADIANCE FOUNDATION, INC. <br> and RYAN BOMBERGER, individually, | ) <br> ) <br> ) | |
| Plaintiffs/Counterdefendants, | ) <br> ) | |
| v. | ) <br> ) | Case No. 2:13-cv-53 (RAJ/LRL) |
| NATIONAL ASSOCIATION FOR THE <br> ADVANCEMENT OF COLORED PEOPLE, | ) <br> ) <br> ) | |
| Defendant/Counterplaintiff. | ) <br> ) | |

**DEFENDANT/COUNTERPLAINTIFF NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

COMES NOW Defendant/Counterplaintiff National Association for the Advancement of Colored People ("Defendant" or "NAACP"), by undersigned counsel and pursuant to Rule 56 of the Federal Rules of Civil Procedure and the Local Rules of this Court, and hereby submits its memorandum of law in support of its Motion for Summary Judgment on Counts I through IV of its Counterclaim (Dkt. 10) against Plaintiffs/Counterdefendants The Radiance Foundation, Inc. ("Radiance") and Ryan Bomberger ("Bomberger") (together, "Plaintiffs").

## I.  INTRODUCTION

It is important to emphasize at the outset what this case is and is not about.  This is ***not*** a case where the NAACP seeks to suppress free speech.  Nothing could be further from the truth.  This case concerns Plaintiffs' unlawful use of the famous and distinctive NAACP acronym mark alongside the adulterated and fictitious name "National Association for the Abortion of Colored People."  Viewed in context, this use is not a protected fair use or a

parody.  It is a use made in commerce to support Plaintiffs' sale of goods and services from their

websites.  And, as uncontroverted survey evidence shows, it causes confusion and dilution by

leading consumers to believe there is an actual organization dedicated to racially motivated

genocide sharing the same acronym and a confusingly similar name with the real NAACP.

To help raise money for themselves, Plaintiffs conjured up a straw man organization to

attack: the "National Association for the Abortion of Colored People."  They gave this

organization the same acronym as the well-known NAACP.  In so doing, Plaintiffs created the

misleading impression that the real and fictitious NAACP organizations were somehow related,

or that the real NAACP had changed its name or mission, or that the straw-man NAACP is an

actual organization.  These uncontroverted facts, as shown in the survey evidence, demonstrate

substantial levels of consumer confusion and dilution by tarnishment of the NAACP's reputation

by associating it in the minds of consumers with racially motivated genocide.

Plaintiffs desperately sought to stave off any discovery by moving for summary judgment

at the beginning of this case.  The Court, in a one-page Order, summarily denied Plaintiffs'

motion on October 15, 2013.  (Dkt. 44)  Despite ample opportunity, Plaintiffs failed to proffer

any evidence to support their meritless defense of parody.  Fact and expert discovery have been

completed.  The purpose and actual effect of Plaintiffs' activities have become clear.  No

material issues of fact remain in dispute.  Summary judgment is appropriate on the NAACP's

counterclaims for federal trademark infringement (Count I), false designation of origin (Count

II), trademark dilution (Count III), and common law unfair competition (Count IV).

## II.  STATEMENT OF MATERIAL FACTS NOT IN DISPUTE[1]

Construed in the light most favorable to Plaintiffs, and with the NAACP reserving the

right to contest these facts as appropriate at trial, the undisputed facts in this case are as follows:

1.      The NAACP is the nation's oldest and largest civil rights organization.  It owns

and maintains the website at www.naacp.org.  The principal stated objectives of the NAACP are

to ensure the political, educational, social, and economic equality of all citizens, and to achieve

equality of rights and eliminate racial prejudice among citizens of the United States.  The

NAACP's leadership consists of prominent individuals in American society, including lawyers,

government officials, clergy, physicians, policymakers, and social advocates.  (Declaration of

Benjamin Todd Jealous, dated May 13, 2013, *see* Dkt No. 22 ("Jealous Dec.") at ¶ 2; **Ex. A**,

NAACP's Response to Radiance's Interrogatory No. 1.)

2.      The NAACP engages in and provides community outreach, informational, and

educational services activities on a range of issues of importance to the African American

community.  With regard to health care issues, the NAACP has advocated for equal access to

quality health care for all Americans, including members of the African American community.

(**Ex. A**, the NAACP's Response to Radiance's First Set of Interrogatories No. 10;  **Ex. B**

Radiance's Responses to the NAACP's Requests for Admission Nos. 92-94.)

3.      The black community is the focus of the NAACP's activities and programs.  (**Ex. B**,

Radiance's Response to the NAACP's Request for Admission No. 96.)

4.      The NAACP actively solicits contributions from, among others, members of the

African-American community and other people of color to support its programs and outreach

---

[1]   All citations in this brief to the NAACP's Statement of Material Facts Not In Dispute are shown as "SOF, ¶ __."  All references to "**Ex. __**" are to the exhibits attached to the Declaration of Steven J. Wadyka, Jr., dated November 11, 2013, submitted herewith.

activities. (*see*  Dkt No. 22, Jealous Dec. at ¶ 21; **Ex. B**, Radiance's Response to the NAACP's Request for Admission No. 95.)

5.      The NAACP sponsors billboards for the purpose of promoting its campaigns and outreach activities, which are focused issues of pressing importance to members of the black community. (**Ex. A**, the NAACP's Response to Radiance's Interrogatory No. 10; **Ex. B**, Radiance's Response to the NAACP's Request for Admission No. 98.)

6.      The NAACP mark (U.S. Trademark Registration No. 1,188,182) is a valid and subsisting federally registered trademark.  By virtue of this registration, the registered NAACP mark is entitled to protection under the Lanham Act, 15 U.S.C. § 1051, *et seq.*  (Dkt No. 10, NAACP's Counterclaim, ¶ 28; Dkt No. 15, Plaintiffs' Answer to the Counterclaim, ¶ 28.)

7.      The marks NAACP and NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE are owned and used by the NAACP, and are valid, protectable and distinctive.  (Dkt. No. 10, NAACP's Counterclaim, ¶¶ 11, 12, 33; Dkt No. 15, Plaintiffs' Answer to the Counterclaim, ¶¶ 11, 12, 33.)

8.      The NAACP and NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE marks have achieved widespread recognition among the general public of the United States. (Dkt No. 10,  NAACP's Counterclaim, ¶ 12; Dkt No. 15, Plaintiffs' Answer to the Counterclaim, ¶ 12.)

9.      The NAACP and NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE are famous and strong marks. (**Ex. B**, Radiance's Responses to the NAACP's Requests for Admission Nos. 86-89; Dkt No. 10, NAACP's Counterclaim, ¶ 38; Dkt No. 15, Plaintiffs' Answer to the Counterclaim, ¶ 38.)

10.    The NAACP and NATIONAL ASSOCIATION FOR THE ADVANCMENT OF COLORED PEOPLE marks were famous before Plaintiffs' first use of them.  (Dkt No. 10, NAACP's Counterclaim, ¶ 38; Dkt No. 15, Plaintiffs' Answer to the Counterclaim, ¶ 38; **Ex. B**, Radiance's Response to the NAACP's Request for Admission No. 111.)

