UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
(Norfolk Division)

| | |
|---|---|
| THE RADIANCE FOUNDATION, INC. and RYAN BOMBERGER, individually, <br><br> Plaintiffs/Counterdefendants, <br><br> v. <br><br> NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, <br><br> Defendant/Counterplaintiff. | Case No. 2:13-cv-53 (RAJ/LRL) |

**DEFENDANT/COUNTERPLAINTIFF NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE'S REPLY TO PLAINTIFFS/COUNTERDEFENDANTS THE RADIANCE FOUNDATION, INC. AND RYAN BOMBERGER'S OPPOSITION TO MOTION *IN LIMINE* TO EXCLUDE EXPERT REPORT AND TESTIMONY OF TRACY TUTEN, PH.D.**

COMES NOW Defendant/Counterplaintiff National Association for the Advancement of Colored People ("Defendant" or "NAACP"), and hereby submits its Reply to the Opposition of Plaintiffs/Counterdefendants The Radiance Foundation, Inc. and Ryan Bomberger (together, "Plaintiffs") to the NAACP's Motion *in Limine* To Exclude Expert Report and Testimony of Tracy Tuten, Ph.D.

## I. INTRODUCTION

Plaintiffs' attempt to muster support for their purported expert witness, Tracy Tuten, Ph.D., is akin to forcing a square peg into a round hole. In their Opposition, Plaintiffs seek to pass off Dr. Tuten as a "generalist" on marketing and consumer surveys, and argue that this qualifies her to critique the expert report and consumer survey submitted in this case by the NAACP's expert, Henry D. Ostberg, Ph.D. The problem with Plaintiffs' argument, which

1

completely undermines their attempt to interject Dr. Tuten into this case, is that Dr. Tuten does not assume the role of generalist in her critiques of Dr. Ostberg's report. Rather, she takes on the role of a trademark litigation survey expert, pontificating on principles of likelihood of confusion and dilution and attacking the design and methodology employed in the Ostberg survey to determine them. Indeed, these issues of trademark law and trademark litigation survey design and methodology are at the core of Dr. Tuten's report and opinions.

Dr. Tuten's complete lack of "knowledge, skill, experience, training or education" (*Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999)) regarding the concepts of likelihood of confusion and dilution, and the design and methodology for a survey that seeks to measure them, shows that is utterly unqualified to offer expert testimony or opinion to critique Dr. Ostberg's survey. Moreover, her innumerable mistaken – and demonstrably wrong – beliefs and assumptions on these topics demonstrate beyond question that her proffered opinions are completely unreliable. Tellingly, Plaintiffs' Opposition fails even to address the fact that Dr. Tuten – who conducted Internet research *after* submitting her report to, in essence, see if she "got it right" – lacks confidence in her own opinions. Nor do Plaintiffs confront the numerous instances during Dr. Tuten's deposition where she retreated from or repudiated entirely her criticisms of Dr. Ostberg's survey.

In short, Dr. Tuten's report and opinions fail to meet the standards for admissibility of expert testimony under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and its progeny. The Court should therefore exclude Dr. Tuten's report and testimony from evidence in this case.

## II. ARGUMENT

### A. Plaintiffs Fail to Bear their Burden to Establish the Admissibility of Dr. Tuten's Purported Expert Testimony and Opinions

