| | |
|---|---|
| THE RADIANCE FOUNDATION, INC.<br>and RYAN BOMBERGER, individually,<br><br>Plaintiffs/Counterdefendants,<br><br>v.<br><br>NATIONAL ASSOCIATION FOR THE<br>ADVANCEMENT OF COLORED PEOPLE,<br><br>Defendant/Counterplaintiff. | Case No. 2:13-cv-53 (RAJ/LRL) |

**DEFENDANT/COUNTERPLAINTIFF NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE'S PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW**

COMES NOW Defendant/Counterplaintiff National Association for the Advancement of

Colored People ("Defendant" or "NAACP"), by undersigned counsel and pursuant to Rule 52 of

the Federal Rules of Civil Procedure, the Local Rules of this Court, and the Court's Scheduling

Order, and hereby submits its proposed findings of fact and conclusions of law.

## I.       PROPOSED FINDINGS OF FACT

### A.  The NAACP and its Marks

1.      Founded in 1909, the NAACP is the nation's oldest and largest civil rights

organization.  Along with its more than half a million members nationwide, the NAACP fights for

social justice for all Americans.  Its mission is to advance the cause of equality and justice in all

areas of society, and is dedicated to advocating on such core issues as voting rights, economic

justice, criminal justice, health and environmental justice, and education.   NAACP's leadership

consists of prominent individuals in American society, including lawyers, government officials, clergy, physicians, policymakers, and social advocates.

2.      In recent years, the issues of health justice and equality have become increasingly important and critical for African Americans and other people of color.  The  NAACP has adopted and implemented a four-tiered health agenda to improving the health and well-being of African American families and families of color.  These four tiers consist of: (1) childhood obesity – advocating changes in policies and programs at the local, state and federal levels and executing an outreach plan to educate African American families and increase awareness of the root causes of childhood obesity; (2) HIV/AIDS – advocating for increased testing, education and policies aimed at stopping the rates of new infections and increasing access to care in communities of color; (3) healthcare system reform – advocating and mobilizing in support of the passage of the health care reform bill for all Americans; and (4) health disparities – assisting in the eradication of racial and ethnic health disparities, identifying social and environmental factors that affect health and wellness in communities of color, and engaging the workforce to increase the representation of people of color in the medical and public health professions.

3.      On the issue of abortion, the NAACP has not taken a position supporting or opposing abortion, and has never espoused a pro-abortion position.  The issue of abortion remains absent from the NAACP's educational and advocacy efforts.

4.      For over one hundred years, the NAACP has used its NAACP trademark to identify its organization and the services it provides to communities of color, and has registered this and other trademarks with the United States Patent and Trademark Office ("USPTO").

5.      In addition, since its founding in 1909 and continuing through to the present and without abandonment, the NAACP has extensively used in interstate commerce throughout the

United States the NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE mark and its seal logo (the "NAACP Seal") to identify its organization and its services to the general public of the United States. As a result of such use, which has achieved for the NAACP's marks widespread recognition among the general public of the United States, the NAACP owns valuable common law rights in and to the NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE mark and the NAACP Seal.

6. NAACP has promoted and continues to promote its organization, its services and the NAACP Marks extensively through virtually every available type of digital, broadcast, and print media, including but not limited to national, regional, and local print publications, billboards, signage, television, and the Internet.

7. NAACP also actively promotes its organization, services and the NAACP Marks through popular and highly-trafficked social networking websites, including FACEBOOK, TWITTER and LINKEDIN. NAACP's FACEBOOK page has received over a million "likes," showing FACEBOOK users' positive feedback in connection with NAACP and its organization and services.

8. In addition, NAACP presents annually its Image Awards, the nation's premier event celebrating the outstanding achievements and performances of people of color in the arts as well as those individuals or groups who promote social justice. The honorees, presenters and performers at the have included many of the major celebrities in America as well as international political figures and dignitaries. Each year, the NAACP Image Awards program is televised nationally to an audience of millions of viewers. Each telecast of the NAACP Image Awards prominently displays and features the NAACP Marks.

9.     As a result of NAACP's extensive continuous use and promotion of the NAACP Marks, these trademarks (1) have become well-known and famous, and have acquired secondary meaning, among the general public in the United States, (2) are distinctive to designate NAACP, its organization, and its services from the organizations and services of others, and (3) distinguish and identify NAACP as the source or origin of its organization and services.

10.     NAACP has expended significant resources and investment to establish and build the NAACP Marks as distinctive, well-known and famous marks.  As a result, the general public of the United States recognizes and has come to associate these marks with NAACP and the principles of social justice and equality for which it has fought for over one hundred years.

11.     The NAACP engages in and provides community outreach, informational, and educational services activities on a range of issues of importance to the African American community.  With regard to health care issues, the NAACP has advocated for equal access to quality health care for all Americans, including members of the African American community.

12.     The black community is the focus of the NAACP's activities and programs.

13.     The NAACP actively solicits contributions from, among others, members of the African-American community and other people of color to support its programs and outreach activities.

14.     The NAACP sponsors billboards for the purpose of promoting its campaigns and outreach activities, which are focused issues of pressing importance to members of the black community.

15.     The NAACP mark (U.S. Trademark Registration No. 1,188,182) is a valid and subsisting federally registered trademark.  By virtue of this registration, the registered NAACP mark is entitled to protection under the Lanham Act, 15 U.S.C. § 1051, *et seq.*

4

16.    The marks NAACP and NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE are owned and used by the NAACP, and are valid, protectable and distinctive.

17.    The NAACP and NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE marks have achieved widespread recognition among the general public of the United States.

18.    The NAACP and NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE are famous and strong marks.

19.    The NAACP and NATIONAL ASSOCIATION FOR THE ADVANCMENT OF COLORED PEOPLE marks were famous before Plaintiffs' first use of them.

### B. The Radiance Foundation

20.    Radiance portrays itself as an educational, life-affirming 501(c)(3) organization. Radiance owns and maintains the website at the URL www.theradiancefoundation.org (the "Radiance Site"). Radiance provides informational, educational, and community outreach services relating to the anti-abortion movement.

21.    Radiance launched its "TooManyAborted.com" campaign in 2010 for Black History Month to help publicize its view that abortion in the black community has become "epidemic."

22.    Radiance also owns and maintains the website at the URL www.toomanyaborted.com (the "TooManyAborted Site"). Among other things, the TooManyAborted Site displays (a) graphics and information indicating that abortion is the number one killer of black Americans, (b) photographs of black teenagers protesting funding for Planned Parenthood, (c) and endorsements from prominent black civil rights leaders, including Dr. Alveda King, a niece of Dr. Martin Luther King, Jr.

23.   Radiance provides community outreach services to organizations and individuals, including outreach on educational, character development, social issues, and racism against the black community.  Through its "Shine" community outreach activity, Radiance takes on various social issues, including poverty, educational choice, and civil rights.  Bomberger considers abortion to be a civil rights issue.

### C.  The "TooManyAborted" Campaign

24.   Radiance's "TooManyAborted.com" campaign claims to be the first public ad campaign to associate abortion with racism against members of the black community.  The stated mission of the "TooManyAborted.com" campaign is to educate the public about abortion's impact on the African-American community.

25.   Radiance purchases billboard space for the purpose of promoting and publicizing its campaigns and outreach activities.

