**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**(Norfolk Division)**

| | | |
|---|---|---|
| THE RADIANCE FOUNDATION, INC. and RYAN BOMBERGER, individually, | ) ) ) | |
| Plaintiffs/Counterdefendants, | ) ) | |
| v. | ) ) | Case No. 2:13-cv-53 (RAJ/DEM) |
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, | ) ) ) ) | |
| Defendant/Counterplaintiff. | ) ) | |

**DEFENDANT/COUNTERPLAINTIFF NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE'S POST-TRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

COMES NOW Defendant/Counterplaintiff National Association for the Advancement of Colored People ("Defendant" or "NAACP"), by undersigned counsel, pursuant to Rule 52 of the Federal Rules of Civil Procedure, the Local Rules of this Court, and the Court's directive at the conclusion of the bench trial in this matter, and hereby submits its proposed findings of fact and conclusions of law.

## I.        PROPOSED FINDINGS OF FACT

### A.  The NAACP

1.        The NAACP is the nation's oldest and largest civil rights organization.  The principal stated objectives of the NAACP are to ensure the political, educational, social, and economic equality of all citizens, and to achieve equality of rights and eliminate racial prejudice among citizens of the United States.  Stipulated Facts in Final Pretrial Order (Dkt. 59) ("Stipulated Facts"), ¶ 1.

1

2.     The NAACP engages in and provides community outreach, informational, and educational services activities on a range of issues of importance to the African American community, such as education, healthcare, political advocacy, criminal justice, the environment, and others.  Transcript of Proceedings, dated December 10-12, 2013 ("Trial Transcript" or "Tr. at __") at 221:11-222:1; Stipulated Facts, ¶ 3.

3.     The NAACP has no formal or official position or policy regarding abortion. Having such a position or policy would create problems for the NAACP with its diverse membership and constituency, which embraces a wide range of views on the controversial issue of abortion.  Tr. at 243:4-25.  The organization does, however, generally support full and equal access for all persons to all legally available forms of healthcare.  Tr. at 244:25-245:13; Stipulated Facts, ¶ 2.

**B.  The NAACP Marks**

4.     The NAACP acronym mark (Reg. No. 1,188,182) has been federally registered since 1982.  The registered acronym mark, plus the non-registered word mark NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, are owned and used by the NAACP, and are valid, distinctive and protectable under the Lanham Act, 15 U.S.C. § 1051 *et seq*.  Stipulated Facts, ¶¶ 6-9.

5.     The NAACP has used one or more of the NAACP and NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE marks, along with the NAACP Seal (collectively, the "NAACP Marks"), for over one hundred years to identify its organization and services.  Those marks are synonymous with the services provided by the NAACP to communities of color and historically disenfranchised communities.  The NAACP has used the NAACP Marks in all available media, including television, magazines, newspapers,

and the Internet.  The NAACP marks are famous and strong, and have achieved widespread recognition among the general public of the United States to identify the NAACP and its services.  Stipulated Facts, ¶¶ 6-9; Tr. at 219:21-220:23; 227:9-228:6.  The NAACP's acronym and word marks were famous before Plaintiffs' first use of them.  Stipulated Facts, ¶ 10.

### C.  The Radiance Foundation

6.      Ryan Bomberger ("Bomberger") is a writer and media creator who, with his wife, Bethany Bomberger, formed The Radiance Foundation, Inc. ("Radiance") in 2009, and who serves as its chief creative officer.  Radiance is a non-profit corporation (501(c)(3)) with a stated mission to educate people about social issues from its Christian perspective.  One such issue is a strong opposition to abortion.  Radiance owns and maintains the website at the URL www.theradiancefoundation.org (the "Radiance Site").   Stipulated Facts, ¶¶ 11-14; Tr. at 43:21-23; 48:4-12.

### D.  The "TooManyAborted.com" Campaign and Website

7.      In 2010, Radiance launched its "TooManyAborted.com" campaign with the stated purpose to educate the public about abortion's impact on the African-American community.  The campaign is strongly anti-abortion.  In conjunction with this campaign, Radiance created, and continues to own and maintain the website at the URL address www.toomanyaborted.com (the "TooManyAborted Site"), which includes many forms of anti-abortion content.  Stipulated Facts, ¶¶ 15, 16, 18; Tr. at 49:6-9; 89:13-24; Pls. Tr. Exs. 2064, 2103-2124.

8.       In addition to providing anti-abortion content, Radiance uses the TooManyAborted Site to offer the public the opportunity to pay to sponsor billboards opposing abortion.  For additional fees, the site offers other anti-abortion related services, such as licensing of artwork, research, content creation, and the opportunity to finance placement of a state-

3

specific anti-abortion web page on the TooManyAborted Site.  Tr. at 84:9-88:10; 101:6-102:21; 144:19-146:20; Pls. Tr. Ex. 2131.

9.      Anyone can initiate a financial transaction with Radiance via the TooManyAborted Site by selecting the desired types of services and clicking the "Submit" button.  Radiance then contacts the interested party to confirm the details and sends a license agreement specifying the services to be rendered along with the payment and invoicing terms. Tr. at 147:1-148:8; 149:10-150:19; Def. Tr. Exs. 1014, 1015.

10.      Transactions via the TooManyAborted Site have resulted in the financing and placement of hundreds of billboards in seven states, along with seven state-specific anti-abortion webpages.  In each such transaction, third parties paid money to Radiance for services rendered. Tr. at 150:20-151:10; Pls. Tr. Exs. 2086-2092.

### E.  Plaintiffs' Use and Alteration of the NAACP Marks

11.      In January 2013, the NAACP learned – through an alert generated by the Google Internet search engine for the "NAACP" acronym mark – about an anti-abortion article entitled "NAACP: National Association for the Abortion of Colored People," written by Bomberger and posted on the LifeNews.com website on January 16, 2103.  Tr. at 209:18-210:14; 260:3-14; Pls. Tr. Ex. 2223.   The webpage on which the article appeared could be accessed directly by clicking on the live hyperlink in the heading in the Google alert results.  Tr. at 162:3-25; 261:2-18.  The link to the article appeared as the second "hit" in the Google results out of a total of 18 hits.  Tr. at 261:19-262:20; Def. Tr. Ex. 1030.

12.      The article was written in a serious tone.  It did not anywhere indicate an intention or purpose of satire or parody.  Tr. at 158:18-159:9.  It repeatedly criticized a civil rights organization identified alternatively as "NAACP" or "National Association for the Abortion of

Colored People" for actively promoting and supporting racially-targeted abortion.  At no point did it use the actual true name of the NAACP.  Pls. Tr. Ex. 2223.  A sample passage is as follows:

> The only racial profiling the NAACP supports is the vilification of any black public figure or organization that is conservative and the targeting of unborn black children for death via abortion.

> The National Association for the Abortion of Colored People has no moral ground to stand upon, just quick sand oozing with the blood of those most discriminated against. The NAACP's covert and overt support of Planned Parenthood negates any other human rights they purport to defend.

