## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Norfolk Division

**THE RADIANCE FOUNDATION, INC. et al.,**

**Plaintiffs,**

**v.**

**CIVIL ACTION NO. 2:13cv53**

**NATIONAL ASSOCIATION FOR THE**
**ADVANCEMENT OF COLORED PEOPLE,**

**Defendant.**

### *MEMORANDUM OPINION AND ORDER*

This Memorandum Opinion and Order is issued after a bench trial in the above-styled matter to resolve trademark infringement and trademark dilution claims.

On February 1, 2013, the Radiance Foundation, Inc. ("Radiance") and Ryan Bomberger ("Bomberger") brought this action for declaratory judgment against the National Association for the Advancement of Colored People ("Defendant" or "NAACP"). Radiance and Bomberger (together referred to as "Plaintiffs") moved this Court to enter judgment declaring that their use of certain marks allegedly owned by the NAACP was not infringing, tarnishing or diluting in violation of common law or the Lanham Act. Radiance and Bomberger also requested that the Court declare their use of these trademarks protected under the First Amendment right to free speech. The NAACP filed four counterclaims against Radiance and Bomberger, asserting it is entitled to relief for trademark infringement and trademark dilution under the Lanham Act and the Virginia Code. The NAACP claimed Plaintiffs' use of its federally registered trademarks "NAACP" and "Image Awards" and as well as the unregistered "National Association for the

Advancement of Colored People" name and Scales of Justice Seal (referred to collectively as

"NAACP Marks") was unlawful.

The Court held a bench trial, which commenced on December 10, 2013. The parties have

filed post-trial briefs and this matter is now ripe for judicial determination. The Court issues the

following Findings of Fact and Conclusions of Law, as required by Rule 52(a) of the Federal

Rules of Civil Procedure. For the reasons set forth herein, Radiance and Bomberger's request

for declaratory judgment in their favor is **DENIED.** On the NAACP's counterclaims, the Court

**FINDS** that Plaintiffs are liable for trademark infringement and trademark dilution of the

"NAACP" and "National Association for the Advancement of Colored People" trademarks.

## I. FACTUAL FINDINGS

### A.    Factual and Procedural History

Radiance, a non-profit organization founded by Bomberger, educates the public about

social issues from a Christian perspective. Compl. ¶¶ 1, 8. The NAACP is a civil rights

organization that provides educational and outreach services to African Americans. Countercl.

¶¶ 8-9. After NAACP executives publicly criticized Plaintiffs' anti-abortion billboards in 2010

and 2011, Bomberger wrote three news articles critiquing the NAACP's position on abortion,

employing the phrase "National Association for the Abortion of Colored People."[1] Compl. ¶¶

13-15. These articles were posted on Radiance's websites TooManyAborted.com and

TheRadianceFoundation.org as well as on a third party website LifeNews.com. Compl. ¶¶ 14-

20. The first article, published June 21, 2011 on TooManyAborted.com, had a headline that read

"NAACP: National Association for the Abortion of Colored People" and discussed Defendant's

---

[1] Initially, California NAACP Chapter President Alice Huffman called Radiance's billboards "horribly racist." Trial Transcript 107:16-108:2 (hereinafter "Tr."). Then, in June of 2011, the Huffington Post published an article about Radiance's billboards in Georgia, quoting the NAACP's Washington Bureau Director and Senior Vice President for Advocacy and Policy Hilary Shelton as criticizing the campaign for comparing abortion to slavery. Tr. at 108:6-109:10.

endorsement of the 2004 March for Women's Lives. Compl. ¶ 15. The second article from July 6, 2011, published on LifeNews.com, included a graphic of the Scales of Justice Seal and stated that National Association for the Abortion of Colored People would be a fitting moniker for the NAACP. Compl. ¶¶ 19- 20. The third article, published on TheRadianceFoundation.org, LifeNews.com and TooManyAborted.com in January of 2013, discussed the NAACP's Annual Image Awards. Compl. ¶¶ 23-26.[2] This article employed the phrase "National Association for the Abortion of Colored People" throughout its text and headline. *Id.* Additionally, Bomberger made a speech in December of 2012, during which he stated, "Groups such as the NAACP (which has become The National Association for the Abortion of Colored People) and the Congressional Black Caucus aid and abet this mass destruction of beautiful potential in the black community," a statement that was later posted on TooManyAborted.com. Compl. ¶ 22.

The NAACP became aware of Radiance's use of its marks through a Google Alert that identified the third article on LifeNews.com as a "hit" when a search for "NAACP" was performed. On January 28, 2013, the NAACP sent Plaintiffs a letter threatening to take legal action if Radiance and Bomberger did not cease to use the NAACP Marks. Compl., Ex. 7. On February 1, 2013, Radiance filed a Complaint for declaratory judgment, asserting that its use of the NAACP Marks does not constitute infringement, tarnishment or dilution and is protected speech under the First Amendment. On April 8, 2013, the NAACP filed counterclaims for trademark infringement and federal unfair competition under the Lanham Act, trademark dilution under the Trademark Dilution Revision Act, and Virginia common law trademark infringement and unfair competition.

---

[2] This third article, first published in January 2013, is the article upon which the NAACP bases its counterclaims. *See infra* Part I, Section C, point 14.

On April 29, 2013, Plaintiffs filed a motion for summary judgment simultaneously with their Answer to the counterclaims, which this Court denied. Order, Oct. 15, 2013, ECF No. 44. On November 11, 2013, after the completion of discovery, the NAACP filed a motion for summary judgment, which was also denied. Order, Dec. 6, 2013, ECF No. 70. This Court also granted-in-part and denied-in-part the motion in limine filed by the NAACP on November 6, 2013, limiting the testimony of Plaintiffs' expert Tracy Tuten, Ph.D. to opinions regarding general consumer survey principles and methodologies. Order, Dec. 11, 2013, ECF No. 76. Lastly, this Court denied the NAACP's request for a directed verdict in its favor as to its counterclaims. Order, Jan. 9, 2014, nunc pro tunc Dec. 12, 2013, ECF No. 83. The bench trial commenced on December 10, 2013 and ended on December 12, 2013.

## B.     Stipulated Facts

The parties have stipulated to the following facts, which the Court accepts and finds:

1. The NAACP is the nation's oldest and largest civil rights organization. It owns and maintains the website at www.naacp.org. The principal stated objectives of the NAACP are to ensure the political, educational, social, and economic equality of all citizens, and to achieve quality of rights and eliminate racial prejudice among citizens of the United States. The NAACP's leadership consists of prominent individuals in American society, including lawyers, government officials, clergy, physicians, policymakers, and social advocates.

2. The NAACP engages in and provides community outreach, informational, and educational services activities on a range of issues of importance to the African American community. With regard to health care issues, the NAACP has advocated for equal

access to quality health care for all Americans, including members of the African American community.

3. The Black community is the focus of the NAACP's activities and programs.

4. The NAACP actively solicits contributions from, among others, members of the African American community and other people of color to support its programs and outreach activities.

5. The NAACP sponsors billboards for the purpose of promoting its campaigns and outreach activities, which are focused on issues of pressing importance to members of the Black community.

6. The NAACP mark (U.S. Trademark Registration No. 1,188,182) is a valid and subsisting federally registered trademark. By virtue of this registration, the registered NAACP mark is entitled to protection under the Lanham Act, 15 U.S.C. § 1051, *et seq*.

7. The marks NAACP and NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE are owned and used by the NAACP, and are valid, protectable and distinctive.

8. The NAACP and NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE marks have achieved widespread recognition among the general public of the United States.

9. The NAACP and NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE are famous and strong marks.

10. The NAACP and NATIONAL ASSOCIATION FOR THE ADVANCMENT OF COLORED PEOPLE marks were famous before Plaintiffs' first use of them.

11. Ryan Bomberger is a writer and media creator who, with his wife, Bethany Bomberger, formed The Radiance Foundation in 2009.

12. Radiance is a non-profit corporation (501(c)(3)) dedicated to educating people about social issues from its Christian perspective.

13. Among other things, Radiance provides informational, educational and community outreach services related to race relations, diversity, adoption, fatherlessness, pop culture, pluralism and the impact of abortion on the Black community.

14. Radiance owns and maintains the website at the URL www.theradiancefoundation.org (the "Radiance Site").

15. Radiance launched its "TooManyAborted.com" campaign in 2010 for Black History Month to help publicize the impact of abortion in the Black community.

16. In conjunction with this campaign, Radiance created, and continues to own and maintain the website at the URL www.toomanyaborted.com (the "TooManyAborted Site").

17. Radiance provides community outreach services to organizations and individuals, including outreach on education, character development, social issues, and racism against the Black community. Through its "Shine" community outreach activity, Radiance takes on various social issues, including poverty, educational choice, and civil rights.

18. The stated mission of Radiance's "TooManyAborted.com" campaign is to educate the public about abortion's impact on the African American community.

19. Radiance purchases billboard space for the purpose of promoting and publicizing its campaigns and outreach activities.

20. Radiance has provided t-shirts and onesies (i.e. a babies' garments) and novelty items such as stuffed animals, pins, buttons, and stickers to individuals who have donated money to Radiance.

21. "National Association for the Abortion of Colored People" closely resembles "National Association for the Advancement of Colored People."

22. Bomberger used the term "National Association for the Abortion of Colored People" in order to convey to people that the actual NAACP is pro-abortion.[3]

## C. Additional Factual Findings

The Court has made the following additional factual findings:

1. The NAACP has no formal or official position or policy regarding abortion because such a position may create problems within its diverse membership and constituency, who embrace a wide range of views on the controversial issue of abortion.[4] The NAACP generally supports full and equal access for all persons to all legally available forms of healthcare.[5]

2. The "NAACP" trademark represents "[a]ssociation services, namely, providing legal assistance, technical assistance and other resources to achieve civil rights in education, voting, housing, employment and economic opportunity."[6] "NAACP" is an acronym of the name of Defendant's organization, the National Association for the Advancement of Colored People.

3. The "National Association for the Advancement of Colored People" trademark is the name of Defendant's organization. The NAACP has extensively used "National

---

[3] The aforementioned Stipulated Facts represent the Undisputed Facts outlined in the Final Pretrial Order in this case. ECF No. 59.
[4] Tr. at 243:4-25.
[5] Tr. at 244:25-245:13.
[6] Countercl. ¶ 11.

Association for the Advancement of Colored People" in interstate commerce since its founding in 1909 to identify its organization and services.[7]

4. The Scales of Justice Seal trademark represents the NAACP. The NAACP has extensively used the Scales of Justice Seal in interstate commerce since its founding in 1909 to identify its organization and services. The graphic of the Scales of Justice Seal includes "NAACP," "National Association for the Advancement of Colored People" and the founding year of the organization.[8]

5. The "Image Awards" trademark was federally registered on November 15, 2005. "Image Awards" represents services such as "organizing and conducting the presentation of awards recognizing exemplary works, people or projects that promote a positive impression of people of color; educational and entertainment services in the nature of a live show and broadcast of the presentation of awards."[9]  The NAACP held its 44th Annual Image Awards broadcast in 2013.[10]

6. The NAACP has used the NAACP Marks in all available media, including telephone, telegraph, faxes, magazines, newspapers, television and the Internet.[11]

7. Radiance advocates its viewpoints on a number of social issues by preparing and distributing media in a variety of forms, including short video messages, printed graphics and news articles published on the Internet. Bomberger also makes personal appearances at events and provides interviews for the media.[12]

---

[7] Countercl. ¶ 12.
[8] Countercl. ¶ 12.
[9] Countercl. ¶ 11.
[10] Radiance Ex. 2045.
[11] Tr. at 220:14-23.
[12] Tr. at 49:20-51:11.