11.    Radiance portrays itself as an educational, life-affirming 501(c)(3) organization. (Dkt No. 1, Complaint, ¶ 9; **Ex. B**, Radiance's Response the NAACP's Request for Admission No. 15.)  Radiance owns and maintains the website at the URL www.theradiancefoundation.org (the "Radiance Site").  Radiance provides informational, educational, and community outreach services relating to the anti-abortion movement.  (**Ex. B**, Radiance's Response to the NAACP's Request for Admission Nos. 1, 7.)

12.    Radiance launched its "TooManyAborted.com" campaign in 2010 for Black History Month to help publicize its view that abortion in the black community has become "epidemic." (**Ex. B**, Radiance's Response to the NAACP's Request for Admission No. 28; **Ex. E**, Bomberger Dep. Ex. 5)

13.    Radiance also owns and maintains the website at the URL www.toomanyaborted.com (the "TooManyAborted Site").  Among other things, the TooManyAborted Site displays (a) graphics and information indicating that abortion is the number one killer of black Americans, (b) photographs of black teenagers protesting funding for Planned Parenthood, (c) and endorsements from prominent black civil rights leaders, including Dr. Alveda King, a niece of Dr. Martin Luther King, Jr. (**Ex. B**,  Radiance's Response to the NAACP's Request for Admission Nos. 16, 17, 19, 21, 27;  **Ex. C**, 09/24/13 Deposition Transcript of Ryan Bomberger ("Bomberger Dep. I") at 137:8-138:3; 196:5-197:7; **Ex. E**, 09/24/13 Bomberger Dep. Exs. 5, 12.)

14.    Radiance provides community outreach services to organizations and individuals, including outreach on educational, character development, social issues, and racism against the black community.  Through its "Shine" community outreach activity, Radiance takes on various social issues, including poverty, educational choice, and civil rights.  Bomberger considers abortion to be a civil rights issue.  (**Ex. C**, Bomberger Dep. I at 81:12-82:18; 83:15-84:9; 133:8-12; **Ex. E**, 09/24/13 Bomberger Dep. Ex.  4.)

15.    Radiance's "TooManyAborted.com" campaign claims to be the first public ad campaign to associate abortion with racism against members of the black community.  The stated mission of the "TooManyAborted.com" campaign is to educate the public about abortion's impact on the African-American community.  (**Ex. C**, Bomberger Dep. I at 84:18-85:7; 92:18-93:12; **Ex. E** 09/24/13 Bomberger Dep. Exs. 4, 6.)

16.    Radiance purchases billboard space for the purpose of promoting and publicizing its campaigns and outreach activities.  (**Ex. B**, Radiance's Response to the NAACP's Request for Admission No. 99.)

17.    As part of its "TooManyAborted.com" campaign, Radiance provides the opportunity to sponsor billboards in exchange for a fee paid.  Radiance provides various services to the payor, including the licensing of artwork, creation of a state-specific web page, extensive research, content creation, and the opportunity to have the state-specific web page hosted on Radiance's TooManyAborted Site.  (**Ex. C**, Bomberger Dep. I at 74:3-75:6; 106:1-7; 176:10-178:13; 179:15-181:3; 182:11-184:17; 185:9-19.)

18.    The billboards financed through Radiance's "TooManyAborted.com" public ad campaign are placed in predominantly black neighborhoods.  (**Ex. C**, Bomberger Dep. I at 99:5-12; 102:10-16; 103:5-22; 104:4-105:3; 109:6-21; 112:1-14; 115:11-14; 116:16-117:11; 118:9-

119:4; 119:19-122:20; 126:7-127:4; 128:7-15; 130:16-19; 131:5-18; **Ex. E**, Bomberger Dep.

Exs. 7-10; **Ex. D**, 09/25/13 Deposition Transcript of Ryan Bomberger ("Bomberger Dep. II") at

383:18-384:8.)

19.     Anyone can initiate a financial transaction with Radiance by entering the payor's

contact information on the "Expose the Lies. Sponsor a Billboard" page of the TooManyAborted

Site.  The page enables the payor to specifically select the types of services it wishes to purchase.

A visitor to the TooManyAborted Site can access the page directly from the page on that site that

bears the name "National Association for the Abortion of Colored People."  By clicking the

"Submit" button on the "Expose the Lies. Sponsor a Billboard" page, the payor sends its contact

information directly to Radiance, which then contacts the interested party.  Radiance prefers to

have a signed agreement in place with the interested party before any financial transaction takes

place.  After all the details are confirmed with the interested party, Radiance sends that party a

license agreement.  (**Ex. C**, Bomberger Dep. I at 176:10-178:13; 185:20-187:21; 193:8-14; **Ex.**

**E**, 09/24/13 Bomberger Dep. Exs. 15, 16, 17.)

20.     Radiance has a standard licensing agreement for the financial transactions it enters into

with paying sponsors.  That agreement specifies the services to be provided by Radiance to the

organization, lists the pricing for those services, and specifies the payment and invoicing terms.

By signing this agreement, the payor enters into a partnership arrangement with Radiance. (**Ex.**

**C**, Bomberger Dep. I at 188:5-191:9, **Ex. E**, Bomberger Dep. Exs. 16, 38)

21.     Radiance's business plan, which has never been revised, states under the heading

"Merchandise" that "[a]ll merchandise is an extension of programs implemented by The

Radiance Foundation, Inc.  The sales will be a means by which to create revenue and market the

organization."  (**Ex. C**, Bomberger Dep. I at 65:2-66:8; Bomberger Dep. Ex. 2)

22.    In carrying out its tax exempt purposes as a 501(c)(3) organization, Radiance provides

goods, services or funds to individuals.  Those goods have included clothing such as t-shirts and

onesies, and novelty items such as stuffed animals, pins, buttons, and stickers.  Radiance has

provided these goods in exchange for money received from individuals.  (**Ex. C**, Bomberger

Dep. I at 77:4-13; 79:8-80:18; Bomberger Dep. Exs. 2-3)

23.    A page on the TooManyAborted Site displays the name "National Association for the

Abortion of Colored People" in an orange bar across the top of the page that identifies to a

viewer which page of the website the viewer has accessed.  The name "National Association for

the Abortion of Colored People" also appears on that page in large black lettering directly

beneath the orange bar, again in orange lettering directly beneath the black lettering, and again in

a large graphic beneath the orange lettering.  An orange box containing the word "Donate"

appears directly to the right of the large graphic and below the wording "National Association

for the Abortion of Colored People."  A visitor to this webpage can click on the "Donate" box

and make an online donation to Radiance.  (**Ex. C**, Bomberger Dep. I at 139:18-140:6; 140:18-

141:21; Bomberger Dep. Ex. 13)

24.    The web page on the TooManyAborted Site that displays the fictitious name "National

Association for the Abortion of Colored People" also contains an article in which that name and

the acronym "NAACP" appear.  That same article also appears on the Radiance Site beneath a

large photograph of a billboard that displays the NAACP mark together with the name "National

Association for the Abortion of Colored People."  An orange box containing the word "Donate"

appears directly to right of the article on this webpage of the Radiance Site.  A visitor to this

webpage can click on the "Donate" box and make an online donation to Radiance.  Nowhere on

these pages of the TooManyAborted Site or the Radiance Site, whether in the headings, graphics

or the article's text, does the actual name "National Association for the Advancement of Colored People" appear.  A person would not be able to ascertain from the headings alone that the name "National Association for the Abortion of Colored People" is not the real NAACP. (**Ex. C**, Bomberger Dep. I at 160:12-161:1; 162:7-163:1.165:15-21; 173:16-174:14, **Ex. E**, Bomberger Dep. Exs. 13-14)

25.    The name "National Association for the Abortion of Colored People" closely resembles "The National Association for the Advancement of Colored People."  (**Ex. B**, Radiance's Response to the NAACP's Request for Admission No. 100.)