It is well settled in this Circuit that the proponent of expert testimony bears the burden of establishing its admissibility by a preponderance of proof. *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001). "Courts have distilled the admissibility requirements of Rule 702 [of the Federal Rules of Evidence] into two crucial inquiries: whether the proposed expert's testimony is relevant and whether it is reliable." *SMD Software, Inc. v. EMove, Inc.*, --- F.Supp.2d ---, 2013 WL 1332432 at *2 (E.D.N.C., March 29, 2013). One factor pertinent to reliability is the proposed expert's qualifications. *Giddings v. Bristol-Myers Squibb Co.*, 192 F.Supp.2d 421, 425 (D. Md. 2002). The court may exclude expert testimony where "the purported expert [has] neither satisfactory knowledge, skill, experience, training nor education ***on the issue for which the opinion is offered***." *Thomas J. Kline, Inc. v. Lorillard, Inc.*, 878 F.2d 791, 799 (4th Cir. 1989) (emphasis added). Moreover, " '[a]n expert's opinion should be excluded when it is based on assumptions which are speculative and are not supported by the record.' " *SMD Software, Inc.* at *3 (quoting *Tyger ConstCo. Inc. v. Pensacola Const. Co.*, 29 F.3d 137, 142 (4th Cir. 1994)).

Here, Plaintiffs fall far short of meeting their burden of establishing the admissibility of Dr. Tuten's purported expert testimony by a preponderance of proof. Specifically, they fail to refute that Dr. Tuten is wholly unqualified to offer any expert critique of a consumer survey on likelihood of confusion and dilution and, to the extent she attempts to opine on such matters, her opinions are completely unreliable.

### B. Plaintiffs Fail to Establish that Dr. Tuten is Qualified to Offer the Particular Opinions Contained in Her Report

It is readily apparent – and, indeed, undisputed – that Dr. Tuten has no knowledge, skill, experience, training or education on the issues for which her opinion is offered in this case. In her report, Dr. Tuten states that her "first concern" is whether the design of Dr. Ostberg's survey is appropriate to address the "core issues" which she defines as follows:

> a) does the use of the term National Association for the Abortion of Colored People *create a likelihood of confusion* that the National Association for the Advancement of Colored People be the source of related communications?, b) if an association exists between the two phrases, does the use of the phrase National Association for the Abortion of Colored People *dilute the mark* of the National Association for the Advancement of Colored People?, and c) if an association exists between the two phrases, does the use of the phrase National Association for the Abortion of Colored People *tarnish the mark* of the National Association for the Advancement of Colored People?

Tuten Report, ¶ 14 (emphasis added). But as she vividly demonstrated during her deposition, Dr. Tuten is completely unfamiliar with and has no knowledge of the concepts of likelihood of confusion or dilution. *See* The NAACP's Memorandum of Law in Support of its Motion in Limine (Dkt. 49) (hereinafter, the "Memo") at pp. 6-7. Indeed, her statement of the "core issues" betrays her lack of knowledge, as it misstates the standards for likelihood of confusion and dilution and reflects her lack of familiarity with the concept of dilution itself. *See* Memo at pp. 15-16.

While Plaintiffs go to great lengths to portray Dr. Tuten as a marketing and consumer survey "generalist" (*see* Plaintiffs' Opposition to the NAACP's Motion in Limine (Dkt. 57) (hereinafter, "Opp.") at pp. 3-7), they make no attempt to show how she is qualified to offer expert testimony or opinions *on the matters addressed in her report*. Not surprisingly, they

ignore how Dr. Tuten brazenly ventures into the realm of the trademark litigation survey expert with sweeping (and inaccurate) categorical pronouncements, such as the following:

- "[Q]uestions which measure the reputation of the senior mark before and after exposure to the junior mark are necessary if harm to reputation or harm to uniqueness of the mark are to be measured." (Tuten Report, ¶ 15);

- "[The target universe] should include all prospective and actual purchasers of the goods in question." (Tuten Report, ¶ 21);

- "[I]f a senior mark is to be potentially infringed by a junior mark, presumably those marks would be competing among the same universe of consumers." (Tuten Report, ¶ 23);

- "The junior mark, if targeting a different audience, could not dilute the senior mark." (Tuten Report, ¶ 23); and

- "[T]he use of a sample drawn from members of self-recruited and incentivized online panel does not meet the basic requirements for assessing likelihood of confusion, dilution, and/or tarnishment." (Tuten Report, ¶ 29)[1]