26.   As part of its "TooManyAborted.com" campaign, Radiance provides the opportunity to sponsor billboards in exchange for a fee paid.  Radiance provides various services to the payor, including the licensing of artwork, creation of a state-specific web page, extensive research, content creation, and the opportunity to have the state-specific web page hosted on Radiance's TooManyAborted Site.

27.   The billboards financed through Radiance's "TooManyAborted.com" public ad campaign are placed in predominantly black neighborhoods.

28.   Anyone can initiate a financial transaction with Radiance by entering the payor's contact information on the "Expose the Lies. Sponsor a Billboard" page of the TooManyAborted Site.  The page enables the payor to specifically select the types of services it wishes to purchase.  A visitor to the TooManyAborted Site can access the page directly from the page on that site that

bears the name "National Association for the Abortion of Colored People." By clicking the "Submit" button on the "Expose the Lies. Sponsor a Billboard" page, the payor sends its contact information directly to Radiance, which then contacts the interested party. Radiance prefers to have a signed agreement in place with the interested party before any financial transaction takes place. After all the details are confirmed with the interested party, Radiance sends that party a license agreement.

29.  Radiance has a standard licensing agreement for the financial transactions it enters into with paying sponsors. That agreement specifies the services to be provided by Radiance to the organization, lists the pricing for those services, and specifies the payment and invoicing terms. By signing this agreement, the payor enters into a partnership arrangement with Radiance.

30.  Radiance's business plan, which has never been revised, states under the heading "Merchandise" that "[a]ll merchandise is an extension of programs implemented by The Radiance Foundation, Inc. The sales will be a means by which to create revenue and market the organization."

31.  In carrying out its tax exempt purposes as a 501(c)(3) organization, Radiance provides goods, services or funds to individuals. Those goods have included clothing such as t-shirts and onesies, and novelty items such as stuffed animals, pins, buttons, and stickers. Radiance has provided these goods in exchange for money received from individuals.

### D.  Plaintiffs' Acts of Trademark Infringement and Dilution

32.  In January 2013, the NAACP learned through an alert generated by the Google Internet search engine for the "NAACP" name that Plaintiffs had posted material on their Radiance Site and TooManyAborted Site in which they used the registered NAACP mark together with the name "The National Association for the Abortion of Colored People." Each of these websites

7

displayed on its homepage the name "The National Association for the Abortion of Colored People." By clicking the live hyperlink at that name, a visitor to each site was taken to a page that prominently displayed the name "The National Association for the Abortion of Colored People" (or, on the Radiance Site, "NAACP: National Association for the Abortion of Colored People"). The pages on the Radiance Site and the TooManyAborted Site prominently displayed graphical images in which the wording "NAACP: National Association for the Abortion of Colored People" appear.

33. A page on the TooManyAborted Site displays the name "National Association for the Abortion of Colored People" in an orange bar across the top of the page that identifies to a viewer which page of the website the viewer has accessed. The name "National Association for the Abortion of Colored People" also appears on that page in large black lettering directly beneath the orange bar, again in orange lettering directly beneath the black lettering, and again in a large graphic beneath the orange lettering. An orange box containing the word "Donate" appears directly to the right of the large graphic and below the wording "National Association for the Abortion of Colored People." A visitor to this webpage can click on the "Donate" box and make an online donation to Radiance.

34. The web page on the TooManyAborted Site that displays the fictitious name "National Association for the Abortion of Colored People" also contains an article in which that name and the acronym "NAACP" appear. That same article also appears on the Radiance Site beneath a large photograph of a billboard that displays the NAACP mark together with the name "National Association for the Abortion of Colored People." An orange box containing the word "Donate" appears directly to right of the article on this webpage of the Radiance Site. A visitor to this webpage can click on the "Donate" box and make an online donation to Radiance. Nowhere on

these pages of the TooManyAborted Site or the Radiance Site, whether in the headings, graphics or the article's text, does the actual name "National Association for the Advancement of Colored People" appear. A person would not be able to ascertain from the headings alone that the name "National Association for the Abortion of Colored People" is not the real NAACP.

35. The name "National Association for the Abortion of Colored People" closely resembles "The National Association for the Advancement of Colored People."

36. The article on the web pages that display the name "National Association for the Abortion of Colored People" does not explain that the name is meant to be a parody.

37. The web page displaying the name "National Association for the Abortion of Colored People" has appeared in Google Alert results for the term "NAACP." A Google Alert generates a report to the subscriber whenever a specified term, such as the acronym "NAACP,' appears in a new place on the Internet. The report is displayed in a manner similar to the result of a Google search. A viewer of a Google Alert result displaying the heading "NAACP: National Association for the Abortion of Colored People" would not be able to determine from the heading or the text beneath it whether the name "National Association for the Abortion of Colored People" was being used as a parody.

### E. The NAACP's Consumer Survey

38. The NAACP engaged Henry D. Ostberg, Ph.D., an expert in marketing, consumer surveys, and marketing communications, to conduct a survey to determine reactions to the term "National Association for the Abortion of Colored People," including but not limited to when that term is used in close association with the actual NAACP acronym.

39. This survey was designed to determine reactions towards the term "National Association for the Abortion of Colored People," with respect to whether it was deemed to be

a parody or used sarcastically, whether it caused a likelihood of confusion with the National Association for the Advancement of Colored People (NAACP) and whether or not it is likely to cause dilution of that organization's name and reputation.

40. To accomplish the above objective, the following research design was employed: A total of 365 interviews were conducted with a cross-section of relevant respondents. To be included in the survey, individuals had to indicate that they had a "strong interest" in opposing abortion and/or ensuring racial equality. Some respondents (81) indicated a "strong interest" in both opposing abortion and ensuring racial equality, and were included in each of the two groups. The sample was divided between men and women (176 and 189 respondents, respectively). The sample was also divided between African Americans (180 respondents) and Caucasian/Whites, Hispanic/Latinos, Asians and others (185 respondents).

41. The relevant universe for determining the likelihood of confusion between the people who use the term "National Association for the Abortion of Colored People" and the National Association for the Advancement of Colored People (NAACP) are those likely to be in favor of the views and activities of the Radiance Foundation - - i.e., people who have a "strong interest" in opposing abortion (166 respondents). When it comes to the issue of dilution of the NAACP name, the relevant universe are potential supporters of the NAACP --i.e., those who have a "strong interest" in ensuring racial equality (280 respondents). Whether or not the term "National Association for the Abortion of Colored People" was deemed to be a parody among these respondents is a relevant issue.

42. Respondents were shown an article from the Radiance Foundation website which uses the "NAACP" acronym and the term "National Association for the Abortion of Colored People." Respondents were told:

"**In** a moment you will be shown an article which appears on a website.

"Please look at the article the way you *would normally do if you came across it on the internet.*

"Please take - as much or as little - time as you would do if you were to encounter it on the web."

43.    Before any questions were asked, respondents were told not to guess when giving their answers.  Respondents were told:

"We want your candid opinions.

"Do not guess when giving your answers.

"If you don't know or are unsure of an answer, please indicate this."

44.    To determine whether or not there was a likelihood of confusion between the National Association for the Advancement of Colored People (NAACP) and the term "National Association for the Abortion of Colored People," potential Radiance Foundation supporters were asked a series of questions.  After potential Radiance Foundation supporters had looked at the article taken from the Radiance Foundation website, they were asked to name the organization(s) or group(s) which were cited in the article.