13.    The NAACP Seal was prominently displayed on the LifeNews.com webpage next to the article.  Pls. Tr. Ex. 2223.  Bomberger gave LifeNews.com permission to reprint the article, Tr. at 50:22-51:22, and was aware that the NAACP Seal was displayed next to the article. He did not tell the editor of LifeNews.com that the seal should not be displayed or to remove the seal from the webpage.  Tr. at 200:1-14.   The webpage also contained a link to the TooManyAborted Site.  Tr. at 132:15-19; 164:14-165:4.

14.    The same article displaying the headline "NAACP: National Association for the Abortion of Colored People" was posted by Plaintiffs on January 16, 2013 on the Radiance Site. Tr. at 129:22-130:1.  The page with the article could be accessed directly via an Internet search. Tr. at 77:4-12; 81:4-6.  On that webpage, the wording "NAACP: National Association for the Abortion of Colored People" appeared prominently in a heading at the top of the page and in a graphical image beneath the heading.  Tr. at 68:5-8; 77:4-12; Pls. Tr. Ex. 2045.

15.    On January 28, 2013, the NAACP, through counsel, sent a letter to Radiance stating that Radiance's use of the NAACP acronym mark and the name "National Association for the Abortion of Colored People" constituted a violation of the NAACP's trademark rights, and demanded that Radiance cease such uses.  The letter also stated that "*[w]hile you are*

5

***certainly entitled to express your viewpoint, you cannot do so in connection with a name that*** ***infringes on the NAACP's rights.***" Tr. at 129:22-130:18; Pls. Tr. Ex. 2225 (emphasis added).

16.     Immediately upon receipt of the NAACP's cease and desist demand, Bomberger sent an e-mail on January 28, 2013 seeking to raise money to fund a public relations effort to generate publicity for Radiance and its dispute with the NAACP, indicating that he "would love to be able to call out the NAACP with some PR." Tr. at 179:20-180:23; Def. Tr. Ex. 1021.

17.     On February 1, 2013, less than a week after receiving the NAACP's cease and desist demand, Plaintiffs posted the same article on a page of the TooManyAborted Site. Tr. at 122:4-7; Def. Tr. Ex. 1012. That webpage prominently displayed the name "National Association for the Abortion of Colored People" four times: (1) in an orange bar across the top of the page; (2) in large black lettering directly beneath the orange bar; (3) in orange lettering directly beneath the black lettering; and (4) in a large graphical image beneath the orange lettering. Tr. at 135:20-136:10. The name "National Association for the Abortion of Colored People" continued to be displayed four times on this webpage for the entire month of February 2013. Tr. at 112:1-5; 136:19-23.

18.     By clicking on the "Take Action" dropdown menu item at the top of this webpage, a visitor is taken to the page where the visitor can initiate a transaction with Radiance to finance the placement of a billboard, license artwork, or pay for the creation of a state-specific webpage. Tr. at 100:8-15; 124:1-8; 165:5-12; Pls. Tr. Ex. 2131. An orange box containing the word "Donate" appears on this webpage, through which Radiance solicits and receives donations of money for its organization. Tr. at 152:4-13; Def. Tr. Ex. 1012.

19.     Nowhere on these pages of the TooManyAborted Site or the Radiance Site, whether in the headings, graphics or the article's text, does the NAACP's actual true name

6

appear.  Nor was there any other signal or suggestion that the confusingly similar name

"National Association for the Abortion of Colored People" was anything other than a real name

of a real organization or possibly reflective of an actual new name or mission of the actual

NAACP.  Tr. at 152:14-19; Def. Tr. Ex. 1012; Pls. Tr. Ex. 2045; Stipulated Facts, ¶ 21.

  20. Bomberger claims that the name "National Association for the Abortion of

Colored People" is by itself a parody.  Tr. at 166:20-24.  However, Plaintiffs have done nothing

to determine if anyone actually perceived that name as a parody, whether within or outside the

context of the article on the challenged pages.  Tr. at 154:9-21.  Bomberger admits that someone

may not be able to tell from the name alone that the "National Association for the Abortion of

Colored People" is not the real NAACP.  Tr. at 153:1-17.  The challenged pages on which the

article appears contain nothing to suggest a parody.  Tr. at 158:18-159:9.[1]

  21. Bomberger authorized and approved the uses of the name "National Association

for the Abortion of Colored People" in the headings, text, and graphical images displayed on the

pages in the TooManyAborted Site and the Radiance Site.  Tr. at 142:9-25.

  22. The NAACP received numerous calls from members of the public who viewed

the article and webpage that use and display the name "National Association for the Abortion of

Colored People."  Some callers asked why the NAACP was supporting the abortion of people of

color.  Others were angrier, stating such things as "I used to be a supporter of the NAACP.  You

---

[1] A separate page on the TooManyAborted Site with a different article, accessible by a single
link embedded in the middle of sixteen paragraphs of text in the disputed article on that site, does
use the name "National Association for the Abortion of Colored People" in a form which could
reasonably be viewed as a form of criticism, satire or parody:  "The NAACP, whose moniker
would be better described as the National Association for the Abortion of Colored People,
publicly proclaimed their support of abortion when they endorsed the 2004 'March for Women's
Lives' held by Planned Parenthood and NARAL."  Pls. Tr. Ex. 2125.  This other article is not in
dispute, and no evidence has been provided to show that any viewers of the disputed article
would have seen the other article, or, even if they had seen it, whether it would have
counteracted their views as expressed in the survey in this case.

had a proud history during the civil rights movement, and I can't believe you are supporting the genocide of black babies."  Tr. at 262:22-263:1; 269:7-23.

23.     Plaintiffs' uses of the name "National Association for the Abortion of Colored People" have harmed the NAACP in one or more of the following ways:  (a) suggesting that the NAACP has changed its name or central mission; (b) suggesting the existence of an actual social advocacy organization sharing the same acronym and a confusingly similar full name as NAACP; (c) associating the NAACP Marks with a central purpose or mission of racially motivated genocide.  Tr. at 229:5-231:9; 260:23-261:18.

24.     Plaintiffs have criticized the NAACP on the issue of abortion in other ways and contexts without unlawfully using the NAACP Marks.  Pls. Tr. Exs. 2125, 2126.  They have continued to engage in such criticism of the NAACP since the filing of this action.  Def. Tr. Ex. 1041.  In no instance has the NAACP sought to silence any such criticism.  Tr. at 174:18-23; 176:3-22; 228:24-229:4.

### F. The Ostberg Survey  -- Design and Methodology

25.     The NAACP engaged Henry D. Ostberg, Ph.D., an expert in marketing, consumer surveys, and marketing communications, to conduct a survey to determine consumer perception of the name "National Association for the Abortion of Colored People" as used in the context of the challenged Bomberger article, including whether members of the public interpreted the name as a parody or sarcastic criticism of the NAACP, or  whether it instead was viewed as a real name or real organization thereby creating a likelihood  of confusion  or dilution of one or more of the NAACP Marks.  The Court found Dr. Ostberg qualified to serve as an expert in marketing research and conducting consumer surveys for intellectual property cases.  Tr. at 287:25-288:5.