8. Radiance has never owned or operated a website with any of the NAACP Marks or "National Association for the Abortion of Colored People" in the domain name.[13]

9. Neither Radiance nor Bomberger own, maintain or operate the LifeNews.com website. LifeNews.com is operated by a third party.[14]

10. In January 2013, Bomberger wrote an article regarding the NAACP's Annual Image Awards, bearing the headline "NAACP: National Association for the Abortion of Colored People" (hereinafter "January 2013 Article"). This article was first posted on the Radiance Site. This article also appeared on LifeNews.com. Radiance later posted the article a third time on the TooManyAborted Site under the title "National Association for the Abortion of Colored People."[15]

11. On the Radiance Site, the headline for the January 2013 Article appears in text and in a graphic. The graphic headline included the phrase "NAACP: National Association for the Abortion of Colored People" adjacent to an image of a TooManyAborted billboard with the text "Black & Beautiful" and a photograph of an African American baby.[16]

12. On LifeNews.com, the Scales of Justice Seal was prominently displayed on the webpage next to the text of the January 2013 Article.[17] The webpage also contained a link to the TooManyAborted Site.[18] Bomberger gave LifeNews.com permission to reprint the article and was aware that the Scales of Justice Seal was displayed next to the text.[19]

---

[13] Tr. 58:2-20.
[14] Tr. 189:2-4; 190:11-20.
[15] Radiance Ex. 2127; Tr. 122:4-11.
[16] Radiance Ex. 2045; Tr. 77:4-12.
[17] Radiance Ex. 2223.
[18] Tr. at 132:15-19.
[19] Tr. at 51:15-25; 200:1-14.

13. On the TooManyAborted Site, the January 2013 Article appeared with a graphic headline that included the words "Civil Wrong" in large letters. Underneath the large letters is "The National Association for the Abortion of Colored People."[20]

14. On January 17, 2013, the NAACP learned of the existence of the January 2013 Article through an alert generated by the Google Internet search engine for the "NAACP" trademark. The Google Alert presented a hyperlink to the January 2013 Article on LifeNews.com.[21] The hyperlink to the article appeared as the second "hit" in the Google Alert results out of a total of 18 hits.[22]

15. On January 28, 2013, the NAACP, through counsel, sent a cease and desist letter to Radiance stating that Radiance's use of the NAACP Marks and "National Association for the Abortion of Colored People" constituted a violation of the NAACP's trademark rights. The letter demanded that Radiance cease such uses.[23]

16. On January 28, 2013, Bomberger sent an e-mail to Joseph A. Brinck seeking to raise money to fund a public relations effort to generate publicity for Radiance and its dispute with the NAACP.[24]

17. Members of the public who viewed the January 2013 Article called the NAACP to express concern about the "National Association for the Abortion of Colored People" moniker.[25]

18. The NAACP engaged Henry D. Ostberg, Ph.D., an expert in marketing, consumer surveys and marketing communications, to conduct a survey to determine consumer perception of the name "National Association for the Abortion of Colored People" as

---

[20] Radiance Ex. 2127.
[21] NAACP Ex. 1030.
[22] *Id.*
[23] Radiance Ex. 2225
[24] NAACP Ex. 1021.
[25] Tr. at 262:22-263:1; 269:11-23.

used in the context of the challenged Bomberger article, including whether members of the public interpreted the name as a parody or sarcastic criticism of the NAACP, or whether it instead was viewed as a real name or real organization thereby creating a likelihood of confusion or dilution of one or more of the NAACP Marks.[26]

19. The Radiance Site presents its visitors with an opportunity to donate to Radiance. An orange box containing the word "Donate" appeared on Radiance Site webpages, through which Radiance solicits and receives donations of money for its organization.[27]

20. The TooManyAborted Site presents its visitors with the opportunity to donate to Radiance or sponsor outdoor billboards with anti-abortion messaging.[28] For additional fees, the TooManyAborted Site offers other services related to billboards, such as licensing of artwork, research, content creation, and the opportunity to finance placement of a state-specific anti-abortion webpage.[29] Visitors can initiate a financial transaction with Radiance through the TooManyAborted Site by submitting their contact information.[30] Radiance then contacts the interested party to confirm the details and sends a license agreement specifying the services to be rendered along with payment and invoicing terms.[31]

21. Radiance has erected billboards in seven states, along with seven state-specific anti-abortion webpages. Seven different messages have appeared on billboards. The billboards also include a reference to the TooManyAborted Site as well as a sponsorship

---

[26] NAACP Ex. 1045.
[27] Radiance Ex. 2045.
[28] Radiance Ex. 2131.
[29] *Id.*
[30] Tr. at 147:1-148:8.
[31] Tr. at 149:9-150:13; NAACP Ex. 1015.

tagline identifying Radiance and any sponsoring organization.[32] The seven state-specific webpages appear under the "The Impact" section of the TooManyAborted Site.[33]

22. None of Radiance's billboard artwork has displayed any of the NAACP Marks or has included the phrase "National Association for the Abortion of Colored People."[34] None of the NAACP Marks or "National Association for the Abortion of Colored People" has appeared on any webpage accessed via the "Take Action" menu item, including the "Expose the Lies. Sponsor a Billboard" page.[35]

## II. CONCLUSIONS OF LAW

1. This Court has subject matter jurisdiction in this matter under 28 U.S.C. § 1338(a) to hear claims arising out of federal trademark laws. This Court also has jurisdiction under 28 U.S.C. § 1332 because there is citizenship diversity between the parties and the matter in controversy exceeds $75,000.

2. This Court has personal jurisdiction over Plaintiffs because Radiance's principal place of business is in Virginia and Bomberger is domiciled in Virginia. This Court has personal jurisdiction over Defendant because the NAACP conducts activities and derives revenue in Virginia, and has a substantial number of chapters and members throughout the Commonwealth.

3. Venue is proper under § 1391 in any judicial district in which the defendant is properly subject to personal jurisdiction. 28 U.S.C. § 1391(b) and (c). Venue is proper pursuant to § 1391 because a substantial part of the acts giving rise to the claims occurred in this District, and Defendant has sufficient connection with the Eastern District of Virginia.

---

[32] Tr. 84:9-86:13; 150:20-151:2.
[33] Tr. 85:11-24.
[34] Tr. 107:10-12.
[35] Tr. 100:16-101:5.

*Trademark Infringement*

4. Pursuant to Section 32(1)(a) the Lanham Act, "[a]ny person who shall, without the consent of the registrant — use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive . . . shall be liable in a civil action by the registrant. . . ." 15 U.S.C. § 1114.

5. Pursuant to Section 43(a) the Lanham Act, "[a]ny person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which — is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . . shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act." 15 U.S.C. § 1125(a)(1).

6. The party making the allegations of infringement has the burden of proof to present evidence in support of the allegations set forth in its complaint and to prove those allegations by a preponderance of the evidence. *Tie Tech, Inc. v. Kinedyne Corp.*, 296 F.3d 778, 783 (9th Cir. 2002); *Eurotech, Inc. v. Cosmos European Travels Aktiengesellschaft*, 213 F. Supp. 2d 612, 623 (E.D. Va. 2002).

7. To establish an infringement violation of the Lanham Act for either a registered mark under 15 U.S.C. § 1114 or an unregistered mark under 15 U.S.C. § 1125(a), "a plaintiff

must prove: (1) that it owns a valid mark; (2) that the defendant used the mark 'in commerce' and without the plaintiff's authorization; (3) that the defendant used the mark (or an imitation of it) 'in connection with the sale, offering for sale, distribution, or advertising' of goods or services; and (4) that the defendant's use of the mark is likely to confuse consumers." *Rosetta Stone Ltd. v. Google, Inc.*, 676 F.3d 144, 152 (4th Cir. 2012) (quoting 15 U.S.C. § 1114(a)).

8. To establish trademark infringement liability under Virginia law, a plaintiff must prove that a defendant "uses in a manner likely to cause a consumer confusion, mistake, or deception as to the source or origin of any goods or services, without the consent of the owner of a registered mark, any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of such goods or services." VA. CODE ANN. § 59.1-92.12(i) (West 2011).

9. For a trademark to be used "in connection with the sale, offering for sale, distribution, or advertising of goods or services," the alleged infringer must offer goods or services in commerce under the trademark without the consent of the mark holder. *OBH, Inc. v. Spotlight Magazine, Inc.*, 86 F. Supp. 2d 176, 186 (W.D.N.Y. 2000).

10. "Services" are defined as "a wide variety of non-commercial public and civic benefits," including donation solicitation, event hosting, information dissemination and campaigning. *Lamparello v. Falwell*, 420 F.3d 309, 314 (4th Cir. 2005).

11. The NAACP has established by a preponderance of the evidence that Radiance used the NAACP Marks in connection with the offering for sale of services because the marks appeared in connection with the NAACP's information services as well as Radiance's fundraising, sponsorship and outreach efforts.

12. Likelihood of confusion involves potential consumers being confused about the source of services as well as their sponsorship. *Rosetta Stone Ltd.*, 676 F.3d at 157. Likelihood of confusion exists if the consuming public assumes upon viewing a mark that the service offered under the mark is associated with a different service represented by a similar mark. *Harlem Wizards Entm't Basketball, Inc. v. NBA Props., Inc.*, 952 F. Supp. 1084, 1094 (D.N.J. 1997).

13. The Fourth Circuit "has articulated at least nine factors that generally are relevant to the 'likelihood of confusion' inquiry: (1) the strength or distinctiveness of the plaintiff's mark as actually used in the marketplace; (2) the similarity of the two marks to consumers; (3) the similarity of the goods or services that the marks identify; (4) the similarity of the facilities used by the markholders; (5) the similarity of advertising used by the markholders; (6) the defendant's intent; (7) actual confusion; (8) the quality of the defendant's product; and (9) the sophistication of the consuming public." *George & Co., LLC v. Imagination Entm't Ltd.*, 575 F.3d 383, 393 (4th Cir. 2009).

14. Parody is not an affirmative defense to trademark infringement "but only another factor to be considered in determining the likelihood of confusion. . . . The keystone of parody is imitation, but must convey two simultaneous—and contradictory—messages: 'that it is the original, but also that it is not the original and is instead a parody.'" *World Wrestling Fed'n Entm't Inc. v. Big Dog Holdings, Inc.*, 280 F. Supp. 2d 413, 431 (W.D. Pa. 2003) (quoting *Nike, Inc. v. Just Did It Enters.*, 6 F.3d 1225, 1228 (7th Cir. 1993)).

15. First Amendment concerns regarding freedom of speech and expression must be balanced against trademark rights and remedies, and an alleged infringer's use of a mark as part of a communicative message is entitled to First Amendment protection so long as it does not

mislead or create confusion. *Westchester Media v. PRL USA Holdings, Inc.,* 214 F.3d 658, 672 (5th Cir. 2000).

16. The NAACP has demonstrated by a preponderance of the evidence that consumers are likely to be confused about whether "National Association for the Abortion of Colored People" is sponsored, authorized by or otherwise affiliated with the NAACP, and there is a high likelihood of confusion involving Radiance's use of "NAACP" and a colorable imitation of "National Association for the Advancement of Colored People." The NAACP has not established that the relevant confusion factors are indicative of any likelihood that consumers would be confused about the origin or sponsorship of any services offered under Radiance's use of "Image Awards" and the Scales of Justice Seal.

*Trademark Dilution*

17. Pursuant to Section 43(c)(1) of the Lanham Act, "the owner of a famous mark that is distinctive, inherently or through acquired distinctiveness, shall be entitled to an injunction against another person who, at any time after the owner's mark has become famous, commences use of a mark or trade name in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark, regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury." 15 U.S.C. § 1125(c)(1).