26.    The article on the web pages that display the name "National Association for the Abortion of Colored People" does not explain that the name is meant to be a parody.  (**Ex. C**, Bomberger Dep. I at 173:3-6, **Ex. E**, 09/24/13 Bomberger Dep. Exs. 13-14)

27.    The web page displaying the name "National Association for the Abortion of Colored People" has appeared in Google Alert results for the term "NAACP."  A Google Alert generates a report to the subscriber whenever a specified term, such as the acronym "NAACP,' appears in a new place on the Internet.  The report is displayed in a manner similar to the result of a Google search.  A viewer of a Google Alert result displaying the heading "NAACP:  National Association for the Abortion of Colored People" would not be able to determine from the heading or the text beneath it whether the name "National Association for the Abortion of Colored People" was being used as a parody.  (**Ex. C**, Bomberger Dep. I at 270:20-279:2, **Ex. E**, 09/24/13 Bomberger Dep. Ex. 31)

28.    The NAACP engaged Henry D. Ostberg, Ph.D., an expert in marketing, consumer surveys, and marketing communications, to conduct a survey to determine reactions to the term "National Association for the Abortion of Colored People," including but not limited to when

that term is used in close association with the actual NAACP acronym.  A total of 365 interviews were conducted with a cross-section of relevant respondents.  Among these respondents, 81 of them consisted of both potential Radiance supporters (*i.e.*, those with a strong interest in opposing abortion) and potential NAACP supporters (*i.e.*, those with a strong interest in ensuring racial equality.  (**Ex. F**, Declaration of Henry D. Ostberg, Ph.D., dated 11/11/13 ("Ostberg Dec."), at ¶¶ 2-10; Appendix A to Ostberg Dec., Table 35)

29.    Based on the results of the survey, a significant percentage (13%) of potential Radiance supporters (*i.e.*, respondents who said they have a "strong interest" in opposing abortion) believed that the people using the term "National Association for the Abortion of Colored People" and the associated NAACP acronym were either affiliated with the actual NAACP or had obtained or required permission from the actual NAACP to use the term "National Association for the Abortion of Colored People."  (**Ex. F**, Ostberg Dec. at ¶¶ 26-29.)

30.    The survey results also showed that 10% of potential Radiance supporters believed the initials "NAACP" stood for "National Association for the Abortion of Colored People" or some other name that included the word "abortion."  (**Ex. F**, Ostberg Dec. at ¶ 30.)

31.    Another ten percent (10%) of potential Radiance supporters believed that the term "National Association for the Abortion of Colored People" was the name of an actual organization or group.  (**Ex. F**, Ostberg Dec. at ¶ 31.)

32.    Among potential NAACP supporters, only 5% volunteered, on an unaided basis, that the term "National Association for the Abortion of Colored People" was intended as a parody or criticism.  When it was suggested to potential NAACP supporters, and they were asked specifically, whether the term "National Association for the Abortion of Colored People" could be described as parody or sarcasm, 22% replied affirmatively.  (**Ex. F**, Ostberg Dec. at ¶¶ 32-34.)

33. After subtracting the percentage of potential NAACP supporters who answered, when asked specifically, if the term "National Association for the Abortion of Colored People" could be a parody or sarcasm (22%) from those who said that the actual NAACP came to mind when they encountered the term "National Association for the Abortion of Colored People" (42%), there was a net dilution by tarnishment of the NAACP's name and reputation of at least 20%. (**Ex. F**, Ostberg Dec. at ¶ 35.)

34. Alternatively, if one were to subtract the percentage who deemed "National Association for the Abortion of Colored People" to be a parody or criticism on an unaided or volunteered basis (5%) from those who volunteered that the term caused them to think of the actual NAACP (42%), there is a net dilution by tarnishment of the NAACP's name and reputation of 37%. (**Ex. F**, Ostberg Dec. at ¶ 38.)

35. A substantial percentage of potential NAACP supporters (21%) said or suggested that the people who use the term "National Association for the Abortion of Colored People" wanted to harm or tarnish the name and reputation of the NAACP rather than to simply criticize its goals or activities. (**Ex. F**, Ostberg Dec. at ¶¶ 39-40.)

36. Potential NAACP supporters who believed that the Radiance article and photograph of the billboard harmed or tarnished the NAACP said or implied such things as: the NAACP supports bigotry/discrimination/hatred/racism, the NAACP wants to wipe out colored people/reduce black population, the NAACP supports genocide, the NAACP supports abortion, supremist [*sic*] group, or made other statements which smeared or defamed the NAACP. (**Ex. F**, Ostberg Dec at ¶ 41.)

37. Moreover, 31% of potential NAACP supporters believed that the Radiance web page, including the photograph of the billboard which prominently displayed the "NAACP"

acronym and the name "National Association for the Abortion of Colored People," was

"truthful/believable."  (**Ex. F**, Ostberg Dec. at ¶ 42.)

38.    Radiance has done nothing to determine whether people who viewed the web page

displaying the name "National Association for the Abortion of Colored People" considered either

that name or the web page in its entirety to be a parody.  It has conducted no study or survey as

to whether its use of the name "National Association for the Abortion of Colored People" has

resulted in confusion among people who have visited the page.  Nor has it conducted a survey as

to whether people who viewed the web page considered it or the name "National Association for

the Abortion of Colored People" to be a parody.  (**Ex. C**, Bomberger Dep. I at 166:13-19;

171:22-173:2.)

39.    When Bomberger used the term "National Association for the Abortion of Colored

People," it was his intent to convey to people that the actual NAACP is pro-abortion.  (**Ex. C**,

Bomberger Dep. I at 173:7-11; **Ex. E**, 09/24/13 Bomberger Dep. Ex. 14.)

40.    The NAACP has not taken a position supporting or opposing abortion, and has never

espoused a pro-abortion position.  The issue of abortion remains absent from the NAACP's

educational and advocacy efforts.  (**Ex. A**, The NAACP's Responses to Radiance's First Set of

Interrogatories Nos. 6, 7.a.; **Ex. C**, Bomberger Dep. I at 212:11-21.)

41.    One of Bomberger's colleagues in the black pro-life movement is Rev. Arnold

Culbreath.  Although Bomberger has known Rev. Culbreath since 2010, Bomberger did not

know until about one month ago that Rev. Culbreath is a member of the NAACP.  (**Ex. C**,

Bomberger Dep. I at 198:11-17; 202:20-203:3; **Ex. E**, Bomberger Dep. Exs. 18-19)

42.    Governor McDonnell of Virginia, whom Bomberger considers to be pro-life, recently

praised the NAACP on Lincoln's Birthday. (**Ex. D**, Bomberger Dep. II at 412:3-19.)