Having proffered Dr. Tuten to present expert opinion on matters specific to trademark litigation surveys such as those set forth above, it is incumbent upon Plaintiffs to demonstrate that she has the requisite qualifications to do so. It is undisputed that she does not. None of Dr. Tuten's educational or academic experience has involved the design and execution of consumer surveys to determine likelihood of confusion or dilution.[2] She has never spoken, published or taken any courses or seminars on the topic. She is not a member of professional organizations

---

[1] While Plaintiffs claim that "Dr. Tuten is not proffered as an expert in trademark law or to render an opinion about whether there is a likelihood of confusion or dilution presented in the case" (Opp. at 6 n. 2), she does precisely that in her report. *See, e.g.,* Tuten Report, ¶ 21 ("[I]f a senior mark is to be potentially infringed by a junior mark, presumably those marks would be competing among the same universe of consumers."); ¶ 23 ("The junior mark, if targeting a different audience, could not dilute the senior mark."). It is well settled that "opinion testimony that states a legal standard or draws a legal conclusion by applying law to the facts is generally inadmissible." *U.S. v. McIver*, 470 F.3d 550, 562 (4th Cir. 2006).

[2] The lone survey designed and conducted by Dr. Tuten in her professional career to determine likelihood of confusion was a "preliminary research study" for a matter that was never litigated. Tuten Dep. at 50:10-51:16; 73:16-74:1.

consisting of trademark litigation survey experts. She has never been qualified as an expert to offer or critique consumer surveys, and no court has ever accepted any survey she conducted for any purpose. And she lacks basic knowledge of the concepts of likelihood of confusion and dilution and the design and methodology for trademark surveys.[3] *See* Memo at pp. 4-8.

As Dr. Tuten lacks the qualifications to give expert testimony and opinion regarding the matters she addresses in her report, the Court should exclude her report and testimony from evidence in this case. *See Giddings v. Bristol-Myers Squibb Co.*, 192 F.Supp.2d at 425 (granting motion to preclude expert testimony for failing to comport with Rule 702 where purported expert lacked background and experience to opine on an issue that was at the "core" of his testimony); *Lorillard*, 878 F.2d at 799-800 (district court abused its discretion in considering expert testimony in antitrust and credit discrimination case where purported expert's "general business education" did not "satisfy even the minimal requirements of Fed.R.Evid. 702").[4]

---

[3] Even the article upon which Dr. Tuten heavily relies, *Reference Guide on Survey Research* by Shari Seidman Diamond, rejects the notion that being a "generalist" is a sufficient qualification to offer expert critique of a consumer survey. Professor Diamond states that an expert who will testify about a survey conducted by someone else "not only should have *general skills* and experience with surveys . . . *but also should demonstrate familiarity with the following properties of the survey being discussed: Purpose of the survey; Survey methodology, . . . the target population, the sampling design used in conducting the survey, . . . and Statistical analyses used to interpret the results*." Shari Seidman Diamond, *Reference Guide on Survey Research* in REFERENCE MANUAL ON SCIENTIFIC EVIDENCE at 375-76 (Federal Judicial Center 2000). As shown, Dr. Tuten is completely unfamiliar with each of those components for a trademark survey, such as Dr. Ostberg's, which determines the nature and extent of likelihood of confusion and dilution among the relevant universe of respondents. *See* Memo at pp. 6-10.

[4] The case of *Belk, Inc. v. Meyer Corp.*, 679 F.3d 146 (4th Cir. 2012) does not help Plaintiffs. The expert in *Belk*, who had been qualified as an expert witness in consumer behavior and marketing "in perhaps 20 law cases over [his] career" and "designed, conducted, analyzed and interpreted probably 80 to 100 consumer research studies in various contexts" (*Belk*, 679 F.3d at 162), was far more qualified than Dr. Tuten, who has *never* been qualified as an expert witness in any court case and, at most, has been involved in "several" research projects that dealt in some way with survey methodology. *See* Tuten Report, ¶ 6.