45.    Thereafter, respondents were shown a photograph of a billboard featuring the term "NAACP: National Association for the Abortion of Colored People."  The photograph of the billboard had been included in the Radiance Foundation article previously shown to the respondents.

46.    Respondents were then asked whether or not the people who use the term "National Association for the Abortion of Colored People" were affiliated with any (other) group or organization (and, if so, the name of that group or organization) and whether or not they believe that the people who use that term either received- or needed to receive- "permission

11

or approval" from any organization or group to do so (and, if so, the names of such groups or organizations and the reason why such permission or approval was needed).

47. Respondents were also asked whether they believed that the people who used the term "National Association for the Abortion of Colored People" favored abortion or opposed abortion (Question 7b) and also whether or not they believed "National Association for the Abortion of Colored People" to be an organization or group. (Question 9.)

48. Both potential Radiance Foundation supporters and potential NAACP supporters were asked questions to determine whether or not the term "National Association for the Abortion of Colored People" was deemed to be a parody. After having seen the Radiance Foundation article, respondents were exposed to a photograph of a billboard which featured the term "National Association for the Abortion of Colored People." The respondents were told:

> "Now you will be shown a photograph that appears on the internet and which features a billboard.
>
> "Please look at the photograph the way you *would normally do if you came across it on the internet.*
>
> "Please take - as much or as little - time as you would do if you were to encounter it on the web."

49. Respondents were then asked the following questions:

> "What thoughts, if any, went through your mind as you looked at the photograph (of the billboard)?
>
> - and -
>
> "What other thoughts, if any, went through your mind as you looked at the photograph?" (Questions 3a and 3b.)

50. To probe the possibility that the term "National Association for the Abortion of Colored People" was deemed to be a parody, respondents were subsequently shown the

specific words "is a parody/is sarcastic," together with some other words and phrases, and asked to check those words and phrases which applied to "National Association for the Abortion of Colored People." (Question 4.)

51. To determine whether the term "National Association for the Abortion of Colored People" had a dilution effect on the NAACP name, potential NAACP supporters were also asked what thoughts came to mind when they encountered the term "National Association for the Abortion of Colored People." Potential NAACP supporters were asked the same questions as potential Radiance Foundation supporters:

> "What thoughts, if any, went through your mind as you looked at the photograph?
>
> - and -
>
> "What other thoughts, if any, went through your mind as you looked at the photograph?" (Questions 3a and 3b.)

52. After having been asked these two open-ended questions, potential NAACP supporters were asked specifically:

> "Does the term 'National Association for the Abortion of Colored People' cause you to think of any group or organization you are familiar with?

53. Respondents who gave an affirmative answer were asked what groups or organizations would come to mind "when you come across the term 'National Association for the Abortion of Colored People.'" (Questions 8a and 8b.)

54. To further probe reactions to the term "National Association for the Abortion of Colored People," and its possible effect on the NAACP, respondents were asked:

> "What do you think the people who use 'National Association for the Abortion of Colored People' are trying to accomplish?" (Question 7a)

13

55.    Interviews were conducted by Toluna under the supervision of the Admar Group, Inc.  Respondents were recruited from members of an online panel, organized and administered by Toluna, one of the leading internet interviewing services in the world. Internet interviews have become a common, probably the most frequent, type of interviews for both commercial and legal-related surveys.  The Toluna panel members interviewed for the Admar survey were recruited on a systematic basis from each of the nine census divisions of the continental United States.  This is a sampling method used for most commercial surveys and most litigation-related surveys.

56.    Interviewing for this study was conducted between August 23, 2013 and September 6, 2013.  A sub-sample of respondents was re-interviewed and validated by an independent research firm (which had not undertaken any of the initial interviewing) to ensure that the interviews had been properly conducted.

57.    This survey was conducted under double-blind conditions, i.e., neither the interviewing service nor respondent were made aware of the sponsor of the survey or had any indication concerning an expected outcome.  The study conformed to the generally-accepted standards of professional marketing research and included quality-control procedures exceeding those of normal commercial research.

58.    A significant percentage (13%) of potential Radiance Foundation supporters (i.e., respondents who said they have a "strong interest" in opposing abortion) believed that the people using the term "National Association for the Abortion of Colored People" were either affiliated with the NAACP or had obtained or required permission from the NAACP because of the use of that term.

59.    When people who had a "strong interest" in opposing abortion were asked whether the people who use the term "National Association for the Abortion of Colored People" were affiliated with any (other) group or organization, 8% replied affirmatively and then mentioned the NAACP.

60.    When the respondents were subsequently asked whether or not the people who use the term "National Association for the Abortion of Colored People" had received or needed to receive permission or approval from any (other) group or organization, an additional 5% replied affirmatively and mentioned the NAACP because of the name/acronym.

61.    Combining those who believed there was an affiliation between the NAACP and the people who use the term "National Association for the Abortion of Colored People" (8%) and those who believed that the people who use the term "National Association for the Abortion of Colored People" required permission or approval from the NAACP because of the name/acronym (5%), there was a total likelihood of confusion of 13% among potential Radiance Foundation supporters.

62.    Confirming the confusion resulting from the term "National Association for the Abortion of Colored People," 10% of the potential Radiance Foundation supporters believed the initials NAACP stood for "National Association for the *Abortion* of Colored People" or some other name which included the word "abortion."

63.     Respondents were generally confused about the term "National Association for the Abortion of Colored People," with 16% believing that the people who use the term favor abortion and 10% saying that the term was the name of an organization or group.

64.    Among potential NAACP supporters, only 5% volunteered that the term "National Association for the Abortion of Colored People" was intended as a parody or as a criticism.

65.    Respondents were given repeated opportunities to indicate their beliefs about the term "National Association for the Abortion of Colored People" and whether or not it was deemed to be a parody or a criticism.  They were asked two questions concerning what thoughts came to mind when they saw the photograph of a billboard with that term (Questions 3a and 3b).  They were also asked what the people using the term "National Association for the Abortion of Colored People" intended to accomplish Despite these questions, only 5% volunteered that they perceived "National Association for the Abortion of Colored People" to be a parody or that it was a criticism.

66.    When it was suggested to potential NAACP supporters, and they were asked specifically, whether or not the term "National Association for the Abortion of Colored People" could be described as a parody or as sarcasm, 22% replied affirmatively.

67.    After subtracting the percentage of potential NAACP supporters who answered, when asked specifically, if the term "National Association for the Abortion of Colored People" could be a parody or sarcasm (22%) from those who said that the NAACP came to mind when they encountered the term "National Association for the Abortion of Colored People" (42%), there was a net dilution by tarnishment of NAACP's name and reputation of at least 20%.

68.    When potential NAACP supporters were asked which organization or group came to mind when they encountered the term "National Association for the Abortion of Colored People," 42% said that the term caused them to think of the NAACP.

69.     After subtracting the percentage of potential NAACP supporters who deemed "National Association for the Abortion of Colored People" to be a parody or sarcastic on an aided basis (22%) from those who volunteered that the term caused them to think of the NAACP (42%), there is a net dilution by tarnishment of NAACP's name and reputation of 20%.