8

26.     For the likelihood of confusion branch of the survey, Dr. Ostberg defined the universe of relevant respondents as persons with a strong interest in opposing abortion.  For the dilution branch of the survey, Dr. Ostberg defined the universe as persons with a strong interest in ensuring racial equality.  Each group was identified via a series of screening questions to determine their interests.  The composition of the two universes was consistent with traditional survey methodology where, for confusion purposes, the study focuses on persons with a natural interest in goods or services associated with the junior mark, and, for dilution purposes, the study focuses on persons with an interest in or familiarity with the goods or services of the senior user's marks.  Tr. at 288:9-16; 298:9-299:13; 299:14-301:4.

27.     The survey in this case was conducted as an Internet, or web-based survey in a manner consistent with surveys commonly accepted by federal courts, including "double-blind" conditions in which neither the professional staff conducting the interviews nor the respondents are aware on whose behalf the survey was being conducted or the issues being tested.  Tr. at 302:23-303:5.  A total of 365 interviews were conducted.  The respondents were divided roughly evenly between men and women (176 and 189 respondents, respectively), and between African-Americans (180 respondents) and Caucasian/Whites, Hispanic/Latinos, Asians and others (185 respondents).  The sample consisted of individuals from 42 states across all nine census regions in the United States.  Tr. at 292:18-294:5; 302:5-13; 365:14-366:2; 444:18-445:14; Def. Tr. Ex. 1045.

28.     After the respondents were qualified through a series of screening questions, all respondents were shown the January 16, 2013 article entitled "NAACP:  National Association for the Abortion of Colored People" as it appeared on the Radiance Site.  All respondents were then also shown the graphical image displayed on that webpage with the words "NAACP:

9

National Association for the Abortion of Colored People" alongside a photograph of a billboard showing a black baby and the words "BLACK AND BEAUTIFUL." All respondents were told to give their candid opinions, not to guess, and to answer "Don't know" if they were unsure. Tr. at 307:9-308:2.

29.     The respondents for the likelihood of confusion branch of the survey were asked what organization was mentioned in the article. If they gave initials or an acronym as an answer, they were asked to give the full name of the organization. They were then asked whether the people who use the term "National Association for the Abortion of Colored People" were affiliated with any other organization or group, and were given the option of answering "Yes," "No," or "Don't know." Only if respondents answered "Yes" were they then asked to name that organization or group. Next, they were asked whether the people who use that term obtained or needed to obtain permission or approval from any other organization or group to use that name. Again, only if the respondents answered "Yes" were they asked to name that organization or group. Tr. at 308:5-309:22.

30.     Respondents in the dilution branch of the survey were asked, "Does the term 'National Association for the Abortion of Colored People' cause you to think of any group or organization you are familiar with?" Only if the respondents answered "Yes" to this question were they then asked to name that organization or group. Finally, these respondents were asked, "What do you think the people who use 'National Association for the Abortion of Colored People' are trying to accomplish?" Tr. at 310:23-311:20.

31.     Respondents in both branches of the survey were asked questions to determine whether they interpreted the term "National Association for the Abortion of Colored People," as used in the article, as a parody. First, they were shown the graphical image of the term as it

appeared in the article and asked the open-ended questions, "What thoughts, if any, went through your mind as you looked at the photograph (of the billboard)?" and, "What other thoughts, if any, went through your mind as you looked at the photograph?"  After answering, they were presented with a list of nine different words or phrases, including "is a parody/is sarcastic," and were asked to check those words or phrases which applied to that term.  Tr. at 310:6-14.

32.     No control group was used to test for a pre-existing belief that the NAACP has a primary mission or reputation of actively promoting abortion, much less on a racially focused basis.  Tr. at 337:21-338:2.  Plaintiffs offered no argument as to why a control might be needed other than to weed out such respondents.  Nor did they offer any no evidence to support a belief that any such person exists.  Accordingly, the Court finds that no "control" specifically aimed at excluding persons with such pre-existing beliefs was necessary.  In any event, the survey employed quasi-controls through the use of filter (or contingency) questions as a means for controlling for possible biases in the answers given.  Tr. at 296:9-297:8.

### G.  The Ostberg Survey – Findings and Conclusions

33.     In the likelihood of confusion branch of the survey, there was a finding of at least 13% direct likelihood of confusion in the traditional sense.  This included 8% who believed there was an affiliation between the people who use the term "National Association for the Abortion of Colored People" and the real NAACP, and 5% who believed that the NAACP's permission or approval was required to use that term.  Tr. at 312:12-24.

34.     An additional 10% believed the initials "NAACP" actually stood for "National Association for the *Abortion* of Colored People" or some other name containing the word "abortion."  Tr. at 315:15-316:4.  Another 10% believed that the "National Association for the

11

Abortion of Colored People" was the name of an actual organization or group.  Tr. at 317:4-318:3.

35.     In the dilution branch of the survey, 42% said that the term "National Association for the Abortion of Colored People" caused them to think of the real NAACP.  Only 5% volunteered, on an unaided basis, that they perceived that term to be a parody or criticism, Tr. at 318:4-320:1.  Subtracting the 5% from the 42%, Dr. Ostberg found a net dilution by tarnishment of the NAACP's Marks of 37% from persons associating the NAACP Marks with a mission of actively promoting abortion on a racially motivated basis.  Tr. at 320:2-321:9.

36.     The findings from the dilution branch of the Ostberg survey also included narrative responses indicating direct tarnishment of an extreme nature, such as "NAACP supports bigotry, discrimination, hatred and racism" and "The NAACP wants to wipe out colored people or reduce the black population."  Tr. at 324:7-326:6.

37.     Plaintiffs have conducted no survey in this case.  Tr. at 461:18-462:7.  They did offer an expert who was deemed qualified to comment on general methodology for an online survey, but the expert's criticisms did not affect the reliability of the methodology used by Dr. Ostberg.  The Court found Plaintiffs' expert unqualified to opine on or criticize the results of Dr. Ostberg's survey showing likelihood of confusion and dilution, which remain unchallenged.

## II.     PROPOSED CONCLUSIONS OF LAW

### A.  Use in Commerce in Connection with Any Goods or Services

1.     Section 32(1)(a) of the Lanham Act, which forms the basis for the NAACP's claim for federal trademark infringement in Count I of its Counterclaim, prohibits the unauthorized use "in commerce" of "any reproduction, counterfeit, copy, or colorable imitation of a [federally] registered mark in connection with the sale, offering for sale, distribution, or

advertising of any goods or services [if] such use is likely to cause confusion, or to cause

mistake, or to deceive." 15 U.S.C. § 1114(1)(a).

     2.     Section 43(a) of the Lanham Act,  which forms the basis for the NAACP's claim

in Count II of its Counterclaim for false designation of origin, prohibits the unauthorized use in

commerce "in connection with any goods or services" of "any word, term, name, symbol, or

device, or any combination thereof, or any false designation of origin, false or misleading

description of fact, or false or misleading representation of fact, which is likely to cause

confusion, or to cause mistake, or to deceive . . . ." 15 U.S.C. § 1125(a)(1)(A).