18. Dilution by tarnishment denotes an "association arising from the similarity between a mark or a trade name and a famous mark that harms the reputation of the famous mark." 15 U.S.C. § 1125(c). A trademark may be tarnished when it is "portrayed in an unwholesome or unsavory context," resulting in "the public [. . .] associat[ing] the lack of

quality or lack of prestige in the defendant's goods with the plaintiff's unrelated goods." *Deere & Co. v. MTD Prods.*, 41 F.3d 39, 43 (2d Cir. 1994).

19. "To state a prima facie dilution claim . . . the plaintiff must show the following: (1) that the plaintiff owns a famous mark that is distinctive; (2) that the defendant has commenced using a mark in commerce that allegedly is diluting the famous mark; (3) that a similarity between the defendant's mark and the famous mark gives rise to an association between the marks; and (4) that the association is likely to impair the distinctiveness of the famous mark or likely to harm the reputation of the famous mark." *Rosetta Stone Ltd.*, 676 F.3d at 168 (citing *Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC*, 507 F.3d 252, 264-65 (4th Cir. 2007)).

20. The fair use defense to trademark dilution allows description and criticism that incidentally involves the use of a trademark. 15 U.S.C. § 1125(c)(3)(A). Fair use may take the form of a nominative use or a parody.

21. A nominative use occurs when a defendant uses a plaintiff's mark to identify the plaintiff's own goods and "makes it clear to consumers that the plaintiff, not the defendant, is the source of the trademarked product or service." *Century 21 Real Estate Corp. v. Lendingtree, Inc.*, 425 F.3d 211, 220 (3d Cir. 2005).

22. An unauthorized use of a trademark for news reporting and news commentary as well as noncommercial use are exempt from liability for dilution by tarnishment. 15 U.S.C. § 1125(c)(3).

23. The NAACP has established by a preponderance of the evidence that Radiance has engaged in conduct that constitutes dilution by tarnishment because Radiance's use of "National Association for the Abortion of Colored People" is likely to harm the

reputation of the "NAACP" and "National Association for the Advancement of Colored People" marks as it insinuates a stance of abortion that the NAACP has deliberately avoided. Radiance has demonstrated by a preponderance of the evidence that it engaged in a nominative use of "Image Awards" and the Scales of Justice Seal, which did not result in dilution by tarnishment.

*Consumer Survey Evidence*

24. "A party introducing a consumer survey bears the burden of establishing that it was conducted in accordance with accepted principles of survey research, *i.e.,* that (1) a proper universe was examined; (2) a representative sample was drawn from that universe; (3) the mode of questioning the interviewees was correct; (4) the persons conducting the survey were recognized experts; (5) the data gathered was accurately reported; and (6) the sample design, the questionnaire and the interviewing were in accordance with generally accepted standards of procedure and statistics." *Harlem Wizards*, 952 F. Supp. at 1098.

25. Although Radiance expert Dr. Tracy Tuten opined that Dr. Ostberg's survey ("Ostberg Survey") suffers from reliability and validity issues such as improper sampling and lack of controls, the Court finds that the NAACP has demonstrated by a preponderance of the evidence that the Ostberg Survey is reliable.[36]

*Remedies*

26. A party seeking an injunction must demonstrate "(1) it has suffered an irreparable injury; (2) remedies available at law are inadequate; (3) the balance of the hardships favors the

---

[36] Specifically, Dr. Tuten testified as to two main critiques of the Ostberg Survey. First, Dr. Tuten argues Dr. Ostberg's sampling frame was improper because he did not use a probability sample and he used self-recruited and incentivized participants without assessing whether this nonprobability panel contributed bias. Tr. 436:5-448:1. Second, Dr. Tuten noted that Dr. Ostberg used no controls to measure any change that occurred by the application of his stimulus and did not address interrater reliability. Tr. 448:12-452:2, 458:6-25. The Court finds that the Ostberg Survey was conducted in accordance with accepted principles of survey research and is reliable. Tr. at 287:25-288:5.

party seeking the injunction; and (4) the public interest would not be disserved by the injunction." *PBM Products, LLC v. Mead Johnson & Co.*, 639 F.3d 111, 126 (4th Cir. 2011) (citing *eBay, Inc. v. MercExchange*, 547 U.S. 388, 391 (2006)).

27. The NAACP has established that it is entitled to a permanent injunction because it suffered irreparable reputational harm, the public has been confused or misled, and such an injunction would not constitute content-based restriction on free speech.

28. A plaintiff may recover monetary damages based on profits obtained from the activity constituting a violation of the Lanham Act. *See generally Otis Clapp & Son, Inc. v. Filmore Vitamin Co.*, 754 F.2d 738, 744 (7th Cir. 1985).

29. The NAACP has not established that it is entitled to any gross profits obtained from Radiance's infringement or dilution.

30. Reasonable attorney fees may be awarded in "exceptional cases" where the defendant's conduct was malicious, fraudulent, willful or deliberate in nature and the defendant acted in bad faith. *Retail Servs., Inc. v. Freebies Publ'g*, 364 F.3d 535, 550 (4th Cir. 2004).

31. The NAACP has not established by clear and convincing evidence that Radiance acted in bad faith or engaged in conduct that was malicious, deliberate, willful or fraudulent to support its request for attorney fees.

## III. DISCUSSION

### A. Plaintiffs' Request for Declaratory Relief

Plaintiffs brought a declaratory judgment action pursuant to 28 U.S.C. § 2201 by which they seek a declaration that they have not violated any rights of the NAACP regarding their trademarks.

The Declaratory Judgment Act authorizes federal courts to issue declaratory judgments to "declare the rights and other legal relations of any interested party seeking such declaration," except "with respect to Federal taxes." 28 U.S.C. § 2201(a).  A declaratory judgment is appropriate "when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and . . . when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Centennial Life Ins. Co. v. Poston*, 88 F.3d 255, 256 (4th Cir. 1996) (quoting *Aetna Cas. & Sur. Co. v. Quarles*, 92 F.2d 321, 325 (4th Cir. 1937)).  A court's authority to grant a declaratory judgment is discretionary.  *Wilton v. Seven Falls Co.*, 515 U.S. 277, 282 (1995). "District courts 'have great latitude in determining whether to assert jurisdiction over declaratory judgment actions,' but should refuse to entertain a declaratory judgment only for good cause." *First Nationwide Mortgage Corp. v. FISI Madison, LLC*, 219 F. Supp. 2d 669, 672 (D. Md. 2002) (citing *Aetna Casualty & Surety Co. v. Quarles*, 92 F.2d 321, 324 (4th Cir.1937)).  Declaratory judgment actions are appropriate to allow "the uncertain party to gain relief from the insecurity caused by a potential suit," *United Capitol Ins. Co. v. Kapiloff*, 155 F.3d 488, 494 (4th Cir. 1998), but are disfavored when filed in anticipation of a certain or imminent lawsuit to secure a more favorable forum or procedural posture. *See Learning Network, Inc. v. Discovery Commc'ns, Inc.*, 11 F. App'x 297, 301 (4th Cir. 2001) ("It has long been established that courts look with disfavor upon races to the courthouse and forum shopping.  Such procedural fencing is a factor that counsels against exercising jurisdiction over a declaratory judgment action.").

Plaintiffs request declaratory judgment on four separate issues: (1) that they did not infringe any NAACP trademarks under either the Lanham Act or common law; (2) that neither Radiance nor Bomberger tarnished or diluted any famous mark owned by the NAACP; (3) that

Radiance and Bomberger's use of marks of the NAACP did not constitute unfair competition or palming off; and (4) that their use of the NAACP's trademarks was protected by the First Amendment right to freedom of speech.

In view of the analysis of the trademark infringement and trademark dilution counterclaims herein, the Court finds that Radiance has failed to establish that it is entitled to declaratory relief. Declaratory judgment will not serve to settle the legal issues in this case because the NAACP has filed counterclaims that require the Court to analyze and resolve the infringement and dilution matters in controversy. Because declaratory relief will not terminate the proceeding, the Court has good cause to find declaratory judgment inappropriate.[37] Accordingly, Plaintiffs' request for declaratory relief is **DENIED**.

**B.      Defendant's Counterclaims for Trademark Infringement and Dilution**

**i.      Counts I, II and IV: Trademark Infringement**

To establish a claim for trademark infringement and unfair competition, the NAACP must show that it possesses a valid, protectable mark used by Radiance and Bomberger in commerce in connection with the offering for sale of services in a manner likely to confuse consumers. *See* 15 U.S.C. §§ 1114, 1125(a); *Rosetta Stone Ltd.*, 676 F.3d at 152; *Lamparello*, 420 F.3d at 313. Virginia's common law standards for trademark infringement and unfair competition mirror the Lanham Act test "because both address the likelihood of confusion as to the source of the goods or services involved." *Lone Star Steakhouse & Saloon, Inc.*, 43 F.3d at

---

[37] The factual history of this dispute may support a determination that Radiance filed this action in anticipation of an impending lawsuit. Specifically, Radiance did not respond to the cease and desist letter in the seven-day timeframe during which the NAACP requested a reply. Instead, Radiance filed suit. However, no persuasive evidence has been presented to show that Radiance's Complaint was an improper anticipatory filing made under an apparent threat of legal action or to engage in forum shopping. Therefore, taken alone, the timing and motivation of Radiance's filing of this action does not preclude this Court from considering a grant of a declaratory judgment.

930 n. 10 (citations omitted).[38] Accordingly, the Court will address Counts I, II and IV together. Count III, the counterclaim for trademark dilution, will be addressed independently.

Counts I, II and IV assert that Radiance infringed the NAACP Marks through the manner in which it used "NAACP," "Image Awards" and the Scales of Justice Seal as well as a variation of "National Association for the Advancement of Colored People" in the January 2013 Article.[39] The parties do not dispute that the NAACP possessed valid trademarks or that Radiance used those certain marks "in commerce." The two key issues are whether Radiance used the NAACP Marks in connection with the offering for sale of services and whether any likelihood of consumer confusion exists. Based on the following analysis, Plaintiffs' use of "NAACP" as well as "National Association for the Abortion of Colored People" instead of "National Association for the Advancement of Colored People" in all three website postings of the January 2013 Article constitutes trademark infringement as charged in Counts I, II and IV.

a. In connection with the offering for sale of services

The first issue the Court must resolve is whether Radiance used the NAACP Marks in connection with the sale, offering for sale, distribution, or advertising of any goods or services. The requirement that an alleged infringer's use of the mark holder's trademark be made in connection with goods or services "does not require the infringer to actually cause goods or services to be placed into the stream of commerce. Rather, all that is needed is that the trademark violation be 'in connection' with any goods or services." *Jews For Jesus v. Brodsky*, 993 F. Supp. 282, 309 (D.N.J. 1998) aff'd, 159 F.3d 1351 (3d Cir. 1998) (citations omitted).

---

[38] Federal courts sitting in diversity apply federal procedural law and state substantive law. *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427 (1996).
[39] Although Defendant did not explicitly address this distinction at trial, the Court recognizes that Defendant's argument regarding infringement of the "National Association for the Advancement of Colored People" mark is based on the alleged use of "National Association for the Abortion of Colored People," a colorable imitation of Defendant's organization name. The term "colorable imitation" includes any mark which so resembles a registered mark as to be likely to cause confusion, mistake or to deceive. 15 U.S.C. §1127.

Services are defined as "a wide variety of non-commercial public and civic benefits." *Lamparello*, 420 F.3d at 314. "Services" may consist of noncommercial benefits including donation solicitation, event hosting, campaigning and dissemination of educational information though public advocacy. *Cf. United We Stand America, Inc. v. United We Stand, America New York*, 128 F.3d 86, 90 (2d Cir. 1997) (holding that the defendant's political activities, including political organizing, soliciting and endorsing candidates, and distributing press releases and literature, were "services"). "Services" may also consist of commercial benefits such as an organization providing hyperlinks to other websites offering goods or services. *People for Ethical Treatment of Animals v. Doughney*, 263 F.3d 359, 363 (4th Cir. 2001) (hereinafter "*PETA*").