43.     Subsequent to the filing of this lawsuit, Bomberger has continued to write articles and create graphics criticizing the NAACP as being pro-abortion without using the name "National Association for the Abortion of Colored People."  He has received no demand from the NAACP that he stop these activities.  (**Ex. D**, Bomberger Dep. II at 422:14-20; 423:17-424:12; 425:3-9; 426:7-17; 427:5-9, **Ex. E**, Bomberger Dep. Ex. 42.)

### III.  LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is proper in a trademark infringement case "if the moving party demonstrates that there is no genuine issue as to any material fact, and that it is entitled to judgment as a matter of law."  *U-Haul Int'l, Inc. v. WhenU.com*, 279 F. Supp 2d 723, 726 (E.D. Va. 2003).  As one court in this Circuit has recognized, "[t]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of <u>material</u> fact."  Id. at 726 -27 (citations omitted, emphasis in original).  As the Supreme Court explained, a fact is "'material' only if it might affect the outcome of the suit."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  Whether a fact is considered to be "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Anderson*, 477 U.S. at 248.

The purpose of summary judgment is

> to avoid a useless trial.  It is a device used to make possible the prompt disposition of controversies on their merits without a trial, if in essence, there is no real dispute as to the salient facts.

*Johnson v. McKee Banking*, 398 F.Supp. 201, 204 (W.D. Va. 1975), *aff'd*, 532 F.2d 750 (4th Cir. 1976) quoting *Bland v. Norfolk and Southern Railroad Company*, 406 F.2d 863, 866 (4th Cir. 1969). Here, as there are no underline material facts in dispute, summary judgment is appropriate.

## IV. ARGUMENT

### A. The NAACP is Entitled to Summary Judgment on its Claims for Trademark Infringement

To establish a trademark infringement claim under the Lanham Act, a plaintiff must prove: (1) that it owns a valid mark; (2) that the defendant used the mark (or a confusingly similar imitation) "in commerce" and without the plaintiff's authorization; (3) that the defendant used the mark (or an imitation of it) "in connection with the sale, offering for sale, distribution, or advertising" of goods or services; and (4) that the defendant's use of the mark is likely to confuse consumers. *Rosetta Stone Ltd. v. Google, Inc.*, 676 F.3d 144, 152 (4th Cir. 2012).

Based on the undisputed material facts adduced through discovery, this case is now ripe for summary adjudication on the NAACP's claims for trademark infringement, false designation of origin, unfair competition and trademark dilution. Accordingly, the Court should now grant summary judgment on these claims in favor of the NAACP.

### 1. The NAACP owns valid, protectable and distinctive marks.

It is undisputed that the NAACP's marks are valid, protectable and distinctive. Indeed, Plaintiffs admit that: (1) the federal trademark registration for the NAACP mark is valid, subsisting and that the acronym mark is entitled to protection under the Lanham Act;[2] (2) the marks NAACP and NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED

---

[2]  In addition, the federal trademark registration for the NAACP acronym is incontestable, and thus constitutes *prima facie* evidence of the NAACP's ownership of the acronym mark, the validity of the mark and of the registration of that mark, and the NAACP's exclusive right to use that mark in connection with the goods and services set forth in the Certificate of Registration. *See* 15 U.S.C. § 1115(b).

PEOPLE are valid, protectable and distinctive; (3) the marks NAACP and NATIONAL

ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE are owned and used by

the NAACP to identify its services and have achieved widespread recognition among the general

public of the United States.  SOF, ¶¶ 6-8.

> **2.** **Plaintiffs have used the NAACP and "National Association for the Abortion of Colored People" marks in commerce, without the NAACP's authorization, "in connection with the sale, offering for sale, distribution, or advertising" of goods or services.**

Section 32(1)(a) of the Lanham Act bars the unauthorized use "in commerce" of "any

reproduction, counterfeit, copy, or colorable imitation of a registered mark *in connection with the*

*sale, offering for sale, distribution, or advertising of any goods or services* [if] such use is likely

to cause confusion, or to cause mistake, or to deceive."  15 U.S.C. § 1114(1)(a) (emphasis

added).[3]

This Circuit and others "have been reluctant to define those terms narrowly.  Rather, . . .

the term 'services' has been interpreted broadly and so the Lanham Act has . . . been applied to

defendants furnishing a wide variety of non-commercial public and civic benefits."  *Lamparello*

*v. Falwell*, 420 F.3d 309, 314 (4th Cir. 2005) (internal citations and quotations omitted).  *See,*

*e.g., Planned Parenthood Federation of America, Inc. v. Bucci*, 42 U.S.P.Q.2d 1430, 1436

(S.D.N.Y., Mar. 24, 1997), *aff'd*, 152 F.3d 920 (2d Cir. 1998) (defendant's solicitation of funds

in relation to his anti-abortion activities was commercial in nature, and defendant's labeling of

his web site with plaintiff's mark related to the origin, sponsorship, or approval by plaintiff of

---

[3]    Section 43(a) of the Lanham Act similarly prohibits the unauthorized use in commerce of "any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person."  15 U.S.C. § 1125(a)(1)(A).

defendant's web site; Lanham Act held applicable);   *United We Stand America, Inc. v. United We Stand, America New York, Inc.*, 128 F.3d 86, 90 (2d Cir. 1997), *cert. denied*, 523 U.S. 1076, 118 S.Ct. 1521, 140 L.Ed.2d 673 (1998) (defendant political organization that was incorporated "to solicit, collect and otherwise raise money," and engaged in political organizing, issuing press releases, endorsing candidates, and distributing partisan political literature, though not undertaken for profit, "unquestionably render[ed] a service . . . .  We have no doubt that they satisfy § 1114(1)(a)'s requirement that the mark be used in connection with goods and services."); *Brach Van Houten Holding, Inc. v. Save Brach's Coalition for Chicago*, 856 F.Supp. 472, 475-76 (N.D. Ill. 1994) (group engaged in soliciting donations, preparing press releases, holding public meetings and press conferences, and organizing on behalf of its members' interests was performing "services" within the meaning of the Lanham Act); *Birthright v. Birthright, Inc.*, 827 F.Supp. 1114, 1138 (D.N.J. 1993) ("Although, strictly speaking, [the defendant's] fundraising letters were not commercial advertisements, Section 43(a)(1)(B) [of the Lanham Act] is broad enough to support, in the context of non-profit fundraising, a claim of false and misleading statements about the services presented by a protected mark.").

The case of *Christian Science Board of Directors of the First Church of Christ, Scientist v. Robinson*, 123 F.Supp.2d 965 (W.D.N.C. 2000) is also instructive on the "commercial use" issue.  In *Christian Science*, the defendant operated a website, which displayed the plaintiff's marks, to provide informational services to convince people that his version of Christian Science was the "true" version and posted material that was critical of the plaintiff.  Rejecting the defendant's contention that he that did not engage in use of the plaintiff's mark under the Lanham Act because he was not offering anything for sale, the court held that "there is no profit

requirement in the Lanham Act."[4]  *Christian Science*, 123 F.Supp.2d at 970.  The court further

held as follows:

> ***The fact that [defendant] criticizes the Plaintiffs does not provide
> immunity.*** [citation omitted] Moreover, as did [defendant], the defendant
> in *Planned Parenthood* solicited funds through the Internet and
> encouraged followers to enlist in his cause.  The "defendant offer[ed]
> informational services for use in convincing people that certain activities,
> including the use of the plaintiff[s'] services, are morally wrong.  ***In this
> way, defendant offers his own set of services, and [defendants'] use of
> plaintiff[s'] mark is in connection with the distribution of those services
> over the Internet***. . . . Thus, contrary to Defendants' position, the Lanham
> Act does apply to "the free distribution of information services"
> concerning the Defendants' religious beliefs on the Internet.