### C. Plaintiffs Fail to Establish that Dr. Tuten's Proffered Expert Testimony and Opinions are Reliable

Continuing to play upon the theme of "Dr. Tuten-as-generalist," Plaintiffs seek to explain away (or ignore entirely) the numerous misstatements and erroneous assumptions made by Dr. Tuten in her attempt to critique Dr. Ostberg's survey and report. *See* Opp. at 8-12. This effort by Plaintiffs only underscores the complete unreliability of Dr. Tuten's opinions.

It is evident from Dr. Tuten's report and deposition testimony that she is completely incapable of performing the "methodology" that Plaintiffs describe in their Opposition but which description is nowhere to be found in her report. Plaintiffs now contend that this "methodology" consists of "assessing the survey's characteristics and measuring it against what the scientific research in the field of consumer surveys reports about whether such characteristics permit valid and reliable conclusions . . . ." Opp. at p. 8. Dr. Tuten's "assess[ment] [of] the [Ostberg's] surveys characteristics," as her deposition testimony amply demonstrates, is so fundamentally flawed that she cannot come close to "employ[ing] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152.

For example, Dr. Tuten (1) erroneously defines the "core issues" to be determined by the Ostberg survey (Memo at pp. 15-16), (2) attempts to opine on the appropriate "universe" of survey respondents based on erroneous beliefs regarding likelihood of confusion and dilution (*Id*. at p. 16), (3) expresses no opinion regarding the survey universe defined by Dr. Ostberg to determine likelihood of confusion after criticizing it in her report as "ill-defined" (*Id*. at pp. 16-17), (4) misstates the standard for defining the survey universe as a whole (*Id*. at p. 17), (5) is unaware as to whether incentives are commonly offered to respondents in trademark surveys (*Id*.), (6) acknowledges the invalidity of her criticisms of the Ostberg survey's use of control

7

questions, self-recruited panel members, and a non-probability sample (*Id*. at pp. 17-18), (7) cannot interpret the basic types of statistical tables annexed to the Ostberg report (*Id*. at p. 18), and (8) relies wholly on her subjective opinion in dismissing evidence of harm to reputation identified by the Ostberg survey[5] (Tuten Dep. at 191:10-192:20).[6]

Plaintiffs' attempts to "rehabilitate" Dr. Tuten's opinions are unavailing. They seek to justify Dr. Tuten's misstatement of the types of confusion measured by the Ostberg survey (Opp. at p. 8) but ignore her deposition testimony confirming that she included neither "confusion as to affiliation or sponsorship" nor "confusion as to permission or approval" in her statement of the "core issues." *See* Tuten Dep. at 101:9-13. They try to excuse Dr. Tuten's erroneous statements in her report regarding the standards for likelihood of confusion and dilution (Opp. at p. 9) but gloss over her deposition testimony where she acknowledged that those statements are incorrect. Tuten Dep. at 109:6-17; 110:8-15. They assert that the Ostberg survey's use of a non-probability sample is an "acknowledged flaw" (Opp. at p. 9) despite Dr. Tuten's acknowledgement during her deposition that such samples are used in the majority of trademark litigation surveys. Tuten Dep. at 152:20-153:18. They try to explain away Dr. Tuten's misguided criticisms regarding the use of control questions instead of a control group and her demonstrated inability to interpret basic statistical tables (Opp. at p. 10), but ignore that each of these is central to the "methodology" she purportedly employed in her report. *See* Tuten Report, ¶¶ 15, 18, 40, 42.

And most significantly, Plaintiffs make no effort to explain, defend or even address Dr. Tuten's expressed lack of confidence in her own opinions as manifested during her deposition,

---

[5] As this Circuit has recognized, expert opinion cannot be based on "belief or speculation." *See Cooper v. Smith & Nephew, Inc.*, 259 F.3d at 200 (affirming district court's exclusion of purported expert testimony where the expert "asserted what amounted to a wholly conclusory finding based upon his subjective beliefs rather than any valid scientific method.").