70.     If one were to subtract the percentage who deemed "National Association for the Abortion of Colored People" to be a parody or a criticism on an unaided or volunteered basis (5%) from those who volunteered that the term caused them to think of the NAACP (42%), there is a net dilution by tarnishment of NAACP's name and reputation of 37%.

71.     A substantial percentage of potential NAACP supporters (21%) said or suggested that the people who use the term "National Association for the Abortion of Colored People" wanted to harm or tarnish the name and reputation of the NAACP.

72.     When potential NAACP supporters were asked what they believed the people who use "National Association for the Abortion of Colored People" attempted to accomplish, 21% said or suggested that the people who use that term desired to harm or tarnish the name and reputation of the NAACP, rather than to simply criticize its goals or activities.

73.     Potential NAACP supporters who believed that the Radiance Foundation article and photograph of the billboard harmed or tarnished the NAACP said or implied such things as: the NAACP supports bigotry/discrimination/hatred/racism, the NAACP wants to wipe out colored people/reduce black population, the NAACP supports genocide, the NAACP supports abortion, supremist [*sic*] group, or made other statements which smeared or defamed the NAACP.

74.     Moreover, the statistical tables in the Admar Report show that 31% of potential NAACP supporters believed that the Radiance Foundation webpage, including the photograph of the billboard which prominently displayed the "NAACP" acronym and the name "National Association for the Abortion of Colored People," was "truthful/believable."

75.     Further evidence of the harm and tarnishment caused by the Radiance Foundation article is that, even among potential Radiance Foundation supporters, 10% believed that the acronym "NAACP" stood for the "National Association for the Abortion of Colored People" or a name containing the word "abortion."

76.     Not included as tarnishment were specific criticisms of the goals or activities of the NAACP, such as that the people who used the term "National Association for the Abortion of Colored People" want to bring out the truth, point out inconsistency in the NAACP or goad the NAACP into action, etc.

77.     Radiance has done nothing to determine whether people who viewed the web page displaying the name "National Association for the Abortion of Colored People" considered either that name or the web page in its entirety to be a parody.  It has conducted no study or survey as to whether its use of the name "National Association for the Abortion of Colored People" has resulted in confusion among people who have visited the page.  Nor has it conducted a survey as to whether people who viewed the web page considered it or the name "National Association for the Abortion of Colored People" to be a parody.

78.     One of Bomberger's colleagues in the black pro-life movement is Rev. Arnold Culbreath.  Although Bomberger has known Rev. Culbreath since 2010, Bomberger did not know until about one month ago that Rev. Culbreath is a member of the NAACP.

79. Governor McDonnell of Virginia, whom Bomberger considers to be pro-life, recently praised the NAACP on Lincoln's Birthday.

80. Subsequent to the filing of this lawsuit, Bomberger has continued to write articles and create graphics criticizing the NAACP as being pro-abortion without using the name "National Association for the Abortion of Colored People." He has received no demand from the NAACP that he stop these activities.

## II.    PROPOSED CONCLUSIONS OF LAW

1. The essence of trademark law is public perception:

> [T]he keystone of that portion of unfair competition law which relates to trademarks is the avoidance of a likelihood of confusion *in the minds of the buying public*. In trademark cases, whatever route one travels, whether by the street called "trademark infringement" or on the broad avenue of "unfair competition," all paths lead to the same enquiry – whether defendant's acts are likely to cause confusion.

*McCarthy on Trademarks and Unfair Competition*, § 2.8 at notes 2-3 (4th Ed. 2013) (emphasis added), and sources cited therein.

2. The focus in a case of trademark infringement or dilution must be on the impression that Plaintiffs' presentation of the NAACP acronym mark and the name "National Association for the Abortion of Colored People" created on the relevant audience, not the subjective intent of the speaker. *See Taubman Co. v. Webfeats*, 319 F.3d 770, 775 (6th Cir. 2003) (". . . the proper inquiry is not one of intent. In that sense, the Lanham Act is a strict liability statute. If consumers are confused by an infringing mark, the offender's motives are largely irrelevant.") (internal citations omitted).

### A. The NAACP's Trademark Infringement Claims

3. To establish a trademark infringement claim under the Lanham Act, a plaintiff must prove: (1) that it owns a valid mark; (2) that the defendant used the mark (or a confusingly

similar imitation) "in commerce" and without the plaintiff's authorization; (3) that the defendant used the mark (or an imitation of it) "in connection with the sale, offering for sale, distribution, or advertising" of goods or services; and (4) that the defendant's use of the mark is likely to confuse consumers. *Rosetta Stone Ltd. v. Google, Inc.*, 676 F.3d 144, 152 (4th Cir. 2012).

4.      The federal trademark registration for the NAACP mark is valid, subsisting and that the acronym mark is entitled to protection under the Lanham Act.

5.      The marks NAACP and NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE are valid, protectable and distinctive, and are owned and used by the NAACP to identify its services and have achieved widespread recognition among the general public of the United States.

6.      Plaintiffs have used the NAACP acronym mark and the confusingly similar name "National Association for the Abortion of Colored People" in commerce in connection with the sale, offering for sale, advertising or distribution of goods and services.

7.      Section 32(1)(a) of the Lanham Act bars the unauthorized use "in commerce" of "any reproduction, counterfeit, copy, or colorable imitation of a registered mark *in connection with the sale, offering for sale, distribution, or advertising of any goods or services* [if] such use is likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114(1)(a) (emphasis added).

8.      Section 43(a) of the Lanham Act similarly prohibits the unauthorized use in commerce of "any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin,

sponsorship, or approval of his or her goods, services, or commercial activities by another person." 15 U.S.C. § 1125(a)(1)(A).

9.      This Circuit and others "have been reluctant to define those terms narrowly. Rather, . . . the term 'services' has been interpreted broadly and so the Lanham Act has . . . been applied to defendants furnishing a wide variety of non-commercial public and civic benefits." *Lamparello v. Falwell*, 420 F.3d 309, 314 (4th Cir. 2005) (internal citations and quotations omitted). *See, e.g., Planned Parenthood Federation of America, Inc. v. Bucci*, 42 U.S.P.Q.2d 1430, 1436 (S.D.N.Y., Mar. 24, 1997), *aff'd*, 152 F.3d 920 (2d Cir. 1998) (defendant's solicitation of funds in relation to his anti-abortion activities was commercial in nature, and defendant's labeling of his web site with plaintiff's mark related to the origin, sponsorship, or approval by plaintiff of defendant's web site; Lanham Act held applicable); *United We Stand America, Inc. v. United We Stand, America New York, Inc.*, 128 F.3d 86, 90 (2d Cir. 1997), *cert. denied*, 523 U.S. 1076, 118 S.Ct. 1521, 140 L.Ed.2d 673 (1998) (defendant political organization that was incorporated "to solicit, collect and otherwise raise money," and engaged in political organizing, issuing press releases, endorsing candidates, and distributing partisan political literature, though not undertaken for profit, "unquestionably render[ed] a service . . . .  We have no doubt that they satisfy § 1114(1)(a)'s requirement that the mark be used in connection with goods and services."); *Brach Van Houten Holding, Inc. v. Save Brach's Coalition for Chicago*, 856 F.Supp. 472, 475-76 (N.D. Ill. 1994) (group engaged in soliciting donations, preparing press releases, holding public meetings and press conferences, and organizing on behalf of its members' interests was performing "services" within the meaning of the Lanham Act); *Birthright v. Birthright, Inc.*, 827 F.Supp. 1114, 1138 (D.N.J. 1993) ("Although, strictly speaking, [the defendant's] fundraising letters were not commercial advertisements, Section

43(a)(1)(B) [of the Lanham Act] is broad enough to support, in the context of non-profit fundraising, a claim of false and misleading statements about the services presented by a protected mark.").