     3.     Section 43(c) of the Lanham Act, which forms the basis for NAACP's claim for

trademark dilution in Count III of its Counterclaim, prohibits the "use of a mark or trade name in

commerce that is likely to cause dilution by blurring or dilution by tarnishment" of a famous

mark.  15 U.S.C. § 1125(c)(1).

     4.     Plaintiffs challenge the existence of a sufficient nexus to any commercial activity

or any goods or services for any of the above tests to be met.  On the specific facts of this case,

however, the Court finds such nexus to exist.

     5.     In determining whether a mark is used in commerce "in connection with the sale,

offering for sale, distribution, or advertising of any goods or services," this Circuit and others

"have been reluctant to define those terms narrowly.  Rather, . . . the term 'services' has been

interpreted broadly and so the Lanham Act has . . . been applied to defendants furnishing a wide

variety of non-commercial public and civic benefits." *Lamparello v. Falwell*, 420 F.3d 309, 314

(4th Cir. 2005) (internal citations and quotations omitted).  *See, e.g., Planned Parenthood

Federation of America, Inc. v. Bucci*, 42 U.S.P.Q.2d 1430, 1436 (S.D.N.Y., Mar. 24, 1997),

*aff'd*, 152 F.3d 920 (2d Cir. 1998) (soliciting funds for anti-abortion activities via website

labeled with plaintiff's mark); *United We Stand America, Inc. v. United We Stand, America New York, Inc.*, 128 F.3d 86, 90 (2d Cir. 1997), *cert. denied*, 523 U.S. 1076, 118 S.Ct. 1521, 140 L.Ed.2d 673 (1998) (political organizing, advocacy and fundraising by non-profits organization "unquestionably render[ed] a service . . . . We have no doubt that they satisfy § 1114(1)(a)'s requirement that the mark be used in connection with goods and services."); *Brach Van Houten Holding, Inc. v. Save Brach's Coalition for Chicago*, 856 F.Supp. 472, 475-76 (N.D. Ill. 1994) ("services" performed by non-profit community soliciting donations, preparing press releases, holding public meetings, and organizing on behalf of its members' interests).

6.      To satisfy the Lanham Act's "use in connection with" requirement, Plaintiffs need only have prevented users from obtaining or using the NAACP's goods or services, *or* need only have connected their websites to other's goods or services. *People for the Ethical Treatment of Animals v. Doughney*, 263 F.3d 359, 365 (4th Cir. 2001) (hereinafter, "*PETA*"). There is no profit requirement under the Lanham Act. *Christian Science Board of Directors of the First Church of Christ, Scientist v. Robinson*, 123 F.Supp.2d 965, 970 (W.D.N.C. 2000).

7.      Here, Plaintiffs' TooManyAborted Site does not merely link to other websites that engage in commercial activity; rather, the commercial activity is both solicited and takes place **on the Plaintiffs' website itself.**  The page (accessible via an Internet search) on that site that prominently displays the confusingly similar name "National Association for the Abortion of Colored People" links directly to the page **on that same site** from which Plaintiffs offer the public the opportunity to initiate fee-based transactions. These transactions include, among other things, artwork licensing, billboard sponsorships, content creation, research, and the creation and hosting of state-specific webpages.

14

8.     Thus, the nexus with the commercial activity here is far more direct than in *PETA* and cases upon which it relied, where courts found the use "in connection with" requirement was met on the basis of providing links to other sites offering goods or services.  *See, e.g., PETA*, 263 F.3d at 366 (defendant's site linked to 30 commercial websites); *OBH, Inc. v. Spotlight Magazine, Inc.*, 86 F.Supp.2d 176, 183 (W.D.N.Y. 2000) (hyperlinks to competing news sources and a site advertising apartments for rent).  *See also Taubman Co. v. Webfeats*, 319 F.3d 770, 775 (6th Cir. 2003) (links to two commercial websites).

9.     The Lanham Act also applies to the solicitation of donations by organizations, such as Plaintiffs, that engage in social commentary or criticism.  *See, e.g., Planned Parenthood*, 42 U.S.P.Q.2d at 1437 (solicitation of funds for anti-abortion advocacy); *American Diabetes Ass'n v. Nat'l Diabetes Ass'n*, 533 F.Supp. 16, 20 (E.D. Pa. 1981), *aff'd*, 681 F.2d 804 (3d Cir. 1982) (solicitation of donations).  Plaintiffs' webpages with a "Donate" box adjacent to prominent displays of the name "National Association for the Abortion of Colored People" and "NAACP" constitutes a use "in connection with" Plaintiffs' services in commerce.

**B.  Failed Parody**

10.     The heart of Plaintiffs' case is the defense of parody.   "But the cry of 'parody!' does not magically fend off otherwise legitimate claims of trademark infringement or dilution." *Dr. Seuss Enters., L.P. v. Penguin Books, USA,* 105 F.3d 1394, 1405 (9th Cir. 1997).  *See also Anheuser-Busch, Inc. v. VIP Products, LLC*, 666 F.Supp. 2d 974, 984-86 (E.D. Mo. 2008) ("Buttwiper" for dog squeeze toy failed as "parody" of Budweiser); *Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC*, 507 F.3d 252, 260-61 (4th Cir. 2007) (analyzing successful or failed nature of a claimed parody as an essential first step to guide analysis of claimed defense to alleged infringement).

11.    "A 'parody' is defined as a simple form of entertainment conveyed by juxtaposing the irreverent representation of the trademark with the idealized image created by the mark's owner." *PETA,* 263 F.3d at 366.  "A parody must convey two simultaneous – and contradictory – messages: that it is the original, but also that it is *not* the original and is instead a parody." *Id.* "This second message must not only differentiate the alleged parody from the original but must also communicate some articulable element of satire, ridicule, joking, or amusement, presumably a humorous difference, in order to produce its desired effect." *Louis Vuitton*, 507 F.3d at 260. "To the extent that an alleged parody conveys only the first message, it is not only a poor parody but also vulnerable under trademark law, since the customer will be confused." *PETA*, 263 F.3d at 366 (internal quotations and citations omitted).

12.    Plaintiffs' purported parody – which Bomberger claims is the name itself, "National Association for the Abortion of Colored People" – fails in this case.  The evidence shows substantial numbers of viewers of the challenged webpages do not perceive a parody, but instead perceive the existence of another organization with a confusingly similar name and a strongly repugnant mission, or possibly a change in the NAACP's actual mission.  This result is not surprising given the absence in the article of common earmarks of a successful parody.  The famous NAACP acronym mark is juxtaposed, in unaltered form, with the fictitious name "National Association for the Abortion of Colored People" for a civil rights organization which is presented as if it is a real organization.  No "tongue-in-cheek" content signals that there is a joke of any kind.  No other organizations are presented in distorted fashion to suggest a broader parody purpose.  To the contrary, the presentation communicates, expressly and implicitly, that the famous acronym NAACP stands for "National Association for the Abortion of Colored People," or that the famous NAACP organization in fact "has become" the "National Association

for the Abortion of Colored People" (*i.e.*, it has changed its name or mission), or that there is an *actual* organization called "National Association for the Abortion of Colored People" which is affiliated somehow with the actual and famous NAACP.[2]

13.     Cases of successful parody are easily distinguished.  *See, e.g., Louis Vuitton, supra* (distorted and altered versions of famous marks from many high-end fashion houses put onto inexpensive dog chew toys, poking fun at the high-fashion industry, with no survey or other evidence of reputational harm); *New York Stock Exchange, Inc. v. New York, New York Hotel, LLC*, 293 F.3d 550, 555 (2d Cir. 2002) (New York-themed casino resort in Las Vegas with parodies of famous New York landmarks, including "New York $lot Exchange," all done in obviously modified fashion such that "any viewer would understand that the Casino was engaged in a parody or humorous play on words").