Radiance's conduct is subject to trademark infringement liability because it used the NAACP Marks in connection with the information services of both parties. The connection with the NAACP's services is evidenced by the fact that the January 2013 Article could be accessed through a Google search for "NAACP," diverting Internet users to Radiance's article as opposed to the NAACP's websites.[40] *See id.* at 366 (holding that the use of a trademark is in connection with goods and services if it "is likely to prevent Internet users from reaching the [mark holder's] own Internet web site" and services); *see also Planned Parenthood Fed'n of Am., Inc. v. Bucci*, 97 CIV. 0629 (KMW), 1997 WL 133313, at *4 (S.D.N.Y. Mar. 24, 1997) aff'd, 152 F.3d 920 (2d Cir. 1998) ("Prospective users of plaintiff's services who mistakenly access defendant's web site may fail to continue to search for plaintiff's own home page, due to anger, frustration, or the belief that plaintiff's home page does not exist."). The connection with Radiance's own information services is established because Radiance provided information to persuade Internet users that abortion is "wrong." *Compare id.* ("[D]efendant offers informational services for use

---

[40] NAACP Ex. 1030.

in convincing people that certain activities, including the use of plaintiff's services, are morally wrong. In this way, defendant offers his own set of services, and his use of plaintiff's mark is in connection with the distribution of those services over the Internet.").

Additionally, liability under the Lanham Act may be imposed on Radiance for its unauthorized use of the NAACP Marks as part of social commentary or criticism for which they solicit donations and sponsorship. The January 2013 Article was posted on the Radiance Site and the TooManyAborted Site adjacent to orange boxes marked "Donate," which hyperlinked to the "Donate Today" webpage with information on making contributions to Radiance through PayPal.[41] Also, all three postings of the January 2013 Article provided hyperlinks to the TooManyAborted Site, which presented its visitors with the opportunity to support or sponsor the erection of anti-abortion billboards through the "Take Action" webpage. TooManyAborted Site visitors may initiate fee-based transactions to secure billboard artwork and licensing services for $950 and state-specific webpage content creation for $950.[42]

Furthermore, the in connection with the offering for sale of services requirement is established by Bomberger's fundraising activity in relation to the parties' dispute. *Compare Planned Parenthood*, 1997 WL 133313, at *6 ("[D]efendant has testified that he solicits contributions on his 'Catholic Radio' radio show and has solicited contributions on the air in connection with the instant lawsuit. . . . Courts have found that fund-raising activities may bring a defendant's actions within the scope of the Lanham Act."). Upon receipt of the NAACP's cease and desist letter on January 28, 2013, Bomberger e-mailed Joseph A. Brinck about

---

[41] *See* Radiance Ex. 2045 (printed version of article on the Radiance Site); NAACP Ex. 1012 (printed version of article on the TooManyAborted Site with "Donate" box). *But cf.* Radiance Ex. 2127 (printed version of article on the TooManyAborted Site without "Donate" box). The Court finds that at some point in time, the "Donate" box was presented next to the text of the January 2013 Article on the TooManyAborted Site, as evidenced by the NAACP's exhibit. Paypal, Inc. is a person-to-person online payment system through which a user may link his or her bank account to facilitate online purchases and money transfers. *Act II Jewelry, LLC v. Mu Ying Zhu*, 2:09CV407, 2010 WL 2521340 (E.D. Va. June 7, 2010).

[42] Radiance Ex. 2131; Tr. at 85:22-88:4.

fundraising for a public relations effort to generate publicity for Radiance's dispute with the NAACP. This effort included a relaunch of the TooManyAborted Site on February 1, 2013, the same day that the January 2013 Article was posted on the TooManyAborted Site.[43]

The Court finds that there is a sufficient nexus between Radiance's use of the NAACP Marks and the offering of information services, donation solicitation and fee-based billboard services such that the marks were used in connection with the offering for sale of services.

### b. Likelihood of consumer confusion

The second issue the Court will address is whether Radiance's use of the NAACP Marks was likely to confuse consumers:

> Under the Lanham Act, a registered trademark holder has a right to prevent another's use of a trademark that is "likely to cause confusion, or to cause mistake, or to deceive." In other words, an unauthorized use of a trademark infringes the trademark holder's rights if it is likely to confuse an "ordinary consumer" as to the source or sponsorship of the goods.

*Anheuser-Busch, Inc. v. L & L Wings, Inc.*, 962 F.2d 316, 318 (4th Cir. 1992) (quoting 15 U.S.C.

§ 1114(1)(a)). Likelihood of confusion is an "inherently factual issue." *Petro Shopping Ctrs.,*

*L.P. v. James River Petroleum Inc.*, 130 F.3d 88, 92 (4th Cir. 1997). The Court's analysis to determine the likelihood of consumer confusion in a trademark infringement action includes the consideration of nine non-exclusive and non-mandatory factors:

> (1) the strength or distinctiveness of the plaintiff's mark as actually used in the marketplace; (2) the similarity of the two marks to consumers; (3) the similarity of the goods or services that the marks identify; (4) the similarity of the facilities used by the markholders; (5) the similarity of advertising used by the markholders; (6) the defendant's intent; (7) actual confusion; (8) the quality of the defendant's product; and (9) the sophistication of the consuming public.

---

[43] NAACP Ex. 1021; Radiance Ex. 21217; Tr. at 179:20-180:23. *See generally Planned Parenthood*, 1997 WL 133313, at *6 (holding that solicited contributions in connection with a lawsuit may contribute to a finding that "defendant's use of plaintiff's mark is sufficiently tied to defendant's fund-raising efforts for the use to be deemed 'commercial' within the meaning of § 1125(c)").

*George & Co., LLC*, 575 F.3d at 393. Because these nine factors are not all of equal importance and not all factors are relevant in every case, they serve as a guide rather than "a rigid formula for infringement." *Id.*

The Court finds that the first factor, strength or distinctiveness of the trademark, weighs in favor of a likelihood of confusion as to all of the NAACP Marks. The parties do not dispute the strength of marks "NAACP" and "National Association for the Advancement of Colored People."[44] "Image Awards" and the Scales of Justice Seal marks are likewise strong marks. The NAACP has employed the Scales of Justice Seal to identify its organization since its founding in 1909.[45] "Image Awards" is a federally registered mark that has been used for over forty years in relation to the NAACP's annual awards broadcast.[46] The NAACP Marks are strong marks as a result of the NAACP's efforts to cultivate a respectable reputation and protect its intellectual property rights. Since "[g]enerally, the stronger the mark, the greater the likelihood that consumers will be confused by competing uses of the mark," the fact that the NAACP Marks are strong signifies that they are well-recognized and tend to identify services provided under the mark as emanating from the NAACP. *George & Co. LLC*, 575 F.3d at 393.

The second factor, the similarity of the marks, weighs in favor of likelihood of confusion as well. "When considering the similarity of two marks, one must compare the appearance,

---

[44] The NAACP Marks are not conceptually strong because they are not arbitrary or suggestive. *See generally Pizzeria Uno Corp. v. Temple*, 747 F.2d 1522, 1527 (4th Cir. 1984) (suggestive and arbitrary marks are deemed strong and presumptively valid). The NAACP Marks are "descriptive" marks that "define a particular characteristic of the product in a way that does not require any exercise of the imagination." *George & Co. LLC*, 575 F.3d at 394-95. However, the NAACP Marks are commercially strong. *See Wag'N Enterprises, LLC v. United Animal Nations*, 1:11CV955 LMB/IDD, 2012 WL 1633410 (E.D. Va. May 9, 2012) ("Commercial strength is evaluated by considering factors similar to those used in the analysis of a mark's secondary meaning, including '(1) the plaintiff's advertising expenditures; (2) consumer studies linking the mark to a source; (3) the plaintiff's record of sales success; (4) unsolicited media coverage of the plaintiff's business; (5) attempts to plagiarize the mark; and (6) the length and exclusivity of the plaintiff's use of the mark.'"). The NAACP Marks have been associated with millions of dollars in revenue and the NAACP has used its marks for decades. In addition, the NAACP is the subject of unsolicited media coverage and undertakes efforts to enforce its intellectual property rights.

[45] Countercl. ¶ 12.

[46] Countercl. Table, pp. 8-9. Last year marked the 44th Annual Image Awards event. Radiance Ex. 2045.

sound and meaning of the marks, as well as the manner in which they are used." *Taj Mahal Enters., Ltd. v. Trump*, 745 F. Supp. 240, 247 (D.N.J. 1990). Marks "are confusingly similar if ordinary consumers would likely conclude that" the services presented under the marks "share a common source, affiliation, connection or sponsorship." *Fisons Horticulture, Inc. v. Vigoro Indus., Inc.*, 30 F.3d 466, 477 (3d Cir. 1994). Radiance used "NAACP," "Image Awards" and the Scales of Justice Seal in an identical manner as the marks have been used by the NAACP. The parties stipulated that "National Association for the Abortion of Colored People" closely resembles "National Association for the Advancement of Colored People." The NAACP Marks and the marks employed by Radiance are highly similar if not identical and "[t]he high degree of similarity between the marks weighs in favor of the likelihood of confusion among Internet users." *OBH, Inc.*, 86 F. Supp. 2d at 188.

The third factor, the similarity of the services the marks identify, again weighs in favor of likelihood of confusion. The NAACP and Radiance have incorporated "NAACP," "Image Awards" and the Scales of Justice Seal in references to the NAACP's services. "National Association for the Abortion of Colored People" does not refer to the actual services of the NAACP, but refers to information services of a fictitious advocacy association targeted at people of color, which is similar to the services the NAACP provides.

The fourth and fifth factors, the similarity of the facilities and the similarity of advertising used by the mark holders, support a finding of likelihood of confusion. "When considering the similarity of facilities, courts are trying to determine if confusion is likely based on 'how and to whom the respective goods of the parties are sold,' and the key question is whether 'both products [are] sold in the same channels of trade.'" *Rosetta Stone Ltd.*, 676 F.3d at 155. The

parties stipulate that they use the Internet and billboards to engage in public outreach.[47] The parties also stipulate to targeting the African American community.[48] Additionally, Radiance and the NAACP reached the same audience—namely, Internet users searching for webpages displaying "NAACP." Because the parties targeted and reached the same consumers through the same channels, this market overlap creates "a stronger likelihood of confusion." *Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*, 269 F.3d 270, 289 (3rd Cir. 2001); *accord Perfumebay.com Inc. v. eBay Inc.*, 506 F.3d 1165, 1174 (9th Cir. 2007) ("[T]he Web, as a marketing channel, is particularly susceptible to a likelihood of confusion since . . . it allows for competing marks to be encountered at the same time, on the same screen.").