123 F.Supp.2d at 970-71 (emphasis added).

Here, Plaintiffs unquestionably use the actual NAACP's acronym mark, together with the

confusingly similar fictitious name "National Association for the Abortion of Colored People,"

in commerce in connection with the sale, offering for sale, distribution, and advertising of goods

or services.  The following undisputed facts show the commercial activity that is solicited and

conducted by Radiance via its TooManyAborted.com website:

- Radiance provides the opportunity to sponsor billboards in exchange for a fee paid.
  Radiance provides various services to the payor, including the licensing of artwork,
  creation of a state-specific web page, extensive research, content creation, and the
  opportunity to have the state-specific web page hosted on Radiance's TooManyAborted
  Site.  (SOF, ¶ 17)

- Anyone can initiate a financial transaction with Radiance by entering contact information
  on the "Expose the Lies. Sponsor a Billboard" page of the TooManyAborted.com
  website.  The page enables the payor to specifically select the types of services it wishes
  to purchase.  A visitor to the TooManyAborted.com website can access the page directly
  from the page on that site that bears the name "National Association for the Abortion of
  Colored People."  By clicking the "Submit" button on the "Expose the Lies. Sponsor a

---

[4]  As the *Christian Science* court observed, "the [Lanham] Act's requirement that an infringing
use be 'in commerce' encompasses non-profit services."  123 F.Supp.2d at 970 (*citing United
We Stand America*, 128 F.3d at 92-93).  *See also MGM Pathe Communications v. Pink Panther
Patrol*, 774 F.Supp. 869 (S.D.N.Y. 1991) (group formed to offer the free service of protecting
gay individuals from assault was subject to the Lanham Act).

Billboard" page, the payor organization sends its contact information directly to Radiance, which then contacts the interested party.  Radiance prefers to have a signed agreement in place with the interested party before any financial transaction takes place.  After all the details are confirmed with the interested party, Radiance sends that party a license agreement.  (SOF, ¶ 19)

■  Radiance has a standard licensing agreement for the financial transactions it enters into with paying sponsors.  That agreement specifies the services to be provided by Radiance to the payor, lists the pricing for those services, and specifies the payment and invoicing terms.  By signing this agreement, the payor enters into a partnership arrangement with Radiance.  (SOF, ¶ 20)

■  A page on the TooManyAborted.com website displays the name "National Association for the Abortion of Colored People" in an orange bar across the top of the page that identifies to a viewer which page of the website the viewer has accessed.  That name also appears on that page in large black lettering directly beneath the orange bar, again in orange lettering directly beneath the black lettering, and again in a large graphic beneath the orange lettering.  An orange box containing the word "Donate" appears directly to the right of the large graphic and below the wording "National Association for the Abortion of Colored People."  A visitor to this web page can click on the "Donate" box and make an online donation to Radiance.  (SOF, ¶ 23)

This commercial activity amply satisfies the requirement of use "in connection with" goods or services under this Circuit's precedents.  For instance, in *People for the Ethical Treatment of Animals v. Doughney*, 263 F.3d 359 (4th Cir. 2001) (hereinafter, "*PETA*"), the court held that "[t]o use [the plaintiff's] Mark 'in connection with' goods or services, the [defendant] need not have actually sold or advertised goods or services on the *www.peta.org* website.  Rather, [the defendant] need only have prevented users from obtaining or using [the plaintiff's] goods or services, ***or need only have connected the website to other's goods or services.***"  *PETA*, 263 F.3d at 365 (emphasis added).  Here, of course, Plaintiffs' TooManyAborted.com website does not merely link to other websites that engage in commercial activity; rather, the commercial activity is both solicited and takes place ***on the Plaintiffs' website itself*** and from pages on that site that prominently display the fictitious, confusing and hate-filled name "National Association for the Abortion of Colored People."  Thus, the commercial activity here

is far more direct than in *PETA* and cases upon which it relied, where courts found the use "in connection with" requirement was met. *See, e.g., PETA*, 263 F.3d at 366 ("[Defendant's] web site provides links to more than 30 commercial operations offering goods and services. By providing links to these commercial operations, [defendant's] use of PETA's Mark is 'in connection with' the sale of goods or services."); *OBH, Inc. v. Spotlight Magazine, Inc.*, 86 F.Supp.2d 176, 183 (W.D.N.Y. 2000) (defendant's site contained hyperlinks to other local news sources and a site owned by the defendants that advertised Buffalo-area apartments for rent). *See also Taubman Co. v. Webfeats*, 319 F.3d 770, 775 (6th Cir. 2003) (defendant's links to two commercial websites constituted use "'in connection with the advertising' of the goods sold by the advertisers. This is precisely what the Lanham Act prohibits.").

### 3. Plaintiffs' use of the NAACP mark and the name "National Association for the Abortion of Colored People" creates a likelihood of confusion among consumers

This Circuit has recognized that while likelihood of confusion is "an inherently factual issue that depends on the facts and circumstances in each case," summary judgment on likelihood of confusion "is certainly permissible in appropriate cases." *Rosetta Stone Ltd. v. Google, Inc.*, 676 F.3d 144, 153 (4th Cir. 2012). This is one of those cases. Now that fact and expert discovery in this case have been completed, the undisputed material facts demonstrate that summary judgment on likelihood of confusion not only permissible but appropriate here.

The Fourth Circuit has identified seven factors for determining whether a likelihood of confusion exists, but "not all these factors are always relevant or equally emphasized in each case." *Pizzeria Uno Corp. v. Temple,* 747 F.2d 1522, 1527 (4th Cir.1984) (internal quotation

marks, citations, and brackets omitted).[5]  The factors are: "(1) the strength or distinctiveness of the mark; (2) the similarity of the two marks; (3) the similarity of the goods/services the marks identify; (4) the similarity of the facilities the two parties use in their businesses; (5) the similarity of the advertising used by the two parties; (6) the defendant's intent; (7) actual confusion."  *Id.* (citation omitted).  The undisputed facts as to each of these factors strongly favor the NAACP.

As to the first two *Pizzeria Uno* factors (strength of the mark[6] and similarity of the two marks), Plaintiffs *admit* that the NAACP and NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE marks are strong and distinctive marks and that the name "National Association for the Abortion of Colored People" closely resembles the NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE mark. SOF, ¶¶ 7-9, 25.  Moreover, the famous NAACP acronym mark is used in identical, unaltered form by Plaintiffs in association with their fictitious and confusing straw-man organization "National Association for the Abortion of Colored People."  SOF, ¶¶ 23-24.