[6] Excerpts from the Tuten Deposition not previously submitted are attached hereto as Exhibit A.

where she recounted how she conducted Internet searches for material that "would help her form her opinions" and "think through [the issues] more carefully" a week *after* she submitted her report. Memo at p. 11. As Dr. Tuten lacks confidence in the reliability of her own opinions, Plaintiffs cannot reasonably expect the Court to take a different view of those opinions or to admit such unreliable opinion testimony into evidence.

Plaintiffs seek to distinguish *Mitchell v. Gencorp Inc.*, 165 F.3d 778 (10th Cir. 1999) when it is directly on point. As Plaintiffs point out, the court in *Mitchell* excluded the expert's testimony where he never visited the site in question nor attempted to recreate the event through computer modeling. *See* Opp. at p. 11. Here, Dr. Tuten never went to the Radiance web site to view the actual web page and article that was used as the stimulus for Dr. Ostberg's survey (Tuten Dep. at 126:21-127:13), never read the article itself (*Id*. at 128:2-6), does not know how Radiance identifies its target audience (*Id*. at 83:3-6), and never visited the NAACP's web site to look up its mission statement until after she submitted her report (*Id*. at 18:11-19). If the expert in *Mitchell* had no "supporting scientific data" for his conclusions (*Mitchell*, 165 F.3d at 781), then the same must be true for Dr. Tuten.

### III. CONCLUSION

For all of the foregoing reasons, and for the reasons set forth in the NAACP's Memorandum of Law in Support of its Motion *in Limine*, the NAACP respectfully requests that the Court grant this Motion *in Limine* and exclude Dr. Tuten's report and testimony from evidence in this case.

9

Dated: November 25, 2013          Respectfully submitted,

/s/ *David G. Barger*
David G. Barger
VSB No. 21652
GREENBERG TRAURIG, LLP
1750 Tysons Blvd., Suite 1200
McLean, Virginia 22102
Telephone: (703) 749-1300
Facsimile: (703) 749-1301
bargerd@gtlaw.com

Johnine P. Barnes (admitted *pro hac vice*)
Steven J. Wadyka, Jr. (admitted *pro hac vice*)
GREENBERG TRAURIG, LLP
2101 L Street, NW
Suite 1000
Washington, DC 20037
Tel: (202) 331-3100
Fax: (202) 331-3101
barnesj@gtlaw.com
wadykas@gtlaw.com

Ernest L. Greer (subject to *pro hac vice* admission)
GREENBERG TRAURIG, LLP Terminus 200
3333 Piedmont Road, N.E., Suite 2500
Atlanta, Georgia 30305
Tel: (678) 553-2420
Fax: (678) 553-2421
greere@gtlaw.com

*Attorneys for Defendant/Counterplaintiff*
*National Association for the Advancement of*
*Colored People*

## CERTIFICATE OF SERVICE

I hereby certify that on November 25, 2013, the foregoing document was filed with the Clerk of the Court using the CM/ECF filing system and that service will thereby be accomplished on:

Charles M. Allen, Esq.
GOODMAN, ALLEN & FILETTI, PLLC
4501 Highwoods Parkway
Suite 210
Glen Allen, VA 23060
Telephone: (804) 346-0600
Facsimile: (804) 346-5954
callen@goodmanallen.com

*Attorney for Plaintiffs The Radiance Foundation, Inc. and Ryan Bomberger*

    /s/ *David G. Barger*
David G. Barger
VSB No. 21652
Greenberg Traurig, LLP
1750 Tysons Boulevard, Suite 1200
McLean, Virginia 22102
Telephone: (703) 749-1300
Facsimile: (703) 749-1301
bargerd@gtlaw.com
*Counsel for Defendant/Counterplaintiff National Association for the Advancement of Colored People*

*WDC 372856856v1*