10.     There is no profit requirement under the Lanham Act.  *Christian Science Board of Directors of the First Church of Christ, Scientist v. Robinson*, 123 F.Supp.2d 965, 970 (W.D.N.C. 2000).

11.     Plaintiffs' use of the NAACP acronym mark and the name "National Association for the Abortion of Colored People" to criticize or provide social commentary regarding the NAACP does not provide immunity from liability under the Lanham Act.  *See MGM-Pathe Communications v. Pick Panther Patrol*, 774 F.Supp. 869, 877 (S.D.N.Y. 1991) (defendant's goal of political activism did not confer immunity from the Lanham Act, noting that "[t]he seriousness and virtue of a cause do not confer any right to the use of the trademark of another"); *Planned Parenthood*, 42 U.S.P.Q.2d at 1436 ("The mere fact that defendant seeks to criticize plaintiff cannot automatically immunize a use that is otherwise prohibited by the Lanham Act."); *Christian Science Board of Directors of the First Church of Christ, Scientist v. Robinson*, 123 F.Supp.2d 965, 970-71 (W.D.N.C. 2000). ("The fact that [the defendant] criticizes the Plaintiffs does not provide immunity.").

12.     Plaintiffs cannot claim immunity from liability under the Lanham Act by attempting to equate this case with the publication of social commentary in newspapers and magazines.  To this end, they rely heavily on *Lucasfilm, Ltd. v. High Frontier*, 622 F.Supp. 931 (D.D.C. 1985) for the proposition that use of another's mark to "communicate ideas" and "[p]urvey points of view" is not a service contemplated by the Lanham Act.  Opp. at p. 9.  In

disagreeing with this portion of the court's discussion in *Lucasfilm*, the Second Circuit aptly observed:

> If the [*Lucasfilm*] court were right that communicating ideas and purveying points of view is not a service subject to the controls established by trademark law, then one who established a learning center would be free to call it Harvard or Yale University. We do not think the *Lucasfilm* court intended such a rule.

*United We Stand America, Inc. v. United We Stand, America New York, Inc.*, 128 F.3d 86, 91 (2d Cir. 1997).

13. The Lanham Act applies to the free distribution of informational services concerning Plaintiffs' anti-abortion beliefs on the Internet. *Christian Science Board of Directors of the First Church of Christ, Scientist v. Robinson*, 123 F.Supp.2d 965, 970-71 (W.D.N.C. 2000).

14. To use the NAACP acronym mark and the name "National Association for the Abortion of Colored People" in connection with the sale, offering for sale, advertising or distribution of goods or services, Plaintiffs need not have actually sold or advertised goods or services on the Radiance Site or the TooManyAborted Site. Rather, Plaintiffs need only have prevented users from obtaining or using the NAACP's goods or services, or need only have connected their websites to other's goods or services. *People for the Ethical Treatment of Animals v. Doughney*, 263 F.3d 359, 365 (4th Cir. 2001).

15. Plaintiffs use the famous NAACP acronym mark in close association with the name "National Association for the Abortion of Colored People" in webpage banners, headings, and graphical advertising images on the very pages on their websites from which they solicit money for their organization. Plaintiffs also sell their billboard sponsorships, artwork licensing, website creation, hosting, and related services from a page on the same website which can be

directly accessed from the page on that site that prominently displays the NAACP mark together with the name "National Association for the Abortion of Colored People" in webpage banners and headings as a purported real organization to be opposed.

16.    Plaintiffs' prominent use of the name "National Association for the Abortion of Colored People" on their websites for purposes of identification – in this case to identify a fictitious straw-man organization supposedly related somehow to the real NAACP – amply satisfies the "use in connection with" requirement under the Lanham Act.  *See, e.g., Planned Parenthood Federation of America, Inc. v. Bucci*, 42 U.S.P.Q.2d 1430, 1432 (S.D.N.Y. 1997), *aff'd*, 152 F.3d 920 (2d Cir.), *cert. denied*, 525 U.S. 834, 119 S.Ct. 90, 142 L.Ed.2d 71 (1998) (defendant created a homepage that used plaintiff's mark); *OBH, Inc. v. Spotlight Magazine, Inc.*, 86 F.Supp.2d 176, 182 (W.D.N.Y. 2000) (defendant created website using the same stylistic features as the plaintiff's website);  *Christian Science Board of Directors of the First Church of Christ, Scientist v. Robinson*, 123 F.Supp.2d 965, 970 (W.D.N.C. 2000) (defendant designed a home page on his website which infringed plaintiff's marks).

17.    Satisfaction of the "use in connection with" requirement is not dependent upon whether the defendant uses the infringing mark in a domain name.  *PETA*, 263 F.3d at 365.

18.    The Lanham Act applies to the solicitation of donations by organizations, such as Plaintiffs, that engage in social commentary or criticism.  *See, e.g.*, *Planned Parenthood*, 42 U.S.P.Q.2d at 1437 (holding that "defendant's solicitation of funds in relation to his anti-abortion efforts are commercial in nature."); *Cancer Research Institute, Inc. v. Cancer Research Society, Inc.*, 694 F.Supp. 1051 (S.D.N.Y. 1988) (soliciting funds for cancer research); *American Diabetes Ass'n v. Nat'l Diabetes Ass'n*, 533 F.Supp. 16, 20 (E.D. Pa. 1981), *aff'd*, 681 F.2d 804

(3d Cir. 1982) (solicitation of donations); *Brach van Houten Holding, Inc. v. Save Brach's Coalition*, 856 F.Supp. 472, 475-76 (N.D. Ill. 1994) (same).

19.     The placement on Plaintiffs' webpages of the "Donate" box surrounded by prominent displays of the name "National Association for the Abortion of Colored People" in bold lettering and graphical images unquestionably constitutes a use of that infringing and diluting mark "in connection with" Plaintiffs' services -- *i.e.*, an exhortation to donate to help stop a supposedly real organization bent on racially motivated genocide.

20.     The Fourth Circuit has identified seven factors for determining whether a likelihood of confusion exists, but "not all these factors are always relevant or equally emphasized in each case." *Pizzeria Uno Corp. v. Temple,* 747 F.2d 1522, 1527 (4th Cir.1984) (internal quotation marks, citations, and brackets omitted).  The factors are: "(1) the strength or distinctiveness of the mark; (2) the similarity of the two marks; (3) the similarity of the goods/services the marks identify; (4) the similarity of the facilities the two parties use in their businesses; (5) the similarity of the advertising used by the two parties; (6) the defendant's intent; (7) actual confusion." *Id.* (citation omitted).

21.     "There is no need for each factor to support [the NAACP's] position on the likelihood of confusion issue.'" *Rosetta Stone*, 676 F.3d at 154 (quoting *Synergistic Int'l, LLC v. Korman*, 470 F.3d 162, 171 (4th Cir. 2006)).