14.     The uncontroverted survey evidence in this case confirms the failed parody.  At least 13% of respondents believe there is an affiliation between the actual NAACP and the people who use the term "National Association for the Abortion of Colored People."  Another 10% believe that the famous NAACP acronym stands for "National Association for the Abortion of Colored People."  And another 10% believe there is an actual organization called "National Association for the Abortion of Colored People."

---

[2]     Plaintiffs attempt to defend their "parody" by arguing that one could find an explanation of the parody by clicking through to another article on a separate page of the site and reading that article.  That defense is not sufficient or persuasive based on the facts of this case and on the survey results showing confusion and dilution by tarnishment caused by the articles on the challenged pages.  No evidence was offered that viewers of the article on the challenged webpages followed a link to see the other article, or, if they did, that it would have changed their interpretations.  *See* footnote 1, *supra*.  In any event, such a tangential connection to a purported explanation of a parody in a completely separate article is not sufficient.  *See PETA*, 263 F.3d at 367 (infringing nature of misleading internet domain name that diverted traffic through failed parody not cured by explanatory content accessible in the body of the website after the harm was done).

15.     Bomberger's subjective intent – assuming it was to create a parody – is not the

test.   The essence of trademark law is public perception:

> [T]he keystone of that portion of unfair competition law which relates to trademarks is
> the avoidance of a likelihood of confusion *in the minds of the buying public*.   In
> trademark cases, whatever route one travels, whether by the street called "trademark
> infringement" or on the broad avenue of "unfair competition," all paths lead to the same
> inquiry – whether defendant's acts are likely to cause confusion.

1 *McCarthy on Trademarks and Unfair Competition*, § 2.8 at notes 2-3 (4th Ed. 2013) (emphasis

added), and sources cited therein.   The focus must be on the impression that Plaintiffs'

presentation of the NAACP acronym mark and the name "National Association for the Abortion

of Colored People" created on the relevant audience, not the subjective intent of the speaker.   *See*

*Taubman Co. v. Webfeats*, 319 F.3d 770, 775 (6th Cir. 2003) (". . . the proper inquiry is not one

of intent.   In that sense, the Lanham Act is a strict liability statute.   If consumers are confused by

an infringing mark, the offender's motives are largely irrelevant.") (internal citations omitted).

### C.  Trademark Infringement – Likelihood of Confusion

16.     To establish a trademark infringement claim under the Lanham Act, a plaintiff

must prove: (1) that it owns a valid mark; (2) that the defendant used the mark (or a confusingly

similar imitation) "in commerce" and without the plaintiff's authorization; (3) that the defendant

used the mark (or an imitation of it) "in connection with the sale, offering for sale, distribution,

or advertising" of goods or services; and (4) that the defendant's use of the mark is likely to

confuse consumers.  *Rosetta Stone Ltd. v. Google, Inc.*, 676 F.3d 144, 152 (4th Cir. 2012).   The

test for trademark infringement and unfair competition under Virginia law (Count IV of the

NAACP's Counterclaim) is the same as the test under the Lanham Act.   Both address the

likelihood of confusion as to the source of the goods or services involved.  *Lone Star Steakhouse*

*& Saloon, Inc. v. Alpha of Virginia, Inc.*, 43 F.3d 922, 930 n. 10 (4th Cir. 1995).

18

17.     The Fourth Circuit has identified seven factors for determining whether a likelihood of confusion exists, but "not all these factors are always relevant or equally emphasized in each case." *Pizzeria Uno Corp. v. Temple,* 747 F.2d 1522, 1527 (4th Cir.1984) (internal quotation marks, citations, and brackets omitted).  The factors are: "(1) the strength or distinctiveness of the mark; (2) the similarity of the two marks; (3) the similarity of the goods/services the marks identify; (4) the similarity of the facilities the two parties use in their businesses; (5) the similarity of the advertising used by the two parties; (6) the defendant's intent; (7) actual confusion." *Id.* (citation omitted).  "There is no need for each factor to support [the NAACP's] position on the likelihood of confusion issue."  *Rosetta Stone*, 676 F.3d at 154.  The "'confusion that is remedied by trademark and unfair competition law is confusion not only as to source, but also as to affiliation, connection or sponsorship.'"  *Rosetta Stone*, 676 F.2d at 157, quoting 4 *McCarthy on Trademarks* § 23:8.

18.     As to the first two *Pizzeria Uno* factors (strength of the mark and similarity of the two marks), the NAACP's acronym and word marks are strong and distinctive.  The famous NAACP acronym mark is used in identical, unaltered form by Plaintiffs in association with the made-up name "National Association for the Abortion of Colored People," which is highly similar to the NAACP's real name.

19.     Plaintiffs' claim that their use of the marks is "nominative" because they did not use the NAACP marks or "The National Association for the Abortion of Colored People" to refer to their own organization and services but rather to the NAACP is without merit.  As the Fourth Circuit held in *Rosetta Stone*, "by definition, nominative use involves the use of *another's* trademark in order to describe the trademark owner's *own* product."  676 F.3d at 154 (emphasis

in original).  Here, of course, Plaintiffs are *not* using the NAACP's mark but a fictitious altered

version of the NAACP's real name.  As a result, their use is not "nominative."

20.     The third *Pizzeria Uno* factor (similarity of goods or services) is also satisfied.

The real NAACP is one of the nation's leading civil rights organizations.  The fictitious

"National Association for the Abortion of Colored People" is also portrayed as a "civil rights"

organization.

21.     Under the fourth and fifth factors (similarity of facilities and similarity of

advertising), the fictitious "National Association for the Abortion of Colored People" is

portrayed as engaging in exactly the same types of activities as the real NAACP, albeit with

drastically different goals.  "When considering the similarity of facilities, courts are trying to

determine if confusion is likely based on 'how and to whom the respective goods of the parties

are sold.'"  *Rosetta Stone*, 676 F.3d at 155 (quoting 4 J. Thomas McCarthy, *McCarthy on

Trademarks and Unfair Competition* § 24:51).  Accordingly, these factors also support the

NAACP.