As for the sixth factor that assesses the alleged infringer's intent, the Court finds that Radiance and Bomberger intended to confuse the public through the use of "NAACP" in close proximity to "National Association for the Abortion of Colored People." "[T]he relevant intent in trademark cases is not merely an intent to profit . . . but an 'intent to confuse the buying public.'" *Anheuser–Busch, Inc.*, 962 F.2d at 321 (quoting *Pizzeria Uno Corp. v. Temple*, 747 F.2d 1522, 1535 (4th Cir. 1984)). Generally, intent is evidenced by an alleged infringer's efforts to make his use of the mark resemble the mark holder's use in order to pass his services off as the mark holder's services. *See Pizzeria Uno*, 747 F.2d at 1535 ("[O]ne intending to profit from another's reputation generally attempts to make his signs, advertisements, etc., to resemble the other's so as deliberately to induce confusion."); *Best & Co. v. Miller*, 167 F.2d 374, 377 (2d Cir. 1948 ("If the defendant selects a trademark or trade name similar to the plaintiff's with intent to

---

[47] *See infra* Part I, Section B, points 1, 5, 14, 19; *cf. OBH, Inc.*, 86 F. Supp. 2d at 188 ("Because plaintiffs' web site and defendants' web site are both on the Internet, the parties are vying for users in the same 'market.'"); *Playboy Enters., Inc. v. AsiaFocus Int'l, Inc.*, No. Civ. A. 97-734-A, 1998 U.S. Dist. LEXIS 10359, at *18 (E.D. Va. Feb. 2, 1998), adopted by 1998 U.S. Dist. LEXIS 10459 (E.D. Va. Apr. 10, 1998) (same marketing channels exist when "both parties use the Internet as a facility to provide goods and services").
[48] *See infra* Part I, Section B, points 2, 3, 13, 15, 17, 18.

palm off his wares as those of the plaintiff, proof of his intent may be strong evidence of . . . the likelihood of confusion.").

Radiance asserts that its use of "National Association for the Abortion of Colored People" was meant as a parody to convey criticism of the NAACP.[49] As will be discussed, the Court is not persuaded that "National Association for the Abortion of Colored People" is a parody. Instead, the Court recognizes that Bomberger titled the January 2013 Article "NAACP: National Association for the Abortion of Colored People," implying that the acronym "NAACP" stood for his designation as opposed to the actual name of Defendant's organization.[50] Nowhere in the January 2013 Article on the Radiance Site or the TooManyAborted Site does the NAACP's actual name or web address appear.[51] Plaintiffs did not include any signal or suggestion that the confusingly similar name, "National Association for the Abortion of Colored People," was anything other than the name of a real organization or the name of the NAACP.[52]

However, the NAACP has not presented persuasive evidence that Radiance used "Image Awards" or the Scales of Justice Seal with any intent to confuse. "Image Awards" was used only twice in the January 2013 Article, each time in the context of the NAACP's annual event. The Scales of Justice Seal only appeared on the LifeNews.com posting of the January 2013 Article at the selection of a third party.[53] The Court does not find intent to confuse regarding these marks.

---

[49] The NAACP challenges Radiance's parody contention. The NAACP insists that Radiance revised its campaign to include "National Association for the Abortion of Colored People" knowing that the change would result in additional funds raised from its supporters. However, evidence of financial gain alone is insufficient evidence of intent to confuse. *Anheuser–Busch*, 962 F.2d at 322; *see also Rosetta Stone Ltd.*, 730 F. Supp. 2d at 542 ("An alleged infringer may intend to benefit from the trademark without ever intending to cause consumer confusion.").

[50] Radiance Ex. 2223.

[51] *But cf. PETA*, 263 F.3d at 363 (finding infringement where the website hosted under the infringing domain name included a "phrase 'exit immediately' [which] contained a hyperlink to PETA's official website."). Radiance did not include a link to the NAACP's official website or the actual name of the NAACP's organization in its articles.

[52] Tr. at 152:14-19.

[53] The Court notes that the Scales of Justice Seal includes the real name of Defendant's organization, which weakens any inference of intent to cause confusion as to this particular mark. However, the inclusion of the Seal does not preclude a finding of likelihood of confusion as to other uses of the NAACP Marks in the January 2013 Article posted on LifeNews.com. Specifically, the Seal was not featured prominently on the LifeNews.com webpage. It

The seventh factor, actual confusion, offers the best evidence of likelihood of confusion if consumers were actually confused by an infringer's use of a protected trademark. *See Lone Star Steakhouse & Saloon, Inc.*, 43 F.3d at 937 (noting that the actual confusion factor is "entitled to substantial weight as it provides the most compelling evidence of likelihood of confusion"). Actual confusion can be established by anecdotal evidence and survey evidence because "[b]oth types of evidence are relevant, and neither category is necessarily required to prove actual confusion." *Rosetta Stone Ltd.*, 676 F.3d at 156.

There is anecdotal evidence of actual confusion. The NAACP received calls after Internet users observed "National Association for the Abortion of Colored People." Eric Wingerter, the NAACP Vice President for Communications and Digital Media, testified about inquiries regarding the NAACP's possible name or mission change:

> QUESTION: Are you aware of any damage or harm to the NAACP's reputation caused by that Google alert or by the web page that line is taken to by clicking on the heading of that alert?
>
> [WINGERTER]: I know that it caused confusion among some members. . . .
>
> QUESTION: And can you explain for the Court what the nature of the confusion was that you became aware of?
>
> [WINGERTER]: Well, my office receives a number of phone calls. Because we are the communications department, we have a lot of public folks calling in asking us -- the nice ones were asking us why we were supporting abortion of people of color, and then there were some angrier ones as well.
>
> QUESTION: And what were the angrier ones saying?
>
> [WINGERTER]: Just talking about, you know, I used to be a supporter of the NAACP. You had a proud history during the civil rights movement and I can't believe that you are supporting the genocide of black babies.[54]

---

was the second graphic and appeared toward the end of the article. *See* Radiance Ex. 2223. Moreover, the inclusion of the Scales of Justice Seal was initiated by a third party, which does not undermine a finding that Bomberger intended to cause confusion through the use of "NAACP" and "National Association for the Abortion of Colored People." Bomberger did not use the Scales of Justice Seal to clarify the real name of the NAACP to prevent confusion. Tr. at 51:15-25; 200:1-14.

[54] Tr. at 262:22-263:1; 269:11-23.

This anecdotal evidence demonstrates that the January 2013 Article went beyond criticizing the

NAACP's position on abortion. The January 2013 Article employed the NAACP Marks in a

manner that confused the public regarding whether a pro-abortion position was represented by

trademarks ascribed to the NAACP.

There is survey evidence of actual confusion caused by Plaintiffs' use of "NAACP" and

"National Association for the Abortion of Colored People." Courts have considered survey

evidence in their determination of the existence of actual confusion:

> Survey evidence may demonstrate evidence of actual confusion but only to the
> extent "that the survey mirrors the real world setting which can create an instance
> of actual confusion." 3 J. McCarthy, McCarthy on Trademarks and Unfair
> Competition § 23.01[3][a]. A party introducing a consumer survey bears the
> burden of establishing that it was conducted in accordance with accepted
> principles of survey research, i.e., that (1) a proper universe was examined; (2) a
> representative sample was drawn from that universe; (3) the mode of questioning
> the interviewees was correct; (4) the persons conducting the survey were
> recognized experts; (5) the data gathered was accurately reported; and (6) the
> sample design, the questionnaire and the interviewing were in accordance with
> generally accepted standards of procedure and statistics.

*Harlem Wizards*, 952 F. Supp. at 1098 (citing *Nat'l Football League Props., Inc. v. New Jersey*

*Giants, Inc.*, 637 F.Supp. 507, 513–514 (D.N.J. 1986). Dr. Ostberg used reliable methods

consistent with traditional survey methodology to define the universe of relevant respondents and

he employed screening questions to identify the respondents and determine their interests.[55]

The Ostberg Survey revealed that 8% of respondents believed there was an affiliation

between the people who use the term "National Association for the Abortion of Colored People"

and the real NAACP, and 5% of respondents believed that the NAACP's permission or approval

was required to use that term.[56] Ten percent of respondents believed the initials NAACP actually

---

[55] *See supra* note 36. The Court finds Dr. Ostberg qualified to serve as an expert in marketing research and
conducting consumer surveys for intellectual property cases.
[56] Tr. at 312:12-24.

stood for "National Association for the Abortion of Colored People" or some other name containing the word "abortion."[57] Another 10% believed that the "National Association for the Abortion of Colored People" was the name of an actual organization or group.[58] The NAACP did not present evidence of actual confusion regarding the "Image Awards" or Scales of Justice Seal marks.

The eighth factor, assessing the quality of the defendant's product, is not relevant and does not support or preclude a finding of likelihood of confusion. Neither the quality of the parties' services nor their websites can be compared. *See OBH, Inc.*, 86 F. Supp. 2d at 189 ("[T]he Court cannot compare the two web sites in terms of superior or inferior quality.").

The ninth factor, the sophistication of the consuming public, weighs in favor of likelihood of confusion. "If the typical consumer in the relevant market is sophisticated in the use of—or possesses an expertise regarding—a particular product, such sophistication or expertise may be pertinent in determining the likelihood of confusion." *Sara Lee Corp. v. Kayser-Roth Corp.*, 81 F.3d 455, 467 (4th Cir. 1996) (citing *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 127–28 (4th Cir. 1990)). Also, "[i]t is widely accepted as true that consumers are less likely to be confused about the origin of specific goods or services if such goods are expensive because the amount of care and attention expended by consumers increases proportionately as the price of the desired goods or services increases." *Harlem Wizards*, 952 F. Supp. at 1097.

Here, both parties are non-profit organizations that offer no-cost information services to the public. Because the average consumer would not make a time or financial investment to access the parties' information services, the consumer is less likely to take care in investigating

---

[57] Tr. at 315:15-316:4.
[58] Tr. at 316:5-11.

the author or sponsor of articles using the NAACP Marks. Moreover, potential donors of Radiance and the NAACP do not have to be sophisticated:

> Persons wishing to donate are not likely to analyze in depth the credentials of the charity. Rather, they are more likely to be generally familiar with the works of a charity for a cause they support and, when solicited, will contribute to such a cause. Under these circumstances, potential contributors may easily confuse two ... charities that resemble one another in name and function.

*Am. Diabetes Ass'n, Inc. v. Nat'l Diabetes Ass'n*, 533 F. Supp. 16, 21 (E.D. Pa. 1981) aff'd, 681 F.2d 804 (3d Cir. 1982).

Balancing all nine factors, the Court concludes the NAACP has established by a preponderance of the evidence that Radiance used "National Association for the Abortion of Colored People" and "NAACP" in the January 2013 Article as posted on the Radiance Site, the TooManyAborted Site, and LifeNews.com in a manner highly likely to cause consumer confusion. Radiance and the NAACP used similar and identical strong marks to reference similar services within similar facilities, reaching the same unsophisticated Internet users. Radiance achieved its intent to cause consumer confusion through its placement of "NAACP" in close proximity to "National Association for the Abortion of Colored People." The relevant factors weigh powerfully in favor of a finding of likelihood of confusion induced by Radiance's use of "National Association for the Abortion of Colored People" and "NAACP," and the Court finds that the NAACP has met its burden of proof to establish trademark infringement.

The Court finds that there is no likelihood of confusion related to "Image Awards" and the Scales of Justice Seal. These marks were used as a point of reference, and there is scant evidence of intended or actual confusion regarding any use of these marks. The likelihood of confusion factors as applied to "Image Awards" and the Scales of Justice Seal favor Radiance;

thus the NAACP has failed to sustain its burden on its trademark infringement claim for "Image Awards" or the Scales of Justice Seal.

### c. Parody

Radiance attempts to defend against a finding of likelihood of confusion by arguing that its use of "National Association for the Abortion of Colored People" is a parody of the NAACP. Radiance argues that Internet users would not be confused or misled into believing that the January 2013 Article was actually sponsored by the NAACP. The Court finds this argument unavailing.