The third *Pizzeria Uno* factor (similarity of goods or services) also favors the NAACP, as both Radiance and the NAACP provide educational, informational, and community outreach services on social issues of pressing importance to the African-American community, including education and civil rights.  SOF, ¶¶ 1, 2, 14.  Likewise, the fictitious "National Association for the Abortion of Colored People" is portrayed as a social advocacy group.  SOF, ¶¶ 23-24.  Under

---

[5]  As this Circuit has held, "'there is no need for each factor to support [the plaintiff's] position on the likelihood of confusion issue.'"  *Rosetta Stone*, 676 F.3d at 154 (quoting *Synergistic Int'l, LLC v. Korman*, 470 F.3d 162, 171 (4th Cir. 2006).

[6]  The "strength of the mark" factor is the "paramount" consideration under this Circuit's likelihood of confusion analysis.  *See Pizzeria Uno*, 747 F.2d at 1527.

the fourth and fifth factors (similarity of facilities[7] and similarity of advertising), both parties

direct their efforts to members of the black community in the United States and actively solicit

donations to support those efforts, and both sponsor billboards for the purpose of promoting their

campaigns and outreach activities.  SOF, ¶¶ 3-5, 12-19, 23-24.  Again, the fictitious "National

Association for the Abortion of Colored People" is portrayed as engaging in exactly the same

types of activities.[8]

On the actual confusion factor, the results of the consumer survey conducted by Henry D.

Ostberg, Ph.D. -- a recognized consumer survey expert who has performed over 200 surveys on

likelihood of confusion and dilution and has testified at trial in federal court in over 40 trademark

cases -- showed a 13% net level of direct confusion as to source, sponsorship, affiliation or

approval.  SOF, ¶ 29.  This result amply demonstrates actual confusion.  *See Sara-Lee Corp. v.*

*Kayser-Roth Corp.*, 81 F.3d 455, 467 n. 15 (4th Cir. 1996) (noting caselaw that "hold[s] that

survey evidence indicating ten to twelve percent confusion was sufficient to demonstrate actual

confusion.").[9]

---

[7]  As the Fourth Circuit in *Rosetta Stone* held, "[w]hen considering the similarity of facilities,
courts are trying to determine if confusion is likely based on 'how and to whom the respective
goods of the parties are sold.'"  *Rosetta Stone*, 676 F.3d at 155 (quoting 4 J. Thomas McCarthy,
*McCarthy on Trademarks and Unfair Competition* § 24:51).

[8]  It is also important to note that there was substantial overlap among the respondents in Dr.
Ostberg's survey between potential Radiance supporters (*i.e.*, those with a strong interest in
opposing abortion) and potential NAACP supporters (*i.e.*, those with a strong interest in ensuring
racial equality).  *See* SOF, ¶ 28.  This further compels a finding of likelihood of confusion under
the *Pizzeria Uno* factors.

[9]  No fixed percentage in a survey determines the existence or non-existence of confusion.  The
survey result is just one factor to consider among all the others.  However, many cases have
found confusion with survey findings at or below the level of direct confusion as to source,
sponsorship, endorsement or approval present in this case, without even considering the
additional forms of actual confusion also shown in Dr. Ostberg's survey.  *See, e.g.,  Humble Oil
v. American Oil Co.*, 405 F.2d 803, 817 (8th Cir. 1969) (recognizing findings of 11% as sufficient
and "not an insignificant percentage"); *Starbucks Corp. v. Samantha Lundberg*, 2005 U.S. Dist.

Adding to this significant level of direct confusion as to source, sponsorship, affiliation or approval, the results of Dr. Ostberg's survey also showed that 10% of potential Radiance supporters believed the initials "NAACP" stands for "National Association for the Abortion of Colored People," while 10% believed that the term "National Association for the Abortion of Colored People" is the name of an actual organization or group.  SOF, ¶¶ 30-31.  And even Bomberger admits that a visitor to the page on the TooManyAborted.com website, which displays headings consisting of the name "National Association for the Abortion of Colored People," would not be able to ascertain from the headings alone that the "National Association for Abortion of Colored People" is not the real NAACP.  SOF, ¶ 24.  He likewise admits that the results of the Google Alerts on the acronym "NAACP" would not signal in any way to a viewer that the results are supposed to be a parody.[10]  SOF, ¶ 27.

In short, Plaintiffs have (a) presented the fictitious name "National Association for the Abortion of Colored People" as if it is a real organization, (b) associated that fictitious organization with the famous actual acronym NAACP, and (c) caused multiple forms of actual

---

LEXIS 32660 *25 (D. Or. 2005) ("The percentage of consumers likely to confused can be in the range of 10 to 15 percent or even lower."); *James Burrough Ltd. v. Sign of the Beefeater , Inc.*, 540 F.2d 266, 279 (7th Cir. 1976) ("We cannot agree that 15% is small."); *Jockey Int'l, Inc. v. Burkard*, 185 U.S.P.Q. 201, 203 (S.D.Cal. 1975) (11.4%); *James Burrough Ltd v. Lesher*, 309 F.Supp. 1154, 1160, n.6 (S.D. Ind. 1969) (11%); *Grotrian v. Steinway*, 365 F.Supp. 707, 716 (S.D.N.Y. 1973) (7.7% found to be "strong evidence" of likelihood of confusion); *Coca Cola Co. v. Tropicana Prods., Inc.,* 690 F.2d 312, 317 (2d Cir. 1982) (7.5% could sustain a finding of substantial consumer confusion).  In this regard, it should be remembered that even a figure such as 13%, if extrapolated to the U.S. population, results in approximately 40,000,000 million being confused.  *See* U.S. Census estimate of U.S. population, as of November 11, 2013, being over 317 million.  http://www.census.gov/popclock/

[10]   In this regard, the present case bears similarity to the *PETA* case where the separation of explanation from the use of another party's mark in an attempt at parody was a key factor in finding that the parody failed and that the use of the mark was infringing.  *See PETA*, 263 F.3d at 366-67 ("Doughney claims that this second message can be found in the content of his website. . . . However, this second message is not conveyed *simultaneously* with the first message, as required to be considered a parody.") (emphasis in original).

confusion, each sufficient to support a finding of infringement, and all of which, taken together with the totality of the undisputed evidence, demonstrate overwhelming likelihood of confusion.

**B. The NAACP is Entitled to Summary Judgment on its Trademark Dilution Claim**

Plaintiffs' adoption of NAACP's famous acronym for Plaintiffs' fictitious advocacy group – plus the parallel full name "National Association for the Abortion of Colored People" – creates an obvious association with the real NAACP and "harms the reputation" of NAACP's famous marks. This type of association, plus harm to reputation, is the definition of dilution by tarnishment. *See* 15 U.S.C. § 1125(c)(2)(C).

Dilution by tarnishment, which forms the basis of the NAACP's trademark dilution claim against Plaintiffs, "creates consumer aversion to the famous brand – *e.g.*, when the plaintiff's famous trademark is linked to products of shoddy quality, or is portrayed in an unwholesome or unsavory context" such that "the public will associate the lack of quality or lack of prestige in the defendant's goods with the plaintiff's unrelated goods." *Rosetta Stone*, 676 F.3d at 167 (internal quotations omitted). The "*sine qua non* of tarnishment is a finding that plaintiff's mark will suffer negative associations through defendant's use." *NBA Properties v. Untertainment Records LLC*, 1999 WL 335147 at *8 (S.D.N.Y., May 26, 1999), citing *Hormel Foods Corp. v. Jen Henson Prods., Inc.*, 73 F.3d 497, 507 (2d Cir. 1996).