22.     The "strength of the mark" factor is the "paramount" consideration under this Circuit's likelihood of confusion analysis.  *See Pizzeria Uno*, 747 F.2d at 1527.

23.     As to the first two *Pizzeria Uno* factors (strength of the mark and similarity of the two marks), the NAACP and NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE marks are strong and distinctive marks and that the name "National

Association for the Abortion of Colored People" closely resembles the NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE mark. Moreover, the famous NAACP acronym mark is used in identical, unaltered form by Plaintiffs in association with their fictitious and confusing straw-man organization "National Association for the Abortion of Colored People."

24. Plaintiffs seek to belittle the significance of the "strength of the mark" and the "similarity of the marks" factors, claiming that their use of the marks is "nominative" because they did not use the NAACP marks or "The National Association for the Abortion of Colored People" to refer to their own organization and services but rather to the NAACP. As the Fourth Circuit held in *Rosetta Stone Ltd. v. Google, Inc.*, 676 F.3d 144 (4th Cir. 2012), "by definition, nominative use involves the use of *another's* trademark in order to describe the trademark owner's *own* product." 676 F.3d at 154 (emphasis in original). Here, of course, Plaintiffs are *not* using the NAACP's mark but a fictitious altered version of the NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE mark. As a result, their use is not "nominative," and Plaintiffs' reliance upon *Rosetta Stone* for the proposition that the "strength of Defendant's mark and the similarity of the marks is . . . of limited weight" is wholly misplaced.

25. The third *Pizzeria Uno* factor (similarity of goods or services) also favors the NAACP, as both Radiance and the NAACP provide educational, informational, and community outreach services on social issues of pressing importance to the African-American community, including education and civil rights. Likewise, the fictitious "National Association for the Abortion of Colored People" is portrayed as a social advocacy group.

26. As the Fourth Circuit in *Rosetta Stone* held, "[w]hen considering the similarity of facilities, courts are trying to determine if confusion is likely based on 'how and to whom the

respective goods of the parties are sold.'" *Rosetta Stone*, 676 F.3d at 155 (quoting 4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 24:51).

27.     Under the fourth and fifth factors (similarity of facilities and similarity of advertising), both parties direct their efforts to members of the black community in the United States and actively solicit donations to support those efforts, and both sponsor billboards for the purpose of promoting their campaigns and outreach activities.  Again, the fictitious "National Association for the Abortion of Colored People" is portrayed as engaging in exactly the same types of activities.

28.     On the actual confusion factor, the results of the consumer survey conducted by Henry D. Ostberg, Ph.D. showed a 13% net level of direct confusion as to source, sponsorship, affiliation or approval.  This result amply demonstrates actual confusion.  *See Sara-Lee Corp. v. Kayser-Roth Corp.*, 81 F.3d 455, 467 n. 15 (4th Cir. 1996) (noting caselaw that "hold[s] that survey evidence indicating ten to twelve percent confusion was sufficient to demonstrate actual confusion.").

29.     Adding to this significant level of direct confusion as to source, sponsorship, affiliation or approval, the results of Dr. Ostberg's survey also showed that 10% of potential Radiance supporters believed the initials "NAACP" stands for "National Association for the Abortion of Colored People," while 10% believed that the term "National Association for the Abortion of Colored People" is the name of an actual organization or group.  And even Bomberger admits that a visitor to the page on the TooManyAborted.com website, which displays headings consisting of the name "National Association for the Abortion of Colored People," would not be able to ascertain from the headings alone that the "National Association for Abortion of Colored People" is not the real NAACP.  He likewise admits that the results of

the Google Alerts on the acronym "NAACP" would not signal in any way to a viewer that the results are supposed to be a parody.

30.     No fixed percentage in a survey determines the existence or non-existence of confusion.  The survey result is just one factor to consider among all the others.  However, many cases have found confusion with survey findings at or below the level of direct confusion as to source, sponsorship, endorsement or approval present in this case, without even considering the additional forms of actual confusion also shown in Dr. Ostberg's survey.  *See, e.g.,  Humble Oil v. American Oil Co.*, 405 F.2d 803, 817 (8th Cir. 1969) (recognizing findings of 11% as sufficient and "not an insignificant percentage"); *Starbucks Corp. v. Samantha Lundberg*, 2005 U.S. Dist. LEXIS 32660 *25 (D. Or. 2005) ("The percentage of consumers likely to confused can be in the range of 10 to 15 percent or even lower."); *James Burrough Ltd. v. Sign of the Beefeater , Inc.*, 540 F.2d 266, 279 (7th Cir. 1976) ("We cannot agree that 15% is small."); *Jockey Int'l, Inc. v. Burkard*, 185 U.S.P.Q. 201, 203 (S.D.Cal. 1975) (11.4%); *James Burrough Ltd v. Lesher*, 309 F.Supp. 1154, 1160, n.6 (S.D. Ind. 1969) (11%); *Grotrian v. Steinway*, 365 F.Supp. 707, 716 (S.D.N.Y. 1973) (7.7% found to be "strong evidence" of likelihood of confusion); *Coca Cola Co. v. Tropicana Prods., Inc.,* 690 F.2d 312, 317 (2d Cir. 1982) (7.5% could sustain a finding of substantial consumer confusion).   In this regard, it should be remembered that even a figure such as 13%, if extrapolated to the U.S. population, results in approximately 40,000,000 million being confused.  *See* U.S. Census estimate of U.S. population, as of November 11, 2013, being over 317 million.  http://www.census.gov/popclock/

31.     The appropriate universe for a consumer survey on likelihood of confusion should include a fair sampling of those purchasers most likely to partake of the alleged infringer's goods or services.  Shari Seidman Diamond & Jerre B. Swann, *Trademark and Deceptive Advertising*

*Surveys, Law, Science and Design,* p. 29 (ABA Section of Intellectual Property, 2012), quoting *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 264 (5th Cir. 1980), and citing many other sources for this basic proposition. "The reason for this rule is clear . . . what is at issue is whether the junior user's mark is likely to confuse consumers. In order to fairly test that issue, one must look at those consumers likely to encounter the junior user's mark in the marketplace." *Id.*

32.    A survey question which asked whether Plaintiffs required permission or approval to use the name "National Association for the Abortion of Colored People" is a proper and relevant question for a likelihood of confusion survey. *See, e.g.*, *Indianapolis Colts v. Metropolitan Baltimore Football Club Ltd. Partnership*, 34 F.3d 410, 415 (7th Cir. 1994) (survey asked potential buyers of defendant's football merchandise whether the seller needed someone's permission to use the name in dispute); *Schieffelin & Co. v. Jack Co. of Boca, Inc.*, 850 F.Supp. 232, 247 (S.D.N.Y. 1994) (a need to get permission question in a survey is "certainly a relevant inquiry . . ..").

**B. The NAACP's Claim for Dilution by Tarnishment**

33.    Dilution by tarnishment, which forms the basis of the NAACP's trademark dilution claim against Plaintiffs, "creates consumer aversion to the famous brand – *e.g.*, when the plaintiff's famous trademark is linked to products of shoddy quality, or is portrayed in an unwholesome or unsavory context" such that "the public will associate the lack of quality or lack of prestige in the defendant's goods with the plaintiff's unrelated goods." *Rosetta Stone*, 676 F.3d at 167 (internal quotations omitted).