22.     The sixth factor – actual confusion – is "generally considered to be the 'most

important factor' in a likelihood of confusion analysis."  *Swatch AG v. Beehive Wholesale, LLC*,

739 F.3d 150, 162 (4th Cir. 2014), quoting *George & Co. v. Imagination Entertainment Ltd.*, 575

F.3d 383, 398 (4th Cir. 2009).  Indeed, evidence of actual confusion "is entitled to substantial

weight as it provides the most compelling evidence of likelihood of confusion."  *Lone Star*, 43

F.3d at 937.  "Actual confusion can be demonstrated by both anecdotal and survey evidence."

*Rosetta Stone*, 676 F.3d at 156.

23.     There is anecdotal evidence of actual confusion based on numerous calls received

by the NAACP from individuals who saw Plaintiffs' webpages displaying the name "National

Association for the Abortion of Colored People" along with the NAACP acronym mark.  The

confusion by those individuals is manifest from their stated (and mistaken) belief that the

NAACP has adopted a mission of race-based genocide.

24.     In addition, the results of the Ostberg survey showed a 13% net level of direct

confusion as to source, sponsorship, affiliation or approval, which is sufficient to demonstrate

actual confusion.  *See Sara-Lee Corp. v. Kayser-Roth Corp.*, 81 F.3d 455, 467 n. 15 (4th Cir.

1996) (noting case law that "hold[s] that survey evidence indicating ten to twelve percent

confusion was sufficient to demonstrate actual confusion.").  The survey also shows  10%

believed the initials "NAACP" actually stood for "National Association for the Abortion of

Colored People" or some other name containing the word "abortion" rather than the actual name

of the NAACP.  Another 10% believed that the "National Association for the Abortion of

Colored People" was the name of an actual organization or group.[3]

25.     Many cases have found confusion with survey findings at or below the level of

direct confusion as to source, sponsorship, endorsement or approval present in this case, without

even considering the additional forms of actual confusion also shown in Dr. Ostberg's survey.

*See, e.g.,  Humble Oil v. American Oil Co.*, 405 F.2d 803, 817 (8th Cir. 1969) (11% "not an

insignificant percentage"); *Starbucks Corp. v. Samantha Lundberg*, 2005 U.S. Dist. LEXIS

32660 *25 (D. Or. 2005) (10 to 15 percent "or even lower."); *James Burrough Ltd. v. Sign of the

Beefeater , Inc.*, 540 F.2d 266, 279 (7th Cir. 1976) ("We cannot agree that 15% is small.");

*Grotrian v. Steinway*, 365 F.Supp. 707, 716 (S.D.N.Y. 1973) (7.7% "strong evidence" of

---

[3]   While not traditional forms of survey evidence for confusion, these latter two groups clearly
support the fact that, at a minimum, significant numbers of respondents did not interpret the use
of the name "National Association for the Abortion of Colored People" as a parody, but rather as
a factual use of a name for a real organization or a change in name or mission of the real
NAACP.

21

likelihood of confusion); *Coca Cola Co. v. Tropicana Prods., Inc.,* 690 F.2d 312, 317 (2d Cir. 1982) (7.5%).

26.     The appropriate universe for a consumer survey on likelihood of confusion should include a fair sampling of those purchasers most likely to partake of the alleged infringer's goods or services. *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 264 (5th Cir. 1980). "The reason for this rule is clear . . . what is at issue is whether the junior user's mark is likely to confuse consumers.  In order to fairly test that issue, one must look at those consumers likely to encounter the junior user's mark in the marketplace." *Id.*

27.     A survey question which asked whether Plaintiffs required permission or approval to use the name "National Association for the Abortion of Colored People" is a proper and relevant question for a likelihood of confusion survey. *See, e.g.*, *Indianapolis Colts v. Metropolitan Baltimore Football Club Ltd. Partnership*, 34 F.3d 410, 415 (7th Cir. 1994) (survey asked potential buyers of defendant's football merchandise whether the seller needed someone's permission to use the name in dispute); *Schieffelin & Co. v. Jack Co. of Boca, Inc.*, 850 F.Supp. 232, 247 (S.D.N.Y. 1994) (a need to get permission question in a survey is "certainly a relevant inquiry . . ..").

**D.  Trademark Dilution**

28.     Dilution by tarnishment, which forms the basis of the NAACP's trademark dilution claim against Plaintiffs (Count III of the Counterclaim), "creates consumer aversion to the famous brand – *e.g.*, when the plaintiff's famous trademark is linked to products of shoddy quality, or is portrayed in an unwholesome or unsavory context" such that "the public will associate the lack of quality or lack of prestige in the defendant's goods with the plaintiff's unrelated goods." *Rosetta Stone*, 676 F.3d at 167 (internal quotations omitted).  The "*sine qua*

*non* of tarnishment is a finding that plaintiff's mark will suffer negative associations through defendant's use." *NBA Properties v. Untertainment Records LLC*, 1999 WL 335147 at *8 (S.D.N.Y., May 26, 1999).  15 U.S.C. § 1125(c)(2)(C) ("dilution by tarnishment is association arising from the similarity between a mark or trade name and a famous mark that harms the reputation of the famous mark.").

29.     A plaintiff establishes a *prima facie* dilution claim under the Trademark Dilution Revision Act ("TDRA") by showing (1) that the plaintiff owns a famous mark that is distinctive; (2) that the defendant commenced using a mark in commerce that allegedly is diluting the famous mark at any time after the owner's mark became famous; (3) that a similarity between the defendant's mark and the famous mark gives rise to an association between the marks, and (4) that the association is likely to impair the distinctiveness of the famous mark or likely to harm the reputation of the famous mark.  *Rosetta Stone*, 676 F.3d at 168.  A plaintiff can establish dilution by tarnishment "regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury."  15 U.S.C. § 1125(c)(1).  There is no dispute here that the first three factors of the *Rosetta Stone* test are satisfied.

30.     Regarding the fourth factor of likely harm to reputation, far-lesser forms of unsavory association than race-based genocide have routinely been condemned by the courts as forms of dilution by tarnishment without need for extended analysis.  *See, e.g.*, *Anheuser-Busch, Inc. v. Balducci Pubs.*, 28 F.3d 769, 777-78 (8th Cir. 1994), *cert. denied*, 513 U.S. 1112, 115 S.Ct. 903, 130 L.Ed.2d 787 (1995) ("MICHELOB OILY" enjoined for suggestion that plaintiff's beer contained oil ); *Chemical Corp. of America v. Anheuser-Busch, Inc.*, 306 F.2d 433, 436-38 (5th Cir. 1962), *cert. denied*, 372 U.S. 965, 83 S.Ct. 1089, 10 L.Ed.2d 129 (1963) (enjoining use of "WHERE THERE'S LIFE . . . THERE'S BUGS!" slogan as tarnishing of WHERE THERE'S

2em

LIFE, THERE'S BUD); *Pillsbury Co. v. Milky Way Productions, Inc.*, 215 U.S.P.Q. 124, 135

(N.D. Ga. 1981) (cartoon of "Poppin' Fresh" and "Poppie Fresh" doughpersons engaging in

sexual intercourse and fellatio); Coca-*Cola Co. v. Gemini Rising, Inc.*, 346 F.Supp. 1183, 1190-

91 (E.D.N.Y. 1972) (enjoining ENJOY COCAINE posters based on tarnishment because

customers might be "turned off" by so-called "spoof"); *NBA Properties v. Untertainment*

*Records, LLC*, 1999 WL 335147 at *9 (use of NBA logo with gun placed in player's hand plus

slogan SDE SPORTS, DRUGS & ENTERTAINMENT).