A "parody" is defined as a "simple form of entertainment conveyed by juxtaposing the irreverent representation of the trademark with the idealized image created by the mark's owner." *L.L. Bean, Inc. v. Drake Publishers, Inc.*, 811 F.2d 26, 34 (1st Cir. 1987).[59] "Parody" can also be defined as "appropriate[ing] commonly known elements of a prior work to make humorous or critical comment on that same work" being parodied. *Dr. Seuss Enter., L.P. v. Penguin Books USA, Inc.*, 924 F. Supp. 1559, 1567 n.6 (S.D. Cal. 1996) (referencing *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 580 (1994)). The Fourth Circuit has previously held:

> For trademark purposes, a "parody" is defined as a simple form of entertainment conveyed by juxtaposing the irreverent representation of the trademark with the idealized image created by the mark's owner. A parody must convey two simultaneous—and contradictory—messages: that it is the original, but also that it is not the original and is instead a parody. This second message must not only

---

[59] Previously, commercial parodies were enjoined because they went beyond editorial or artistic expression. *L.L. Bean, Inc.*, 811 F.2d at 32; *see, e.g., Original Appalachian Artworks, Inc. v. Topps Chewing Gum*, 642 F. Supp. 1031 (N.D. Ga. 1986) (holding that the advertising of "Garbage Pail Kids" stickers harmed the Cabbage Patch Kids trademark); *General Elec. Co. v. Alumpa Coal Co.*, 205 U.S.P.Q. 1036 (D. Mass. 1979) (holding that the use of "Genital Electric" on clothing harmed the plaintiff's name trademark); *Gucci Shops, Inc. v. R.H. Macy & Co.*, 446 F. Supp. 838 (S.D.N.Y. 1977) (holding the marketing of "Gucchi Goo" diaper bags harmed the plaintiff's trademark). However, the Fourth Circuit more recently protected parodies even where used for commercial purposes because the speech involved was expressive and did not mislead or confuse. *See Louis Vuitton Malletier*, 507 F.3d 252. Although the determination that "National Association for the Abortion of Colored People" was used in connection with the offering for sale of services does not preclude protection of the phrase as a parody under Fourth Circuit precedent, this determination weakens the parody argument. The Court recognizes Radiance's critique of the NAACP as more than a communicative, expressive or artistic work. The critique was commercial commentary with the tendency to confuse the public about the name and positions of the NAACP.

differentiate the alleged parody from the original but must also communicate some articulable element of satire, ridicule, joking, or amusement. Thus, a parody relies upon a difference from the original mark, presumably a humorous difference, in order to produce its desired effect.

*Louis Vuitton Malletier*, 507 F.3d at 260 (internal quotation marks and citation omitted). "The finding of a successful parody only influences the way in which the [likelihood of confusion] factors are applied. Indeed, it becomes apparent that an effective parody will actually diminish the likelihood of confusion, while an ineffective parody does not." *Id.* at 261. In *Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC,* the Fourth Circuit discussed elements of a successful parody to undermine a finding of a likelihood of confusion, including jokes, mockery, irreverence, critique on seller or buyer, and presence of other parodied goods or services:

> [T]he juxtaposition of the similar and dissimilar—the irreverent representation and the idealized image of an LVM handbag—immediately conveys a joking and amusing parody. The furry little "Chewy Vuiton" imitation, as something to be chewed by a dog, pokes fun at the elegance and expensiveness of a LOUIS VUITTON handbag, which must not be chewed by a dog. The LVM handbag is provided for the most elegant and well-to-do celebrity, to proudly display to the public and the press, whereas the imitation "Chewy Vuiton" "handbag" is designed to mock the celebrity and be used by a dog. The dog toy irreverently presents haute couture as an object for casual canine destruction. The satire is unmistakable. The dog toy is a comment on the rich and famous, on the LOUIS VUITTON name and related marks, and on conspicuous consumption in general. This parody is enhanced by the fact that "Chewy Vuiton" dog toys are sold with similar parodies of other famous and expensive brands—"Chewnel No. 5" targeting "Chanel No. 5"; "Dog Perignonn" targeting "Dom Perignon"; and "Sniffany & Co." targeting "Tiffany & Co."

*Id.* at 260-61. The Fourth Circuit concluded that "the 'Chewy Vuiton' dog toys convey 'just enough of the original design to allow the consumer to appreciate the point of parody,' but stop well short of appropriating the entire marks that LVM claims." *Id.*

"National Association for the Abortion of Colored People" lacks many of the classic elements of a successful parody. First, "National Association for the Abortion of Colored People" is almost identical to "National Association for the Advancement of Colored People"

except for the change of one word. Unlike the "Chewy Vuiton" mark that used different words from the "Louis Vuitton" mark, "National Association for the Abortion of Colored People" and "National Association for the Advancement of Colored People" only have a difference of one word and can both be abbreviated by "NAACP." Consequently, almost the entire trademark is appropriated.

Second, the change in word from "Advancement" to "Abortion" does not create a satire of the NAACP, its services or its consumers. That change creates source confusion because it is used next to the famous and unaltered acronym for the original mark. "National Association for the Abortion of Colored People" appears to be the name of a real organization. It signifies that the NAACP's name is something that it is not, especially in light of its usage next to "NAACP," the trademark used most often to refer to the Defendant organization. In the January 2013 Article, Radiance does not clarify that "NAACP" stands for "National Association for the Advancement of Colored People" or has not become the "National Association for the Abortion of Colored People."[60] Additionally, Radiance has not communicated a larger satirical objective by employing other altered organization names.

Third, "National Association for the Abortion of Colored People" does not clearly convey two simultaneous and contradictory messages—that it is the NAACP, but also that it is not the NAACP. The January 2013 Article does not attempt to convey that it is the original organization because it did not poke fun, imitate or mock the NAACP. To the extent articulable elements of ridicule, joking or amusement exist, they are difficult to ascertain. Instead, the article implies that "NAACP" stands for "National Association for the Abortion of Colored

---

[60] The Court notes that the LifeNews.com posting of the January 2013 Article incorporated the Scales of Justice Seal, which includes the real name of Defendant's organization. However, because the Scales of Justice Seal is not featured prominently in the January 2013 Article and was not incorporated by Bomberger to negate confusion or communicate a parody, the Court does not believe that the appearance of "National Association for the Advancement of Colored People" in the border of the Scales of Justice Seal undermines its finding that "National Association for the Abortion of Colored People" is not a parody.

People" without satire or irreverent representation. The article simply criticizes the NAACP without pretending to be the NAACP.

Furthermore, even if the January 2013 Article title itself is assumed to be a parody, a likelihood of confusion nonetheless exists because Internet users looking for webpages related to or sponsored by the NAACP may initially encounter Plaintiffs' website and article by mistake upon entering "NAACP" into a Google search. The consumer confusion factors regarding the strength and similarity of the marks as well as the similarity of services, facilities and advertising are not undermined by the parody argument. Additionally, the parody argument does not mitigate any actual confusion that occurred. Only 5% of respondents to the Ostberg Survey volunteered that they perceived "National Association for the Abortion of Colored People" to be a parody or criticism.[61]  The Court is not persuaded that the message of the January 2013 Article constitutes a parody. Radiance's assertion that its use of "National Association for the Abortion of Colored People" is not likely to confuse consumers because the phrase is a parody fails.

### d. First Amendment Considerations

Radiance attempts to challenge any finding of trademark infringement by asserting that its use of the NAACP Marks is protected speech under the First Amendment. "[I]n deciding the reach of the Lanham Act in any case where an expressive work is alleged to infringe a trademark, it is appropriate to weigh the public interest in free expression against the public interest in avoiding consumer confusion." *Cliffs Notes, Inc. v. Bantam Doubleday Dell Publ'g Grp., Inc.*, 886 F.2d 490, 494 (2d Cir. 1989). Therefore, "Defendant's use of another entity's mark is entitled to First Amendment protection when his use of that mark is part of a communicative message, not when it is used to identify the source of a product." *Planned Parenthood*, 42 U.S.P.Q.2d at 1440; *Westchester Media v. PRL USA Holdings, Inc.*, 214 F.3d

---

[61] Tr. at 318:4-10.

658, 672 (5th Cir. 2000) ("[S]peech that misleads or creates confusion is not protected under the First Amendment."). Intent to engage in social commentary does not provide absolute immunity from liability under the Lanham Act. *Christian Sci. Bd. of Dirs. of the First Church of Christ, Scientist v. Robinson*, 123 F.Supp.2d 965, 970-71 (W.D.N.C. 2000) aff'd sub nom. *Christian Sci. Bd. of Directors of First Church of Christ, Scientist v. Nolan*, 259 F.3d 209 (4th Cir. 2001); *cf. MGM-Pathe Commc'ns v. Pink Panther Patrol*, 774 F.Supp. 869, 877 (S.D.N.Y. 1991) ("The seriousness and virtue of a cause do not confer any right to the use of the trademark of another").

Here, balancing First Amendment considerations against the degree of likely consumer confusion related to "NAACP" and "National Association for the Abortion of Colored People," the Court does not find that a determination of trademark infringement violates Radiance's right to free speech and expression because a high likelihood of confusion exists. Radiance's speech is not restrained by a finding of likelihood of confusion. Radiance is not prevented from criticizing the NAACP's positions or activities, but may not present such critiques in a manner that is likely to confuse the public regarding whether certain trademarks espousing a pro-abortion viewpoint are authorized or sponsored by the NAACP.[62]  In other words, the law only insists that Radiance refrains from using trademarks in a manner that violates the NAACP's intellectual property rights. Because the "[u]se of a trademark in a way that is likely to cause confusion as to the source or sponsorship of the expression is not protected conduct," First Amendment considerations do not preclude a finding that Radiance's use of certain marks owned by the NAACP constitutes trademark infringement. *Coca-Cola Co. v. Purdy*, 382 F.3d 774, 790-91 (8th Cir. 2004).

---

[62] Radiance has criticized the NAACP on the issue of abortion in other ways and contexts without unlawfully using the NAACP Marks. *See* Radiance Exs. 2125, 2126. Also, Radiance has continued to engage in criticism of the NAACP since the filing of this action. *See* NAACP Ex. 1041.

## ii. Count II: Trademark Dilution

The Trademark Dilution Revision Act of 2006 ("TDRA") recognizes actionable forms of trademark dilution, grounded in the notion that a trademark can lose its "ability . . . to clearly and unmistakably distinguish one source through unauthorized use." *Hormel Foods Corp. v. Jim Henson Prods.*, 73 F.3d 497, 506 (2d Cir. 1996) (internal quotation omitted). The Court finds that the NAACP Marks have been tarnished by being presented in the context of a position supporting the abortion of African Americans, and Radiance is liable for dilution of the "NAACP" and "National Association for the Advancement of Colored People" trademarks.

The TDRA provides in relevant part:

> Subject to the principles of equity, the owner of a famous mark . . . shall be entitled to an injunction against another commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark, regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury.

15 U.S.C. § 1125(c)(1) (emphasis added). A mark is "famous" when it is "widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner." *Id.* § 1125(c)(2)(A). "Dilution by tarnishment" is the "association arising from the similarity between a mark or trade name and a famous mark that harms the reputation of the famous mark." *Id.* § 1125(c)(2)(C). "Dilution through tarnishing can occur where an accused, junior mark is used on unwholesome or inferior goods or services that may create a negative association with the goods or services covered by the famous mark." *Ringling Bros.-Barnum & Bailey Combined Shows, Inc. v. Utah Div. of Travel Dev.*, 955 F. Supp. 605, 614 (E.D. Va. 1997) aff'd, 170 F.3d 449 (4th Cir. 1999). Stated another way, dilution by tarnishment "generally arises when the plaintiff's trademark is linked to products of shoddy quality, or is portrayed in an unwholesome or unsavory context likely to evoke

unflattering thoughts about the owner's product." *Deere & Co. v. MTD Prods., Inc.*, 41 F.3d 39,

43 (2d Cir. 1994); *e.g.*, *Anheuser-Busch, Inc. v. Balducci Pubs.*, 28 F.3d 769, 777-78 (8th Cir.