A plaintiff establishes a *prima facie* dilution claim under the Trademark Dilution Revision Act ("TDRA") by showing (1) that the plaintiff owns a famous mark that is distinctive; (2) that the defendant commenced using a mark in commerce that allegedly is diluting the famous mark at any time after the owner's mark became famous; (3) that a similarity between the defendant's mark and the famous mark gives rise to an association between the marks, and (4) that the association is likely to impair the distinctiveness of the famous mark or likely to

harm the reputation of the famous mark.  *Rosetta Stone*, 676 F.3d at 168.  Importantly, a plaintiff

can establish dilution by tarnishment "***regardless of the presence or absence of actual or likely***

***confusion, of competition, or of actual economic injury.***"  15 U.S.C. § 1125(c)(1) (emphasis

added).

Here, the undisputed facts amply demonstrate that the NAACP satisfies the requirements

for establishing dilution by tarnishment.  First, as shown at pages 15 through 19, *supra*, there can

be no question that Plaintiffs have engaged in commercial use in commerce of the famous and

distinctive NAACP acronym and the term "National Association for the Abortion of Colored

People" which, as Plaintiffs admit, closely resembles the famous and distinctive NATIONAL

ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE mark.  SOF, ¶¶ 17-25.

Nor is there any dispute that Plaintiffs began use of the NAACP mark and the fictitious alteration

of its full name after those marks had become famous.  SOF, ¶ 10.  And the survey results show

a substantial level of association – namely, 42% -- among the relevant consumer group between

the fictitious name and the famous NATIONAL ASSOCIATION FOR THE ADVANCEMENT

OF COLORED PEOPLE mark.  SOF, ¶¶ 33-34.

Further, it hardly needs discussion to conclude that the reputation of the genuine NAACP

is harmed by being associated with a purported mission of racially motivated genocide.  Nothing

could be more antithetical to the real NAACP mission.  The NAACP is one of the most revered

civil rights organizations in the country.  Its mission is to "advance" the position of African

Americans in society.  SOF, ¶¶ 1-2.  To associate that name with a *mission* to "abort" African

Americans is toxic.   It conjures images of white-supremacist thugs or Nazi eugenics.   In fact,

many such responses were given among the qualitative answers in the survey.  *See,* SOF, ¶ 36.

("NAACP supports bigotry, discrimination, hatred, racism," "NAACP wants to wipe out colored

people, reduce black population," "NAACP supports genocide," "supremist [*sic*] group").

Far-lesser forms of unsavory association than race-based genocide have routinely been

condemned by the courts as forms of dilution by tarnishment without need for extended analysis.

*E.g.*, *Anheuser-Busch, Inc. v. Balducci Pubs.*, 28 F.3d 769, 777-78 (8th Cir. 1994) (defendants'

use of MICHELOB OILY in a purportedly satirical placement in a humor magazine – i.e., not in

an advertisement for another product or company – held tarnishing due to its suggestion that

plaintiff's beer contained oil ); *Chemical Corp. of America v. Anheuser-Busch, Inc.*, 306 F.2d

433, 436-38 (5th Cir. 1962), *cert. denied*, 372 U.S. 965, 83 S.Ct. 1089, 10 L.Ed.2d 129 (1963)

(enjoining use of "WHERE THERE'S LIFE . . . THERE'S BUGS!" slogan as tarnishing of

WHERE THERE'S LIFE, THERE'S BUD); *Pillsbury Co. v. Milky Way Productions, Inc.*, 215

U.S.P.Q. 124, 135 (N.D. Ga. 1981) ( defendant liable for dilution by tarnishment for publishing

cartoon of "Poppin' Fresh" and "Poppie Fresh" doughpersons engaging in sexual intercourse and

fellatio); Coca-*Cola Co. v. Gemini Rising, Inc.*, 346 F.Supp. 1183, 1190-91 (E.D.N.Y. 1972)

(enjoining ENJOY COCAINE posters based on tarnishment because customers might be "turned

off" by so-called "spoof"); *NBA Properties v. Untertainment Records, LLC*, 1999 WL 335147 at

*9 (use of NBA logo with gun placed in player's hand plus slogan SDE SPORTS, DRUGS &

ENTERTAINMENT).

It has even been suggested that a presumption of harm exists – or at least a strong

inference – merely by associating a famous mark with sex-related product.  *See V Secret*

*Catalogue, Inc. v Moseley*, 605 F.3d 382 (6th Cir. 2010).  If association with sex toys is enough

to presume harm (or at least to infer harm), then association with racially motivated genocide

must also be enough.  As the other examples listed above amply show, extensive evidence to

prove harm to reputation is not needed.  This is particularly true under the current version of the Federal Trademark Dilution Act, 15 U.S.C. § 1125(c), which requires only proof of *likelihood* of dilution, and not proof of actual harm.  This change in the law, introduced in 2006, was expressly intended to lower the standard of proof necessary and to eliminate a need to prove actual harm. *See V Secret Catalogue, Inc. v Moseley*, 605 F.3d at 387-89.

But lest there be any doubt on the issue of likely harm, the survey in this case provides ample support for the likely harm to the NAACP's reputation.  The net dilution by tarnishment caused by Plaintiffs' use of the famous NAACP mark and the term "National Association for the Abortion of Colored People" ranges from at least 20% on an aided basis to as high as 37% on an unaided basis.  SOF, ¶¶ 33-34.  In addition, 21% of respondents from the relevant consumer group (potential NAACP supporters) said or suggested that the people who use the term "National Association for the Abortion of Colored People" wanted to harm or tarnish the name and reputation of the NAACP rather than to simply criticize its goals, SOF, ¶ 36, and 31% of those respondents believed that the Radiance webpage – which features a photograph of a billboard that prominently displays the NAACP acronym alongside the "National Association for the Abortion of Colored People," was "truthful/believable."  SOF, ¶ 37.  These percentages vividly demonstrate the harm to the NAACP's reputation.  There can be no doubt, therefore, that based on the undisputed facts of record, the NAACP has proved dilution by tarnishment.

### C.  Plaintiffs' Use of the Famous NAACP Mark and the Term "National Association for the Abortion of Colored People" is a Failed Parody

The heart of Plaintiffs' case is the defense of parody.   "But the cry of 'parody!' does not magically fend off otherwise legitimate claims of trademark infringement or dilution."  *Dr. Seuss Enters., L.P. v. Penguin Books, USA,* 105 F.3d 1394, 1405 (9th Cir. 1997).  *See also Anheuser-Busch, Inc. v. VIP Products, LLC,* 666 F.Supp. 2d 974, 984-86 (E.D. Mo. 2008) (rejecting

claimed parody defense of "Buttwiper" for a dog squeeze toy as a failed "parody" of Budweiser);
*Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC,* 507 F.3d 252, 260-61 (4th Cir. 2007)
(analyzing successful or failed nature of a claimed parody as an essential first step to guide
analysis of claimed defense to alleged infringement or dilution).