34.    The "*sine qua non* of tarnishment is a finding that plaintiff's mark will suffer negative associations through defendant's use." *NBA Properties v. Untertainment Records LLC*,

1999 WL 335147 at *8 (S.D.N.Y., May 26, 1999), citing *Hormel Foods Corp. v. Jen Henson Prods., Inc.*, 73 F.3d 497, 507 (2d Cir. 1996).

35.     A plaintiff establishes a *prima facie* dilution claim under the Trademark Dilution Revision Act ("TDRA") by showing (1) that the plaintiff owns a famous mark that is distinctive; (2) that the defendant commenced using a mark in commerce that allegedly is diluting the famous mark at any time after the owner's mark became famous; (3) that a similarity between the defendant's mark and the famous mark gives rise to an association between the marks, and (4) that the association is likely to impair the distinctiveness of the famous mark or likely to harm the reputation of the famous mark. *Rosetta Stone*, 676 F.3d at 168. A plaintiff can establish dilution by tarnishment "regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury." 15 U.S.C. § 1125(c)(1).

36.     Far-lesser forms of unsavory association than race-based genocide have routinely been condemned by the courts as forms of dilution by tarnishment without need for extended analysis. *E.g.*, *Anheuser-Busch, Inc. v. Balducci Pubs.*, 28 F.3d 769, 777-78 (8th Cir. 1994) (defendants' use of MICHELOB OILY in a purportedly satirical placement in a humor magazine – i.e., not in an advertisement for another product or company – held tarnishing due to its suggestion that plaintiff's beer contained oil ); *Chemical Corp. of America v. Anheuser-Busch, Inc.*, 306 F.2d 433, 436-38 (5th Cir. 1962), *cert. denied*, 372 U.S. 965, 83 S.Ct. 1089, 10 L.Ed.2d 129 (1963) (enjoining use of "WHERE THERE'S LIFE . . . THERE'S BUGS!" slogan as tarnishing of WHERE THERE'S LIFE, THERE'S BUD); *Pillsbury Co. v. Milky Way Productions, Inc.*, 215 U.S.P.Q. 124, 135 (N.D. Ga. 1981) ( defendant liable for dilution by tarnishment for publishing cartoon of "Poppin' Fresh" and "Poppie Fresh" doughpersons engaging in sexual intercourse and fellatio); Coca-*Cola Co. v. Gemini Rising, Inc.*, 346 F.Supp.

1183, 1190-91 (E.D.N.Y. 1972) (enjoining ENJOY COCAINE posters based on tarnishment because customers might be "turned off" by so-called "spoof"); *NBA Properties v. Untertainment Records, LLC*, 1999 WL 335147 at *9 (use of NBA logo with gun placed in player's hand plus slogan SDE SPORTS, DRUGS & ENTERTAINMENT).

37.     If a presumption of harm exists – or at least a strong inference – merely by associating a famous mark with sex-related product, *See V Secret Catalogue, Inc. v Moseley*, 605 F.3d 382 (6th Cir. 2010), then the same must be true of Plaintiffs' acts of associating the NAACP – the nation's most revered civil rights organization – with racially motivated genocide.

38.     The current version of the Federal Trademark Dilution Act, 15 U.S.C. § 1125(c) requires only proof of *likelihood* of dilution, and not proof of actual harm. This change in the law, introduced in 2006, was expressly intended to lower the standard of proof necessary and to eliminate a need to prove actual harm. *See V Secret Catalogue, Inc. v Moseley*, 605 F.3d at 387-89.

39.     The survey in this case provides ample support for the likely harm to the NAACP's reputation. The net dilution by tarnishment caused by Plaintiffs' use of the famous NAACP mark and the term "National Association for the Abortion of Colored People" ranges from at least 20% on an aided basis to as high as 37% on an unaided basis. In addition, 21% of respondents from the relevant consumer group (potential NAACP supporters) said or suggested that the people who use the term "National Association for the Abortion of Colored People" wanted to harm or tarnish the name and reputation of the NAACP rather than to simply criticize its goals, and 31% of those respondents believed that the Radiance webpage – which features a photograph of a billboard that prominently displays the NAACP acronym alongside the

"National Association for the Abortion of Colored People," was "truthful/believable." These percentages vividly demonstrate the harm to the NAACP's reputation.

40.     Dr. Ostberg's survey is relevant and reliable, and was conducted in accordance with generally-accepted survey procedures. The results of the survey are probative evidence of likelihood of confusion and dilution. Further, Dr. Ostberg's expert qualifications are unassailable.

41.     The report and testimony of Plaintiffs' purported expert, Tracy Tuten, Ph.D., fail to meet the standards for admissibility of expert testimony under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and its progeny. Specifically, Dr. Tuten is wholly unqualified to offer any expert opinion to critique Dr. Ostberg's survey, and her opinions are completely unreliable. Her opinions and testimony are therefore inadmissible.

42.     Plaintiffs cannot avail themselves of the "news reporting or news commentary" exception under the TDRA, as a quick look at the pages on Plaintiffs' website where the fictitious name NATIONAL ASSOCATION FOR THE ABORTION OF COLORED PEOPLE appears belies any argument that those pages were communicating "news" about the NAACP. The purpose of the pages was to sell goods and services to raise money.

**C. Bomberger is Liable in His Individual Capacity**

43.     Bomberger personally directed and carried out the infringing and diluting use of the NAACP's marks and thus is liable in his individual capacity under the Lanham Act. *See Flexible Benefits Council v. Feltman*, 2008 WL 2465457, at *7 (E.D. Va., June 16, 2008) ("it is . . . well-established that an individual corporate officer can be held personally liable for trademark infringement . . . particularly . . . where an officer of the corporation 'authorized and approved' the acts of trademark infringement.") (internal quotations and citations omitted).

**D. Failed Parody**

44.     "A 'parody' is defined as a simple form of entertainment conveyed by juxtaposing the irreverent representation of the trademark with the idealized image created by the mark's owner." *PETA,* 263 F.3d at 366 (failed parody where PETA acronym was used in a context separate from the additional information necessary to convey the necessary information that the user was not affiliated with but instead was critiquing the actual owner of the PETA name).

45.     "A parody must convey two simultaneous – and contradictory – messages: that it is the original, but also that it is *not* the original and is instead a parody." *PETA*, 263 F.3d at 366. "This second message must not only differentiate the alleged parody from the original but must also communicate some articulable element of satire, ridicule, joking, or amusement, . . . presumably a humorous difference, in order to product its desired effect." *Louis Vuitton*, 507 F.3d at 260, quoting *Jordache Enterprises, Inc. v. Hogg Wyld, Ltd.,* 828 F.2d 1482, 1486 (10th Cir. 1987).

46.     "But the cry of 'parody!' does not magically fend off otherwise legitimate claims of trademark infringement or dilution." *Dr. Seuss Enters., L.P. v. Penguin Books, USA,* 105 F.3d 1394, 1405 (9th Cir. 1997). *See also Anheuser-Busch, Inc. v. VIP Products, LLC*, 666 F.Supp. 2d 974, 984-86 (E.D. Mo. 2008) (rejecting claimed parody defense of "Buttwiper" for a dog squeeze toy as a failed "parody" of Budweiser); *Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC*, 507 F.3d 252, 260-61 (4th Cir. 2007) (analyzing successful or failed nature of a claimed parody as an essential first step to guide analysis of claimed defense to alleged infringement or dilution).