31.     A presumption of harm exists – or at least a strong inference – merely by

associating a famous mark with sex-related product.  *See V Secret Catalogue, Inc. v Moseley*,

605 F.3d 382 (6th Cir. 2010).  The same reasoning applies with equal or greater force to

Plaintiffs' acts of associating the NAACP – the nation's most revered civil rights organization –

with racially motivated genocide.

32.     The current version of the Federal Trademark Dilution Act, 15 U.S.C. § 1125(c)

requires only proof of *likelihood* of dilution, and not proof of actual harm.  This aspect of the

law, introduced in 2006, was expressly intended to lower the standard of proof necessary and to

eliminate a need to prove actual harm.  *See V Secret Catalogue, Inc. v Moseley*, 605 F.3d at 387-

89.

33.     The valid and reliable survey in this case shows that there is a net dilution by

tarnishment of 37%.  Narrative responses included additional direct evidence of tarnishment,

such as "NAACP supports bigotry, discrimination, hatred and racism" and "The NAACP wants

to wipe out colored people or reduce the black population."  In addition, 21% of respondents

from the relevant consumer group said or suggested that the people who use the term "National

Association for the Abortion of Colored People" wanted to harm or tarnish the name and

reputation of the NAACP rather than to simply criticize its goals. These results amply demonstrate likelihood of dilution by tarnishment.

34.      "[T]he word 'likelihood' in the dilution part of the Lanham Act has the same meaning as it does in the traditional infringement sections of the Lanham Act." 4 *McCarthy on Trademarks* § 24:115 n. 2. Accordingly, the same survey percentages which are sufficient to demonstrate likelihood of confusion also should apply to the results of a likelihood of dilution survey.

35.      Plaintiffs' attempts to rely on the defenses and exclusions set forth in 15 U.S.C. 1125(c)(3) all fail. A parody-based "fair use" defense to a dilution claim under 15 U.S.C. § 1125(c)(3)(A) is an affirmative defense which Plaintiffs must prove in this case. *Rosetta Stone,* 676 F. 3d at 168-69. As discussed above, Plaintiffs presented no evidence to support that "National Association for the Abortion of Colored People" was perceived as a parody.

36.      With respect to the "news reporting and news commentary" exception under 15 U.S.C. § 1125(c)(3)(B), the fact that the Plaintiffs were not using the NAACP's actual true name takes them outside of a direct application of the concept of "news reporting." *Compare BidZirk, LLC v. Smith*, 2007 WL 3119445 at *1, 6-7 (D.S.C., Oct. 22, 2007) (defendant used plaintiff's mark, in unaltered form, in an article recounting his experience in using eBay listing companies). Even if this exception could apply to use of a modified version of a famous mark, it would nonetheless be inapplicable on the particular facts of this case where the evidence shows public perception of the fictitious name alternately as being actually associated with the NAACP, or as an actual organization, or reflective of a change in mission of the real NAACP. As for "news commentary," while Plaintiffs argue that they were engaged in a satirical parody of the NAACP, for the reasons discussed above the parody failed.

37.     With respect to the "noncommercial use" exception under 15 U.S.C. §
1125(c)(3)(C), this exclusion is inapplicable here.  As described above, the pages on Plaintiffs'
websites where the disputed articles appeared show a sufficient nexus to commercial activity to
constitute a use "in commerce" and "in connection with the sale, offering for sale, distribution or
advertising of any goods or services" to come within the purview of the Lanham Act, 15 U.S.C.
§§ 1114(1)(a) (trademark infringement), 1125(a) (false designation of origin) and 1125(c)(1)
(trademark dilution). The commercial activity here includes the various opportunities for visitors
to pay to sponsor billboards, license content, and have state-specific anti-abortion pages created.
*See PETA*, 263 F.3d at 366 (commercial use found where defendant's website linked to third
party sites even though no commercial activity was solicited or took place on defendant's site);
*United We Stand America, Inc. v. United We Stand, America New York, Inc.*, 128 F.3d 86, 90 (2d
Cir. 1997), *cert. denied*, 523 U.S. 1076, 118 S.Ct. 1521, 140 L.Ed.2d 673 (1998) (political
organizing, advocacy and fundraising by non-profit organization constituted use in connection
with goods and services.).

**E.  Bomberger is Liable in His Individual Capacity**

38.     Bomberger personally authorized and approved the infringing and diluting uses of
the NAACP's marks and thus is liable in his individual capacity under the Lanham Act.  *See*
*Flexible Benefits Council v. Feltman*, 2008 WL 2465457, at *7 (E.D. Va., June 16, 2008)
(individual corporate officer who authorized and approved acts of trademark infringement held
personally liable).

**F.  First Amendment**

39.     Plaintiffs have further argued a general First Amendment defense to all asserted
Counterclaims.  However, based on the facts here, the Court finds that Plaintiffs cannot hide

26

behind the First Amendment, and also that the statutory defenses and exceptions in 15 U.S.C. § 1125(c)(3) therefore do not apply to the dilution claims in this case.

40.     As to the claims of infringement, an intent to engage in criticism or social commentary does not provide absolute immunity from liability under the Lanham Act.  *See MGM-Pathe Communications v. Pink Panther Patrol*, 774 F.Supp. 869, 877 (S.D.N.Y. 1991) (defendant's goal of political activism did not confer immunity from the Lanham Act, noting that "[t]he seriousness and virtue of a cause do not confer any right to the use of the trademark of another"); *Christian Science Board of Directors of the First Church of Christ, Scientist v. Robinson*, 123 F.Supp.2d 965, 970-71 (W.D.N.C. 2000). ("The fact that [the defendant] criticizes the Plaintiffs does not provide immunity.").