1994) (enjoining defendant from using "MICHELOB OILY" because "the majority of those

surveyed construed the ad parody as suggesting that Michelob beer contains oil. This relationship

obviously tarnishes the marks' carefully-developed images."); *Kraft Foods Holdings, Inc. v.*

*Helm*, 205 F.Supp.2d 942, 949–50 (N.D. Ill. 2002) (holding a pornographic website's use of

"VelVeeda" tarnishes the plaintiff's "Velveeta" trademark); *NBA Props. v. Untertainment*

*Records LLC*, 99 CIV. 2933 (HB), 1999 WL 335147, at *9 (S.D.N.Y. May 26, 1999) (finding

trademark dilution where "[t]he NBA is bound to suffer negative associations from the

[defendant's] juxtaposition of the distorted NBA Logo containing the basketball player with a

gun in his right hand and the words "SPORTS, DRUGS, & ENTERTAINMENT.").

To state a dilution claim under the TDRA, a plaintiff must show: (1) that the plaintiff

owns a famous mark that is distinctive; (2) that the defendant has commenced using a mark in

commerce that allegedly is diluting the famous mark; (3) that a similarity between the

defendant's mark and the famous mark gives rise to an association between the marks; and (4)

that the association is likely to impair the distinctiveness of the famous mark or likely to harm

the reputation of the famous mark. *Louis Vuitton*, 507 F.3d at 264-65. The evidence supports a

finding that the NAACP has proved by a preponderance of the evidence the first three

requirements to show a violation of the TDRA. The primary issue to be analyzed is the fourth

element, whether an association between the NAACP Marks and the marks as used by Radiance

is likely to harm the reputation of the NAACP Marks to establish dilution by tarnishment.

The Court recognizes that such an association exists and is likely to harm the reputation

of the NAACP Marks, and finds that the NAACP has established by a preponderance of the

evidence that dilution by tarnishment occurred through Radiance's use of the NAACP Marks.

Dilution by tarnishment is established by Radiance's negative statement about supposed pro-

abortion services represented by trademarks ascribed to the NAACP. The NAACP has

intentionally refrained from taking a stance on abortion, and certainly has not been alleged to

advocate for the abortion of people of color. However, the NAACP is bound to suffer negative

associations from the juxtaposition of the NAACP Marks with the "National Association for the

Abortion of Colored People" phrase. The use of "National Association for the Abortion of

Colored People" in close proximity to the NAACP Marks harms the marks' reputation by

associating the NAACP with a political position that supports abortion of African Americans.

*Compare Coca-Cola Co.*, 382 F.3d at 786 ("It appears that [the defendant] registered many of

these domain names not because of stands the plaintiffs had taken on abortion, but rather to

divert Internet users to websites that could tarnish and disparage their marks by creating initial

confusion as to the sponsorship of the attached websites and implying that their owners have

taken positions on a hotly contested issue."). Indeed, the outrage generated in response to the

January 2013 Article indicates that Radiance represented the NAACP Marks in an unsavory

context in the eyes of the public. Any suggestion that the NAACP endorses the abortion of

African Americans will likely tarnish its reputation with the public at large.

Dilution by tarnishment is also established through survey evidence. According to the

Ostberg Survey, there is a net dilution by tarnishment of 37% based on responses of those

surveyed who construed "National Association for the Abortion of Colored People" as

suggesting that the NAACP Marks are associated with a mission of actively promoting abortion

on a racially motivated basis.[63]  Forty-two percent of respondents to the Ostberg Survey said that

---

[63] Dr. Ostberg calculated the net dilution by tarnishment. In the dilution branch of the survey, 42% of respondents
said that the term "National Association for the Abortion of Colored People" caused them to think of the real

41

the term "National Association for the Abortion of Colored People" caused them to think of the

real NAACP.[64] Dr. Ostberg testified about the narrative responses he received from respondents

evidencing the likelihood of tarnishment:

> [QUESTION]: Can you explain to the Court the tabulation of these results that you
> performed in your report?
>
> [OSTBERG]: Yeah. What is significant when we asked them what do you think was the
> purpose -- and we had the question at the bottom -- what do you think the people who use
> "National Association for the Abortion of Colored People" are trying to accomplish . . .
> They believed that what they [the NAACP] are trying to accomplish is that the NAACP
> supports bigotry, discrimination, hatred and racism, which is 5 percent. The NAACP
> wants to wipe out colored people or reduce black population, 3 percent. Wants to steer up
> trouble or create controversy by use of that name, 3 percent. NAACP support is
> associated with abortion, 2 percent. And then a variety of other comments, all adding
> back to 22 percent, which casts doubt on the reputation, not only criticism, of the
> NAACP as an organization and its activities, and is successful in doing so. In other
> words, these are reflections of beliefs that they obtained as a result of the article and the
> photograph of the billboard.[65]

Additionally, a 21% of respondents from the relevant consumer group said or suggested that the

people who use the term "National Association for the Abortion of Colored People" wanted to

harm or tarnish the name and reputation of the NAACP rather than to simply criticize its goals.[66]

The Court concludes that Radiance's moniker using "Abortion" instead of "Advancement" in the

NAACP's name is likely to harm the NAACP Marks' reputation; therefore, trademark dilution of

the NAACP Marks exists, subject to certain defenses.

### a. Defenses

The TDRA creates three defenses based on the defendant's (1) fair use; (2) news

reporting and news commentary use; and (3) noncommercial use of another's mark. 15 U.S.C. §

1125(c)(3). The first defense to a dilution claim is the fair use defense, which exempts use of a

---

NAACP. Only 5% volunteered, on an unaided basis, that they perceived that term to be a parody or criticism.
Subtracting the 5% from the 42%, Dr. Ostberg calculated a 37% net dilution by tarnishment.
[64] Tr. at 320:7-20.
[65] Tr. at 324:7-13; 325:18-326:6.
[66] NAACP Ex. 1045-16.

famous mark that does not indicate a source or origin for the user's own products or services and negates the likelihood of confusion. The TDRA designates certain fair uses of famous marks that would not be considered dilution:

> including a nominative or descriptive fair use, or facilitation of such fair use, of a famous mark by another person other than as a designation of source for the person's own goods or services, including use in connection with . . . identifying and parodying, criticizing, or commenting upon the famous mark owner or the goods or services of the famous mark owner.

15 U.S.C. § 1125(c)(3)(A). Radiance argues that its use of the NAACP Marks is nominative fair use and its use of "National Association for the Abortion of Colored People" is a parody.

Nominative fair use occurs when a mark is used to describe or refer to a mark holder's services. The Court recognizes Radiance's use of "Image Awards" and the Scales of Justice Seal as nominative fair use. Little evidence has been offered to demonstrate any other use of "Image Awards" and the Scales of Justice Seal besides in a description or reference to the NAACP's services. However, while the majority of instances "NAACP" appeared in the January 2013 Article was in reference to the NAACP, "NAACP" also appeared in the title of the January 2013 Article on the Radiance Site and LifeNews.com adjacent to "National Association for the Abortion of Colored People." This particular use is not nominative fair use because "NAACP: National Association for the Abortion of Colored People" neither describes nor references the NAACP's services.

Parody fair use involves the use of a famous mark, usually in a humorous way, to comment on or criticize the mark holder or its actions. As discussed previously in the trademark infringement analysis, the Court is not persuaded that "National Association for the Abortion of Colored People" is a parody.[67]

---

[67] The parody defense to trademark dilution implicates the First Amendment's protection of artistic expression and speech but is not an absolute right to use an owner's marks in a parody. *Anheuser-Busch, Inc.*, 28 F.3d at 775; *see*

The second defense to trademark dilution exempts all forms of news reporting and news commentary from liability. 15 U.S.C. § 1125(c)(3)(B). The United States District Court for the District of South Carolina analyzed the news reporting and news commentary defense in a trademark dilution action by examining both the intent of the writer as well as the content of the article. *BidZirk, LLC v. Smith*, 2007 WL 3119445 at *1, 6-7 (D.S.C., Oct. 22, 2007). In this case where the defendant wrote an online blog criticizing the plaintiffs' services, the district court found that the defendant's use of the plaintiffs' mark in his article was in the context of news reporting or news commentary for the following reasons:

> The article posted by Smith concerning the Plaintiffs is written for the purpose of conveying information to the public. In the four installments of the article, Smith describes his experience with BidZirk in great detail. In addition, Smith addresses the positive and negative aspects, in his opinion, of dealing with a [*sic*] an eBay listing company, such as BidZirk. Further, Smith provides a checklist for using an eBay listing company and tips for selling items on eBay. Smith felt that what he learned from his experience with BidZirk would be helpful to others in dealing with an eBay listing company. The fact that Smith reports negatively about his experience with BidZirk does not dictate that the article's function or intent was not news reporting or news commentary.

*BidZirk, LLC*, 2007 WL 3119445 at *6 (citations omitted).

The news reporting and news commentary defense is unavailing for Plaintiffs because "National Association for the Abortion of Colored People" is not the actual name of the NAACP; thus, this phrase cannot refer to the NAACP in the news. This altered version of the NAACP's name does more than recount a newsworthy experience or occurrence that is of interest to the public. It is meant to associate the NAACP Marks with a position on abortion, as stipulated by the parties. The use of "NAACP" in the title of the January 2013 Article is not

---

also *Anheuser-Busch, Inc. v. L. & L. Wings, Inc.*, 962 F.2d 316, 327 (4th Cir. 1992) ("Only parody in this 'editorial or artistic' sense serves sufficiently strong First Amendment values to override government interests in trademark protection."). Because the Court does not find "National Association for the Abortion of Colored People" to be a parody and does not find the NAACP's assertion of its intellectual property rights to be an attempt to constrain free speech, the Court does not recognize any First Amendment concerns that must be addressed in the parody defense to trademark dilution.

covered by the news reporting and news commentary defense for the same reason. The direct

association between "NAACP" and "National Association for the Abortion of Colored People,"

separated only by a colon, demonstrates that Radiance did not use "NAACP" to report or

comment on news. To the contrary, "NAACP: National Association for the Abortion of Colored

People" insinuates that the acronym is short for a phrase that includes the word "Abortion" as

opposed to "Advancement." Radiance's use of "NAACP" in the title and graphic of the January

2013 Article as well as "National Association for the Abortion of Colored People" throughout

the article goes beyond gathering and conveying newsworthy information but associates the

famous NAACP acronym with the name of a fictitious organization.

The third defense exempts noncommercial uses of a trademark from trademark dilution

liability. In the absence of a definition of "noncommercial use" in the Lanham Act, the Court

looks to the statutory definition of a "use in commerce," codified in 15 U.S.C. § 1127:

> The term "use in commerce" means the bona fide use of a mark in the ordinary
> course of trade, and not made merely to reserve a right in a mark. For purposes of
> this chapter, a mark shall be deemed to be in use in commerce—. . .
>> (2) on services when it is used or displayed in the sale or advertising of
>> services and the services are rendered in commerce, or the services are
>> rendered in more than one State or in the United States and a foreign
>> country and the person rendering the services is engaged in commerce in
>> connection with the services.

The Court also considers the definition cited in the Congressional Record during the introduction

of legislation to create these defenses to trademark dilution, which explained "noncommercial

use" to include "parody, satire, editorial and other forms of expression that are not part of a

commercial transaction." *Dr. Seuss Enter., L.P.*, 924 F. Supp. at 1573-74 (citing 141 CONG.

REC. S19310 (daily ed. Dec. 29, 1995) (statement of Sen. Hatch)).