"A 'parody' is defined as a simple form of entertainment conveyed by juxtaposing the
irreverent representation of the trademark with the idealized image created by the mark's
owner." *PETA,* 263 F.3d at 366 (failed parody where PETA acronym was used in a context
separate from the additional information necessary to convey the necessary information that the
user was not affiliated with but instead was critiquing the actual owner of the PETA name). "A
parody must convey two simultaneous – and contradictory – messages: that it is the original, but
also that it is *not* the original and is instead a parody." *Id.* "This second message must not only
differentiate the alleged parody from the original but must also communicate some articulable
element of satire, ridicule, joking, or amusement, . . . presumably a humorous difference, in order
to product its desired effect." *Louis Vuitton,* 507 F.3d at 260, quoting *Jordache Enterprises, Inc.
v. Hogg Wyld, Ltd.,* 828 F.2d 1482, 1486 (10th Cir. 1987).

Plaintiffs' purported parody fails in this case.  It has none of the earmarks of successful
parody.  Instead, it causes confusion and serves only to tarnish the name of one of the nation's
most revered civil rights organizations.  The famous NAACP acronym mark is presented in
*unaltered* form in conjunction with the fictitious name "National Association for the Abortion of
Colored People."   The full name "National Association for the Abortion of Colored People" is
presented as if it is a real organization.  The unaltered NAACP acronym is presented as if its
stands for the name of the fictitious organization.   No tongue-in-cheek content signals that there
is a joke of any kind.  Nor would an anti-abortion audience have reason to doubt that the

portrayed target of the web pages and other promotional materials is real.   No other
organizations are presented in distorted fashion to suggest a broader parody purpose.   To the
contrary, the presentation communicates, both expressly and implicitly, that the famous acronym
NAACP stands for "National Association for the Abortion of Colored People, or that the famous
NAACP organization in fact "has become" the "National Association for the Abortion of
Colored People" (*i.e.*, it has changed its name or mission) or that there is an actual organization
called "National Association for the Abortion of Colored People" which is affiliated somehow
with the actual and famous NAACP.

The facts of this case stand in stark contrast to other situations where courts have found a
parody to be successful.  *See, e.g., Louis Vuitton, supra* (distorted and altered versions of famous
marks from many high-end fashion houses put onto a full line of inexpensive dog chew toys in a
manner that called all the original brands to mind but remained distinct as just poking fun at the
entire high-end fashion industry; no use of the literal form of any one company's marks to
designate a purportedly real organization with a mission antithetical to the true owner's mission;
no survey or other credible evidence of reputational harm other than sheer speculation); *New
York Stock Exchange, Inc. v. New York, New York Hotel, LLC*, 293 F.3d 550, 555 (2d Cir. 2002)
(advertisements, brochures and website for New York-themed casino resort in Las Vegas with
parodies of many famous New York landmarks, including "New York $lot Exchange," all done
in such obviously modified fashion "that any viewer would understand that the Casino was
engaged in a parody or humorous play on words," particularly when viewed in context and
combination with all the other obvious parodies).

The uncontroverted survey evidence confirms the failed parody.   At least 13% of
respondents believe there is an affiliation between the actual NAACP and the people who use the

term "National Association for the Abortion of Colored People."   Another 10% believe that the famous NAACP acronym stands for "National Association for the Abortion of Colored People." And another 10% believe there is an actual organization called "National Association for the Abortion of Colored People."  SOF, ¶¶ 29-31.  Any one of these findings alone could support the conclusion of failed parody and dilution.  Together, they conclusively confirm that, whatever Bomberger's subjective intent in conjuring up the fictitious "National Association for the Abortion of Colored People" and associating that straw man organization with the NAACP acronym, the effect in this case failed as a parody.[11]

Bomberger's own deposition testimony demonstrates that his attempt at parody is a failed one.  While he asserts that the "parody" here consists of the name "National Association for the Abortion of Colored People" (Bomberger Dep. I at 169:14-19), he admits that a viewer of the Google Alert result displaying the heading "NAACP: National Association for the Abortion of Colored People" would not be able to determine from the heading or the text appearing beneath it whether the name "National Association for the Abortion of Colored People" was being used as a parody.  SOF, ¶ 27.  Further, when Bomberger used the term "National Association for the Abortion of Colored People," it was his intent to convey to people that the NAACP is pro-abortion.  SOF, ¶ 39.  It is hardly surprising, therefore, that only 5% of survey respondents believed on an unaided basis, after viewing the Radiance webpage and article, that the name "National Association for the Abortion of Colored People" was being used as a parody.  SOF, ¶ 32.  Thus, Plaintiffs' parody defense is without merit.

---

[11]   As discussed at footnote 9, *supra*, survey results as low as single digits have been held sufficient to support findings of infringement.  Given that both infringement and dilution require only a showing of "likelihood," there is no reason to apply any different standard for dilution than for infringement.

## V.  CONCLUSION

For all of the foregoing reasons, the NAACP respectfully requests that the Court grant its

Motion for Summary Judgment and enter judgment in favor of the NAACP on Counts I through

IV of its Counterclaim.


Dated: November 11, 2013                    Respectfully submitted,


                                            /s/  *David G. Barger*
                                            David G. Barger
                                            VSB No. 21652
                                            GREENBERG TRAURIG, LLP
                                            1750 Tysons Blvd., Suite 1200
                                            McLean, Virginia  22102
                                            Telephone: (703) 749-1300
                                            Facsimile: (703) 749-1301
                                            bargerd@gtlaw.com

                                            Johnine P. Barnes (admitted *pro hac vice*)
                                            Steven J. Wadyka, Jr. (admitted *pro hac vice*)
                                            GREENBERG TRAURIG, LLP
                                            2101 L Street, N.W., Suite 1000
                                            Washington, D.C.  20037
                                            Telephone:  (202) 331-3100
                                            Facsimile:  (202) 261-0135
                                            wadykas@gtlaw.com


                                            Ernest L. Greer (subject to *pro hac vice* admission)
                                            GREENBERG TRAURIG, LLP
                                            Terminus 200
                                            3333 Piedmont Road, N.E., Suite 2500
                                            Atlanta, Georgia  30305
                                            Telephone:  (678) 553-2402
                                            Facsimile:  (678) 553-2212
                                            greere@gtlaw.com

                                            *Counsel for Defendant/Counterplaintiff*
                                            *National Association for the Advancement of*
                                            *Colored People*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 11, 2013, the foregoing document was filed with the Clerk of the Court using the CM/ECF filing system and that service will thereby be accomplished on:

Charles M. Allen, Esq.
GOODMAN, ALLEN & FILETTI, PLLC
4501 Highwoods Parkway
Suite 210
Glen Allen, VA  23060
Telephone:  (804) 346-0600
Facsimile: (804) 346-5954
callen@goodmanallen.com

*Attorney for Plaintiffs The Radiance Foundation, Inc.*
*and Ryan Bomberger*

　　　　　　　　　　　　　　　/s/ *David G. Barger*
David G. Barger
VSB No. 21652
Greenberg Traurig, LLP
1750 Tysons Boulevard, Suite 1200
McLean, Virginia  22102
Telephone:  (703) 749-1300
Facsimile: (703) 749-1301
bargerd@gtlaw.com
*Counsel for Defendant/Counterplaintiff*
*National Association for the Advancement of*
*Colored People*