47.     A parody-based fair use defense to a dilution claim is an affirmative defense which Plaintiffs must establish in this case. *Rosetta Stone Ltd. v. Google, Inc.,* 676 F. 3d 144,

168-69 (4th Cir. 2012). Plaintiffs have offered no evidence as to whether people who viewed their webpages considered either the name "National Association for the Abortion of Colored People" or the article in its entirety to be a parody. Instead, Plaintiffs rely solely on Bomberger's own alleged subjective intent.

48. A viewer of a Google Alert result displaying the heading "NAACP: National Association for the Abortion of Colored People" would not be able to determine from the heading or the text beneath it whether the name "National Association for the Abortion of Colored People" was being used as a parody. That name therefore does not meet the legal definition of a parody, *i.e.*, that it "convey two simultaneous – and contradictory – messages: that it is the original, but also that it is *not* the original and is instead a parody." *PETA*, 263 F.3d at 366.

49. Plaintiffs' attempt at parody in this case is a failed one. *Cf., Louis Vuitton, supra* (distorted and altered versions of famous marks from many high-end fashion houses put onto a full line of inexpensive dog chew toys in a manner that called all the original brands to mind but remained distinct as just poking fun at the entire high-end fashion industry; no use of the literal form of any one company's marks to designate a purportedly real organization with a mission antithetical to the true owner's mission; no survey or other credible evidence of reputational harm other than sheer speculation); *New York Stock Exchange, Inc. v. New York, New York Hotel, LLC*, 293 F.3d 550, 555 (2d Cir. 2002) (advertisements, brochures and website for New York-themed casino resort in Las Vegas with parodies of many famous New York landmarks, including "New York $lot Exchange," all done in such obviously modified fashion "that any viewer would understand that the Casino was engaged in a parody or humorous play on words," particularly when viewed in context and combination with all the other obvious parodies).

### E. First Amendment

50.    "The Constitution accords less protection to commercial speech than to other constitutionally safeguarded forms of expression." *Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 64-65, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983); *Edge Broadcasting Co. v. United States*, 5 F.3d 59, 61 (4th Cir. 1992) ("A lesser degree of First Amendment protection is accorded commercial speech than other constitutionally guaranteed expression").  "[R]egulation of commercial speech based on content is less problematic [than non-commercial speech].  In light of the greater potential for deception or confusion in the context of certain advertising messages, . . . content-based restrictions on commercial speech may be permissible." 463 U.S. at 65.  *See also Friedman v. Rogers*, 440 U.S. 1, 99 S.Ct. 887, 59 L.Ed.2d 100 (1979) (upholding prohibition on use of trade names by optometrists).

51.    A "company has the full panoply of protections available to direct its comments on public issues, so there is no reason for providing similar constitutional protection [accorded to non-commercial speech] when such statements are made in the context of commercial transactions." *Bolger*, 463 U.S. at 68.

52.    "Speech that misleads or creates confusion is not protected by the First Amendment." *Westchester Media v. PRL USA Holdings, Inc.*, 214 F.3d 658, 672 (5th Cir. 2000).

53.    Even assuming that Plaintiffs "might communicate their [anti-abortion] message more effectively by appropriating [the NAACP's marks], such appropriation would cause significant consumer confusion.  It is not protected by the First Amendment." *Christian Science*, 123 F.Supp.2d at 971.

54.    Plaintiffs' rote invocation of the First Amendment for its allegedly non-commercial free speech is simply not an absolute defense in this particular case.  *See, e.g.,*

*Anheuser-Busch, Inc. v. Balducci Pubs.*, 28 F.3d 769, 777-778 (8th Cir. 1994) (defendants' use of MICHELOB OILY in a purportedly satirical placement in a humor magazine – *i.e.*, not in an advertisement for another product or company – held tarnishing due to the impression it created that plaintiff's beer contained oil, as confirmed by survey results).

### F. Damages, Injunctive Relief, and Attorney's Fees

55.     When a violation of any right of the registrant of a mark registered in the Patent and Trademark Office, a violation under section 43(a), or a willful violation under section 43(c), shall have been established in any civil action arising under the Lanham Act, the plaintiff shall be entitled, subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of this action.  In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed.  15 U.S.C. § 1117(a).

56.     The NAACP is entitled to an award of its damages and/or the Plaintiffs' profits.

57.     The court in exceptional cases may award attorney's fees to the prevailing party. 15 U.S.C. § 1117(a).

58.     This case is an exceptional one in that Plaintiffs' conduct was willful, intentional, and malicious.  Thus, the NAACP is entitled to recover its attorney's fees from Plaintiffs.

59.     The NAACP is entitled to a permanent injunction against Plaintiffs' use of the name "National Association for the Abortion of Colored People," including but not limited to in close association with the NAACP acronym mark, in any manner that creates a likelihood of confusion or a likelihood of dilution by tarnishment among members of the public.

Dated: December 3, 2013                    Respectfully submitted,


                                           /s/ *David G. Barger*
                                           David G. Barger
                                           VSB No. 21652
                                           GREENBERG TRAURIG, LLP
                                           1750 Tysons Blvd., Suite 1200
                                           McLean, Virginia  22102
                                           Telephone: (703) 749-1300
                                           Facsimile: (703) 749-1301
                                           bargerd@gtlaw.com

                                           Johnine P. Barnes (admitted *pro hac vice*)
                                           Steven J. Wadyka, Jr. (admitted *pro hac vice*)
                                           GREENBERG TRAURIG, LLP
                                           2101 L Street, N.W., Suite 1000
                                           Washington, D.C.  20037
                                           Telephone:  (202) 331-3100
                                           Facsimile:  (202) 261-0135
                                           wadykas@gtlaw.com


                                           Ernest L. Greer (subject to *pro hac vice* admission)
                                           GREENBERG TRAURIG, LLP
                                           Terminus 200
                                           3333 Piedmont Road, N.E., Suite 2500
                                           Atlanta, Georgia  30305
                                           Telephone:  (678) 553-2402
                                           Facsimile:  (678) 553-2212
                                           greere@gtlaw.com

                                           *Counsel for Defendant/Counterplaintiff*
                                           *National Association for the Advancement of*
                                           *Colored People*

## CERTIFICATE OF SERVICE

I hereby certify that on December 3, 2013, the foregoing document was filed with the Clerk of the Court using the CM/ECF filing system and that service will thereby be accomplished on:

>
> Charles M. Allen, Esq.
> GOODMAN, ALLEN & FILETTI, PLLC
> 4501 Highwoods Parkway
> Suite 210
> Glen Allen, VA 23060
> Telephone: (804) 346-0600
> Facsimile: (804) 346-5954
> callen@goodmanallen.com
>
> *Attorney for Plaintiffs The Radiance Foundation, Inc.*
> *and Ryan Bomberger*

>
> /s/ *David G. Barger*
> David G. Barger
> VSB No. 21652
> Greenberg Traurig, LLP
> 1750 Tysons Boulevard, Suite 1200
> McLean, Virginia 22102
> Telephone: (703) 749-1300
> Facsimile: (703) 749-1301
> bargerd@gtlaw.com
> *Counsel for Defendant/Counterplaintiff*
> *National Association for the Advancement of*
> *Colored People*

*WDC 372858677v1*