41.     Contrary to Plaintiffs' protests, the Court concludes that the NAACP is not engaged in an effort to suppress criticism.  The NAACP does not dispute that Plaintiffs have the right under the First Amendment to criticize the NAACP, its mission, and programs.  Indeed, Plaintiffs have voiced such criticisms in the past – and continue to do so today – in many forms which the NAACP does not challenge and where there was no alteration of the NAACP's name or marks in a form or context that caused consumer confusion.  The NAACP Marks "are a form of property, . . . and [the NAACP's] rights therein need not 'yield to the exercise of First Amendment rights under circumstances where adequate alternative avenues of communication exist.'"  *Mutual of Omaha Ins. Co. v. Novak*, 836 F.2d 397, 402 (8th Cir. 1987), *cert. denied*, 488 U.S. 933, 109 S.Ct. 326, 102 L.Ed.2d 344 (1988), quoting *Lloyd Corp. v. Tanner*, 407 U.S. 551, 567, 92 S.Ct. 2219, 2228, 33 L.Ed.2d 131 (1972).[4]

---

[4]     Even an altered form of the name could be permissible in proper circumstances.  For example, if in the challenged articles Plaintiffs had clearly identified the actual NAACP, and then communicated that, based on Plaintiffs' views of the NAACP's policies, the NAACP

42.    Within the context of expressive content, "[u]se of a trademark in a way that is likely to cause confusion *as to the source or sponsorship of the expression* is not protected conduct." *Coca-Cola Co. v. Purdy*, 382 F.3d 774, 790-91 (8th Cir. 2004) (defendant used plaintiffs' marks to divert Internet users to anti-abortion websites "that could tarnish and disparage their marks . . . by implying that their owners have taken positions on a hotly contested issue [*i.e.*, abortion].") (emphasis added).   By creating their fictitious "straw man" organization with a name confusingly similar to the full name of the real NAACP, Plaintiffs have caused *actual* confusion among members of the public who, as the anecdotal evidence and survey results demonstrate, mistakenly believe that the repugnant mission of that made-up organization has become the mission of the real NAACP.   *See Westchester Media v. PRL USA Holdings, Inc.*, 214 F.3d 658, 672 (5th Cir. 2000) ("[s]peech that misleads or creates confusion is not protected by the First Amendment"); *Mutual of Omaha*, 836 F.2d at 402 (enjoining use of MUTANTS OF OMAHA on t-shirts as purported parody or satirical criticism opposing nuclear war); *Christian Science*, 123 F.Supp.2d at 971 (enjoining use of a religious group's name in website postings expressing criticisms of that group).

**G.  Damages, Injunctive Relief, and Attorney's Fees**

43.    When a violation of any right of the registrant of a mark registered in the Patent and Trademark Office, a violation under section 43(a), or a willful violation under section 43(c), shall have been established in any civil action arising under the Lanham Act, the plaintiff shall be entitled, subject to the principles of equity, to recover (1) defendant's profits, (2) any damages

---

should change its name to replace the word "advancement" with "abortion," Plaintiffs might have engaged in a form of protected expression that would merely criticize the NAACP without causing trademark infringement or dilution.  In fact, evidence was presented at trial of at least one article, not at issue in this case, where this approach was taken.  The NAACP has not challenged that other article, which does not appear on the same webpages with the challenged articles.

sustained by the plaintiff, and (3) the costs of this action.  In assessing profits the plaintiff shall

be required to prove defendant's sales only; defendant must prove all elements of cost or

deduction claimed.  15 U.S.C. § 1117(a).

44.     The NAACP is entitled to an award of based on the Plaintiffs' gross revenues in

the amount of $127,903.00.  A plaintiff may recover an award of profits against the defendant

based on the defendant's gross sales of product bearing the infringing mark even though the

defendant made no profit on the sales and actually lost money.  *See Otis Clapp & Son, Inc. v.*

*Filmore Vitamin Co.*, 754 F.2d 738, 744 (7th Cir. 1985) ("the plaintiff should not be prejudiced

by the defendant's inefficiency").

45.     In addition, the court in exceptional cases may award attorney's fees to the

prevailing party.  15 U.S.C. § 1117(a).  This Circuit has interpreted the phrase "exceptional case"

to include those cases where "the defendant's conduct was malicious, fraudulent, willful or

deliberate in nature."  *Retail Services, Inc. v. Freebies Publishing*, 364 F.3d 535, 550 (4th Cir.

2004).  *See Agri-Supply Co., Inc. v. Agrisupply.com*, 457 F.Supp.2d 660, 666 (E.D. Va. 2006)

(awarding attorney's fees under the Lanham Act in view of defendant's "willful defiance and

protraction of the judicial processes attempting to stop the illegalities"); *Baker v. Urban*

*Outfitters, Inc.*, 431 F.Supp.2d 351, 358 (S.D.N.Y. 2006) (improper motivation in bringing suit

in an attempt to garner publicity).

46.     This case is an exceptional one in that Plaintiffs ignored the NAACP's cease and

desist demand, made no effort to resolve the matter, and instead expanded the scope of their

infringing activities.  They then immediately filed this action, armed with financing from a third

party, in an effort to generate publicity for their cause without regard for the harm caused to the

NAACP.  Indeed, Plaintiffs could have avoided this litigation entirely by stopping use of the

name "National Association for the Abortion of Colored People" and using the actual true name

of the NAACP.  Thus, an award of attorney's fees is appropriate in this case.

47.    The NAACP is entitled to a permanent injunction against Plaintiffs' use of the

name "National Association for the Abortion of Colored People" in any manner that creates a

likelihood of confusion or a likelihood of dilution among members of the public.  15 U.S.C. §

1116(a).  Such an injunction will not prevent Plaintiffs from expressing their views or criticizing

the NAACP on the abortion issue.  *See Coca-Cola Co. v. Purdy*, 382 F.3d at 790-91 (rejecting

defendant's argument that permanent injunction would constitute a content based restriction on

his speech in violation of the First Amendment, as an injunction would not restrict the ability of

defendant to express his anti-abortion views in non-confusing ways).

Dated: February 14, 2014                    Respectfully submitted,


                                            /s/  *David G. Barger*
                                            David G. Barger
                                            VSB No. 21652
                                            GREENBERG TRAURIG, LLP
                                            1750 Tysons Blvd., Suite 1200
                                            McLean, Virginia  22102
                                            Telephone: (703) 749-1300
                                            Facsimile: (703) 749-1301
                                            bargerd@gtlaw.com

                                            Johnine P. Barnes (admitted *pro hac vice*)
                                            Steven J. Wadyka, Jr. (admitted *pro hac vice*)
                                            GREENBERG TRAURIG, LLP
                                            2101 L Street, N.W., Suite 1000
                                            Washington, D.C.  20037
                                            Telephone:  (202) 331-3100
                                            Facsimile:  (202) 261-0135
                                            wadykas@gtlaw.com

                                            *Counsel for Defendant/Counterplaintiff*
                                            *National Association for the Advancement of*
                                            *Colored People*

## CERTIFICATE OF SERVICE

I hereby certify that on February 14, 2014, the foregoing document was filed with the Clerk of the Court using the CM/ECF filing system and that service will thereby be accomplished on:

Charles M. Allen, Esq.
GOODMAN, ALLEN & FILETTI, PLLC
4501 Highwoods Parkway
Suite 210
Glen Allen, VA  23060
Telephone:  (804) 346-0600
Facsimile: (804) 346-5954
callen@goodmanallen.com

*Attorney for Plaintiffs The Radiance Foundation, Inc.*
*and Ryan Bomberger*


_/s/ David G. Barger_

David G. Barger
VSB No. 21652
Greenberg Traurig, LLP
1750 Tysons Boulevard, Suite 1200
McLean, Virginia  22102
Telephone:  (703) 749-1300
Facsimile: (703) 749-1301
bargerd@gtlaw.com
*Counsel for Defendant/Counterplaintiff*
*National Association for the Advancement of*
*Colored People*

*WDC 372898122v4*