As previously held, although the January 2013 Article was politically and ideologically

charged, the Court finds that "NAACP" and "National Association for the Abortion of Colored

People" were used in connection with the offering for sale of services. While the politically-driven speech is protectable under the First Amendment, the absence of an economic motivation for the speech does not preclude a finding that the mark was used in commerce. *See Greater Baltimore Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Baltimore*, 721 F.3d 264, 285-86 (4th Cir. 2013) (citing *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983) ("[T]he potential commercial nature of speech does not hinge solely on whether the Center has an economic motive, as even *Bolger* does not preclude classification of speech as commercial in the absence of the speaker's economic motivation."). Radiance offered various opportunities for visitors of the Radiance Site and the TooManyAborted Site to donate to Radiance, pay to sponsor billboards, secure license content, or erect state-specific anti-abortion webpages for a fee.

In sum, Plaintiffs' use of "National Association for the Abortion of Colored People" and "NAACP" constitutes trademark dilution by tarnishment under Count III. However, because "Image Awards" and the Scales of Justice Seal fall under the nominative fair use defense, the NAACP has not established trademark dilution as to these marks.

### C. Damages

The standard for proof of damages for trademark infringement and trademark dilution under the Lanham Act is set forth as follows:

> When a violation of any right of the registrant of a mark registered in the Patent and Trademark Office, a violation under section 1125 (a) or (d) of this title, or a willful violation under section 1125 (c) of this title, shall have been established in any civil action arising under this chapter, the plaintiff shall be entitled, subject to the provisions of sections 1111 and 1114 of this title, and subject to the principles of equity, to recover
> (1) defendant's profits,
> (2) any damages sustained by the plaintiff, and
> (3) the costs of the action. . . .
> In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed. In assessing damages the

court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount. If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case. Such sum in either of the above circumstances shall constitute compensation and not a penalty. The court in exceptional cases may award reasonable attorney fees to the prevailing party.

15 U.S.C. § 1117(a).

The Court concludes that the NAACP is entitled to court costs for this action, pursuant to 15 U.S.C. § 1117(a). This award of court costs is expressly granted by statute. The term "costs of this action" must be interpreted with reference to "costs" defined in 28 U.S.C. § 1920, which includes fees and disbursements for the clerk, marshal, court reporter, experts, witnesses, interpreters, printing, copies and transcript. *See, e.g, PETA*, 263 F.3d at 370-71.

The NAACP requests an award based on Radiance's profits in the amount of $127,903.00. This amount represents Radiance's gross revenue in 2012 from contributions, gifts, grants, and similar amounts received.[68] A plaintiff may recover an award of profits against the defendant based on the defendant's gross sales of products bearing the infringing mark even though the defendant made no profit on the sales and actually lost money. *See Otis Clapp & Son, Inc. v. Filmore Vitamin Co.*, 754 F.2d 738, 744 (7th Cir. 1985) ("[T]he plaintiff should not be prejudiced by the defendant's inefficiency"). "A successful plaintiff in a trademark infringement case is not always entitled to a monetary award in addition to injunctive relief, since any award for damages is subject to the principles of equity which give the court discretion based upon a wide range of considerations." *Ramada Inns, Inc. v. Apple*, 482 F.Supp. 753, 757–58 (D.S.C. 1980).

While the Court finds that the NAACP may have been entitled to monetary damages on their trademark infringement and trademark dilution claims, its requested damages figure is

---

[68] NAACP Ex. 1042.

47

insufficient. The NAACP seeks damages for infringement and dilution in an article published in January of 2013, yet it requests a damage award of Radiance's gross revenue for the previous year. The NAACP has not demonstrated how Radiance's use of the NAACP Marks in 2013 can be compensated by an award based on Radiance's revenue in 2012. Moreover, the NAACP has not presented a reasonably certain accounting of any amounts traceable to Radiance's unlawful activity or to damage the NAACP has sustained. Without any additional figures by which to quantify a compensatory award besides Radiance's gross revenue in 2012, there is no evidence to support monetary damages beyond costs. Because the NAACP has not shown that Radiance profited from the infringing and diluting use and has not claimed that Radiance's conduct caused any monetary losses other than the litigation costs themselves, an award to the NAACP of either Radiance's profits or compensatory damages is inappropriate.

The NAACP also requests attorney fees. This Court "may award reasonable attorney fees," but only in "exceptional cases." 15 U.S.C. § 1117(a). The Fourth Circuit has interpreted "exceptional cases" to include cases where "the defendant's conduct was malicious, fraudulent, willful or deliberate in nature." *Retail Servs., Inc.*, 364 F.3d at 550 (awarding attorney's fees under the Lanham Act in view of defendant's "willful defiance and protraction of the judicial processes attempting to stop the illegalities"). The Fourth Circuit also requires the plaintiff to establish that the Defendant acted in bad faith. *Id.* "Determination of whether this standard has been satisfied is in the sole discretion of the Court." *Agri-Supply Co., Inc. v. Agrisupply.com*, 457 F.Supp.2d 660, 666 (E.D. Va. 2006) (citing *Shell Oil Co. v. Commercial Petroleum, Inc.*, 928 F.2d 104, 108 n. 6 (4th Cir. 1991) ("The court has broad discretion to award any monetary relief necessary to serve the interests of justice.")). In making this determination when the defendant prevails, courts consider "the closeness of the case, tactics of counsel, the conduct of the parties,

and any other factors that may contribute to a fairer allocation of the burdens of litigation between the winner and loser." *McAirlaids, Inc. v. Kimberly-Clark Corp.*, 7:12CV578, 2014 WL 495748, *2 (W.D. Va. Feb. 6, 2014) (citing *US Gates Intern., LLC v. Light Star Travel Agency, Inc.*, 2010 WL 5300822, at *1 (E.D.Va. Dec. 22, 2010). Other considerations include:

> economic coercion, groundless arguments, and failure to cite controlling law. Thus, the focus tends to be on the plaintiff's litigation conduct or pre-litigation assertion of rights. The question, however, is not whether snippets of the record or isolated arguments clearly lack merit. We must determine, in light of the entire case, whether defendants' claims and assertions were so lacking in merit that the action as a whole was "exceptional."

*Schwartz v. Rent A Wreck Am. Inc.*, 468 F. App'x 238, 255 (4th Cir. 2012) (internal citations omitted). "In showing that an exceptional case exists, the prevailing party bears the burden of showing defendant's malicious, fraudulent, willful or deliberate conduct by clear and convincing evidence." *Agri-Supply Co., Inc.*, 457 F.Supp.2d at 666.

The NAACP has not provided clear and convincing evidence that Radiance's declaratory judgment suit and related conduct as a whole were exceptional. Radiance failed to negotiate, reposted the January 2013 Article on the TooManyAborted Site after receiving the cease and desist letter, and sought funds to initiate a public relations effort regarding the instant controversy. However, these actions alone do not satisfy the clear and convincing evidence of bad faith and malicious, fraudulent, willful or deliberate conduct standard. In the Court's view, such conduct on the part of Radiance does not constitute the sort of willful infringement necessary to support a finding of bad faith and the award of attorney fees. It is not apparent from the facts in the record that Radiance's claims were totally groundless or that Radiance did not believe its use of the NAACP Marks was protected by the First Amendment. *See, e.g, PETA*, 263 F.3d at 370 (denying request for attorney fees where defendant thought he has a legitimate right to express himself in the manner which was determined to be infringing); *cf. San Francisco*

*Oven, LLC v. Fransmart, Inc.*, 222 F. App'x 235, 237, 2007 WL 737399 (4th Cir. 2007) (awarding attorney fees where the losing party brought a Lanham Act claim without any factual or legal support, solely to avoid dismissal). There is no clear and convincing evidence that Radiance's conduct went beyond the norm of commercial dealing or aggressive litigation. *See Schwartz*, 468 F. App'x at 255 (noting that appellants were "'entitled to test the legitimacy of the [trademark infringement] claim,' that appellants played 'hard ball' with Schwartz, and that 'they're entitled to do that. That's what happens in the commercial world.'"); *McAirlaids, Inc.*, 2014 WL 495748, *5 (denying request for attorney fees even in light of a "slash and burn" motions practice and taking irrelevant depositions, finding the defendant did not engage in "oppressive and vexatious litigation conduct"). Although a response to the NAACP's cease and desist letter may have demonstrated an attempt to resolve the controversy before involving the courts, it is not clear that Radiance's motivation for filing the lawsuit was completely improper, especially since the NAACP presented Radiance with a choice between facing legal action or ceasing present and future conduct which Radiance believed was protected. Therefore, applying the Fourth Circuit dual standard requiring malicious, fraudulent, willful or deliberate conduct as well as bad faith, the Court does not find clear and convincing evidence that this case is an "exceptional case" and the NAACP is not entitled to an award of attorney fees.

Lastly, the NAACP requests a permanent injunction against Radiance's use of the "National Association for the Abortion of Colored People" phrase in any manner that creates a likelihood of confusion or a likelihood of dilution among members of the public. 15 U.S.C. § 1116(a).[69] The TDRA entitles a prevailing mark holder to an injunction against uses of a famous mark likely to cause confusion if the opposing party is found liable of trademark dilution. *Id.* at

---

[69] The Lanham Act vests district courts with the "power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable, to . . . prevent a violation under [§ 1125(a) ]." 15 U.S.C. § 1116(a).

§ 1125(c)(1). Before an injunction may issue, the party seeking the injunction must demonstrate "(1) it has suffered an irreparable injury; (2) remedies available at law are inadequate; (3) the balance of the hardships favors the party seeking the injunction; and (4) the public interest would not be disserved by the injunction." *PBM Products, LLC*, 639 F.3d at 126.[70]  The Court recognizes irreparable harm through the evidence of reputational harm and actual confusion caused by Radiance's use of the NAACP Marks.  A permanent injunction will not prevent Radiance from expressing its views regarding the NAACP, but would guard the NAACP's trademark rights and protect the public from confusion regarding services offered under the NAACP Marks. *See Coca-Cola Co.*, 382 F.3d at 790-91 (rejecting a defendant's argument that a permanent injunction would constitute a content-based restriction on his speech in violation of the First Amendment, as an injunction would not restrict the ability of a defendant to express his anti-abortion views in non-confusing ways).  In addition, relief in the form of court costs does not adequately address any future infringing or diluting use of "NAACP" with "National Association for the Abortion of Colored People."  The Court finds a permanent injunction against any use of "National Association for the Abortion of Colored People" that creates a likelihood of confusion or dilution appropriate.

## IV. CONCLUSION

For the foregoing reasons, Radiance's request for declaratory judgment is **DENIED.** After carefully considering the evidence introduced at trial, the arguments of counsel, and the law pertaining to this matter, the Court **FINDS** that Radiance has violated the Lanham Act, provisions 15 U.S.C. §§ 1114 and 1125, as well as Virginia Code § 59.1-92.12(i).  On Counts I, II and IV, Radiance is liable for trademark infringement of trademarks "NAACP" and "National

---

[70] Neither party addresses these factors with specificity.  Radiance does not contest the issuance of a permanent injunction in its Proposed Findings of Fact and Conclusions of Law (ECF No. 87).

Association for the Advancement of Colored People." On Count III, Radiance is liable for trademark dilution by tarnishment of trademarks "NAACP" and "National Association for the Advancement of Colored People." Radiance is not liable for trademark infringement or trademark dilution in regards to the "Image Awards" and Scales of Justice Seal marks. Accordingly, the Court hereby **ENTERS JUDGMENT FOR THE NAACP** and awards the NAACP court costs and injunctive relief. An injunction against any use of "National Association for the Abortion of Colored People" that creates a likelihood of confusion or dilution as to any National Association for the Advancement of Colored People trademarks will be entered in a separate order. The Clerk is **DIRECTED** to send a copy of this Order to the parties and counsel of record.

> **IT IS SO ORDERED.**

Norfolk, Virginia
April 24, 2014

Raymond A. Jackson
United States District Judge